

**U.S. Department of Justice**

*United States Attorney*
*District of Connecticut*

*Connecticut Financial Center*    *(203)821-3700*
*157 Church Street, 25th Floor*    *Fax (203) 773-5376*
*New Haven, Connecticut 06510*    *www.justice.gov/usao/ct*

December 10, 2013

Terence S. Ward, Esq.
Kelly Barrett, Esq.
Office of the Federal Defender
10 Columbus Blvd, 6th Floor
Hartford, Connecticut 06106

Joshua Dratel
29 Broadway, Suite 1412
New York, New York 10006

    Re:    *United States v. Babar Ahmad*, 3:04CR301(JCH)

Dear Attorneys Ward, Barrett and Dratel:

    This letter confirms the plea agreement between your client, Babar Ahmad (the "defendant"), and the United States Attorney's Office for the District of Connecticut (the "Government" or "this Office") concerning the referenced criminal matter.

## THE PLEAS AND OFFENSES

    Babar Ahmad agrees to plead guilty to Counts One and Two of the Indictment in this case that charge him with conspiring to provide and providing material support to terrorists in violation of 18 U.S.C. § 2339A. He understands that to be guilty of these offenses the following essential elements of the offense must be satisfied for each count:

Count One:

1. The defendant joined an agreement between two or more persons to commit an offense against the United States, namely to provide material support or resources or to conceal or disguise the nature, location, source, or ownership of material support or resources; and

2. The defendant did so intending that such support or resources be used in preparation for or in carrying out, or in preparation for or in carrying out the concealment of an escape from the commission of, violations of one or more of the following: Title 18, United States Code, Section 956 (conspiracy to commit at a place outside the United States an

1

act that would constitute the offense of murder, kidnaping, or maiming if committed in the special maritime and territorial jurisdiction of the United States, where one of the conspirators committed an act within the jurisdiction of the United States to effect an object of the conspiracy); or Title 18, United States Code, Section 2332(b) (attempt or conspiracy to kill a national of the United States while such national is outside the United States).

Count Two:

1. The defendant provided material support or resources or concealed or disguised the nature, location, source, or ownership of material support or resources; and

2. The defendant did so intending that such support or resources be used in preparation for or in carrying out, or in preparation for or in carrying out the concealment of an escape from the commission of, violations of one or more of the following: Title 18, United States Code, Section 956 (conspiracy to commit at a place outside the United States an act that would constitute the offense of murder, kidnaping, or maiming if committed in the special maritime and territorial jurisdiction of the United States, where one of the conspirators committed an act within the jurisdiction of the United States to effect an object of the conspiracy); or Title 18, United States Code, Section 2332(b) (attempt or conspiracy to kill a national of the United States while such national is outside the United States).

The defendant understands that the term "material support or resources" includes currency, financial services, communications equipment, personnel, lodging, training, safehouses, false documentation and identification, facilities, transportation and other physical assets, including military items.

## THE PENALTIES

Each count carries a maximum penalty of 15 years imprisonment and a $250,000 fine. Thus, the total effective statutory maximums are 30 years imprisonment and a $500,000 fine.

The defendant also is subject to the alternative fine provision of 18 U.S.C. § 3571. Under this section, the maximum fine that may be imposed on the defendant is the greatest of the following amounts: (1) twice the gross gain to the defendant resulting from the offense; (2) twice the gross loss resulting from the offense; or (3) $250,000 for each count.

In addition, the defendant is obligated by 18 U.S.C. § 3013 to pay a special assessment of $100 on each count of conviction, for a total of $200. The defendant agrees to pay the special assessment on or before the date of sentencing unless he establishes an inability to pay on or before the date of sentencing through the financial disclosure to the Probation Office as part of the presentence investigation and report, in which case the defendant agrees to pay it as soon as practicable

2

FORFEITURE

Upon conviction of one or more of the federal crimes of terrorism offenses alleged in this Indictment, the defendant shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(G), all right, title, and interest in all assets: (i) of any individual, entity, or organization engaged in planning or perpetrating any federal crime of terrorism against the United States, its citizens or residents, or their property, and all assets affording any person a source of influence over any such entity or organization; (ii) acquired or maintained by any person with the intent and for the purpose of supporting, planning, conducting, or concealing any federal crime of terrorism against the United States, its citizens or residents, or their property; (iii) derived from, involved in, or used or intended to be used to commit any federal crime of terrorism against the United States, its citizens or residents, or their property; and (iv) of any individual, entity, or organization engaged in planning or perpetrating any act of international terrorism against any international organization or against any foreign Government, including but not limited to, the following:

1. One (1) Generic Computer Tower (no serial number available)
2. One (1) Generic Computer Tower (SN 8713439106374)
3. One (1) Gateway 500LS Computer (SN 1416193)
4. One (1) Compaq Armada M700 Laptop (SN 3JOBDTQGF568888)
5. One (1) Generic Computer (no serial number available)
6. Any and all loose electronic media, including but not limited forty (40) compact disks, eighty four (84) floppy disks, two (2) external hard drives, two (2) digital organizers, one (1) GPS device, and four (4) USB flash drives seized by authorities in searches of residences associated with the defendant in London, England.
7. Two (2) ballistic vests

The defendant understands and agrees that by virtue of his plea of guilty he waives any rights or cause of action to claim that he is a "substantially prevailing party" for the purpose of recovery of attorney fees and other litigation costs in any related forfeiture proceeding pursuant to 28 U.S.C. § 2465(b)(1).

**THE SENTENCING GUIDELINES**

Applicability

The defendant understands that the Court is required to consider any applicable Sentencing Guidelines as well as other factors enumerated in 18 U.S.C. § 3553(a) to tailor an appropriate sentence in this case. The defendant agrees that the Sentencing Guideline determinations will be made by the Court, by a preponderance of the evidence, based upon input from the defendant, the Government, and the United States Probation Office.

Acceptance of Responsibility

At this time, the Government agrees to recommend that the Court reduce by two levels the defendant's adjusted offense level under § 3E1.1(a) of the Sentencing Guidelines, based on the defendant's prompt recognition and affirmative acceptance of personal responsibility for the

offense. Moreover, should the defendant qualify for a decrease under § 3E1.1(a) and his offense level determined prior to the operation of subsection (a) is level 16 or greater, the Government will file a motion with the Court pursuant to § 3E1.1(b) which recommends that the Court reduce the defendant's Adjusted Offense Level by one additional level based on his prompt notification of his intention to enter his pleas of guilty. The defendant expressly understands that the Court is not obligated to accept the Government's recommendations on the reductions.

The above-listed recommendations are conditioned upon the defendant's affirmative demonstration of acceptance of responsibility, by (1) truthfully admitting the conduct comprising the offense(s) of conviction and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable under Sentencing Guideline § 1B1.3, and (2) truthfully disclosing to the Probation Office personal information requested, including the submission of a complete and truthful financial statement detailing the defendant's financial condition.

In addition, the Government expressly reserves the right to seek denial of the adjustment for acceptance of responsibility if the defendant engages in any acts, unknown to the Government at the time of the signing of this agreement, which (1) indicate that the defendant has not terminated or withdrawn from criminal conduct or associations (Sentencing Guideline § 3E1.1); or (2) could provide a basis for an adjustment for obstructing or impeding the administration of justice (Sentencing Guideline § 3C1.1). Moreover, the Government reserves the right to seek denial of the adjustment for acceptance of responsibility if the defendant seeks to withdraw his plea of guilty or takes a position at sentencing, or otherwise, which, in the Government's assessment, is inconsistent with affirmative acceptance of personal responsibility. The defendant understands that he may not withdraw his plea of guilty if, for the reasons explained above, the Government does not make one or both of the recommendations or seeks denial of the adjustment for acceptance of responsibility.

Stipulation

Pursuant to § 6B1.4 of the Sentencing Guidelines, the defendant and the Government have entered into a stipulation, which is attached to and made a part of this plea agreement. The defendant understands that this stipulation does not set forth all of the relevant conduct and characteristics that may be considered by the Court for purposes of sentencing. The defendant understands that this stipulation is not binding on the Court. The defendant also understands that the Government and the United States Probation Office are obligated to advise the Court of any additional relevant facts that subsequently come to their attention.

Guidelines Stipulation

The parties agree as follows:

The Guidelines Manual in effect on November 5, 2003 is used to determine the applicable Guidelines range.

The parties stipulate that the defendant's base offense level under U.S.S.G. §§ 2X2.1 and 2A1.5 is 28. The parties further stipulate that the base offense level is increased by 12 levels under § 3A1.4 because the offense involved or was intended to promote a federal crime of terrorism.

The parties disagree, however, as to the applicability of § 3B1.1. The defendant reserves his right to argue that no leadership enhancement applies under this section, while the government will argue that the base offense level is increased by an additional 4 levels because the defendant was an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive.

Thus, if the Court determines that enhancement under § 3B1.1 applies, the total offense level, before an adjustment for acceptance of responsibility, will be 44. Alternatively, if the Court determines that enhancement under § 3B1.1 does not apply, the total offense level, before an adjustment for acceptance of responsibility, will be 40.

Three levels are subtracted under U.S.S.G. § 3E1.1 for acceptance of responsibility, as noted above.

Pursuant to § 3A1.4(b), because the offense involved, or was intended to promote, a federal crime of terrorism, the defendant's criminal history is automatically assigned Criminal History Category Category VI.

Thus, if the Court determines that the four level enhancement under § 3B1.1 applies, the total offense level will be 41. With a Criminal History Category of VI, the Guidelines sentencing range is 30 years imprisonment given the statutory maximums of the offenses of conviction and a fine range of $25,000 to $250,000. U.S.S.G. § 5E1.2(c)(3). The defendant is also subject to a supervised release term of 2 years to 5 years. U.S.S.G. § 5D1.2.

If the Court determines that the enhancement under § 3B1.1 does not apply, the Guideline range is 37. With a Criminal History Category of VI, the Guidelines sentencing range is 30 years imprisonment given the statutory maximums of the offenses of conviction and a fine range of $20,000 to $200,000. U.S.S.G. § 5E1.2(c)(3). The defendant is also subject to a supervised release term of 2 years to 5 years. U.S.S.G. § 5D1.2.

The defendant reserves his right to seek departures or a non-Guideline sentence. The government reserves its right to respond and oppose any such requests.

<u>Plea Agreement Pursuant to Rule 11(c)(1)(C)</u>

The defendant and the Government agree, pursuant to Fed. R. Crim. P. 11(c)(1)(C), to a sentencing range of 0 to 25 years of incarceration. At sentencing, the Government will ask the Court to impose a term of incarceration of 25 years. The defendant reserves his right to ask for any sentence in the agreed-upon range (0-25 years), including a sentence of time served.

In accordance with Fed. R. Crim. P. 11(c)(1)(C), if the Court accepts this plea agreement, the Court must include the agreed disposition in the judgment and must sentence the defendant within the range of 0-25 years of imprisonment. Pursuant to Fed. R. Crim. P. 11(c)(5), if the Court rejects this plea agreement or the agreed-upon sentencing stipulation, the defendant shall be afforded the opportunity to withdraw his guilty plea. The defendant understands that he has no right to withdraw his guilty plea as long as the Court imposes a sentence of 25 years of imprisonment or less. The defendant further understands that if the Court rejects the plea agreement or the agreed-upon sentencing stipulation, the Government may deem this plea agreement null and void.

The defendant and the Government further agree that all other aspects of the sentence, including the imposition of any fine and the determination of the length and conditions of supervised release, about which the parties intend to make recommendations, will be left to the discretion of the Court.

At sentencing, the defendant will request that the District Court recommend to the Bureau of Prisons that the defendant be given credit for time spent in official detention in the United Kingdom prior to his extradition to the United States. The government will not oppose this request. The parties understand, however, that any initial decision regarding credit for time spent in official detention in the United Kingdom prior to extradition will be made by the Bureau of Prisons. To the extent permitted by law, the defendant reserves his right to bring any adverse ruling regarding credit for time served by the Bureau of Prisons before the District Court.

### Waiver of Right to Appeal or Collaterally Attack Conviction and Sentence

The defendant acknowledges that under certain circumstances he is entitled to challenge his conviction and sentence. The defendant agrees not to appeal or collaterally attack in any proceeding, including but not limited to a motion under 28 U.S.C. § 2255 and/or § 2241, the conviction or sentence imposed by the Court if that sentence does not exceed 300 months of incarceration and a 5 year term of supervised release, even if the Court imposes such a sentence based on an analysis different from that specified above. The Government agrees not to appeal Court's imposition of a sentence of imprisonment within the agreed-upon range. The defendant acknowledges that he is knowingly and intelligently waiving these rights. Furthermore, the parties agree that any challenge to the defendant's sentence that is not foreclosed by this provision will be limited to that portion of the sentencing calculation that is inconsistent with (or not addressed by) this waiver.

### Information to the Court

The Government reserves its right to address the Court with respect to an appropriate sentence to be imposed in this case. Moreover, the Government will discuss the facts of this case, including information regarding the defendant's background and character, 18 U.S.C. § 3661, with the United States Probation Office and will provide the Probation Officer with access to material in its file, with the exception of grand jury material.

6

## WAIVER OF RIGHTS

### Waiver of Venue

The defendant understands that by entering a plea, he is knowingly, intelligently and voluntarily waiving his right to a trial by an impartial jury in a particular place or "venue" in the United States. The defendant understands that the United States must prosecute an offense in a state or district in the United States where venue is proper. To the extent that the defendant believes venue is an issue, by entering into this plea agreement, the defendant expressly acknowledges that he is knowingly, intelligently and voluntarily waiving his right to be prosecuted or tried in another district or districts where venue may be proper; and he knowingly, intelligently and voluntarily consents to the disposition of this case in the District of Connecticut. Such a waiver of the right to be tried in a particular state and district is constitutionally permissible. See Singer v. United States, 380 U.S. 24, 35 (1965).

### Waiver of Trial Rights and Consequences of Guilty Plea

The defendant understands that he has the right to be represented by an attorney at every stage of the proceeding and, if necessary, one will be appointed to represent him.

The defendant understands that he has the right to plead not guilty or to persist in that plea if it has already been made, the right to a public trial, the right to be tried by a jury with the assistance of counsel, the right to confront and cross-examine the witnesses against him, the right not to be compelled to incriminate himself, and the right to compulsory process for the attendance of witnesses to testify in his defense. The defendant understands that by pleading guilty he waives and gives up those rights and that, if the plea of guilty is accepted by the Court, there will not be a further trial of any kind.

The defendant understands that, if he pleads guilty, the Court may ask him questions about each offense to which he pleads guilty, and if he answers those questions falsely under oath, on the record, and in the presence of counsel, his answers may later be used against him in a prosecution for perjury or making false statements.

### Waiver of Statute of Limitations

The defendant agrees that, should the conviction following defendant's plea of guilty pursuant to this plea agreement be vacated for any reason, then any prosecution that is not time-barred by the applicable statute of limitations on the date of the signing of this plea agreement (including any indictment or counts the Government has agreed to dismiss at sentencing pursuant to this plea agreement) may be commenced or reinstated against defendant, notwithstanding the expiration of the statute of limitations between the signing of this plea agreement and the commencement or reinstatement of such prosecution. The defendant agrees to waive all defenses based on the statute of limitations with respect to any prosecution that is not time-barred on the date the plea agreement is signed.

7

<u>Waiver in Right of Immigration Status</u>

The defendant understands that pleading guilty may have consequences with respect to his immigration status if he is not a citizen of the United States. Under federal law, a broad range of crimes are removable offenses, including the offense(s) to which the defendant is pleading guilty. Indeed, because the defendant is pleading guilty to providing material support to terrorists, removal is presumptively mandatory. Removal and other immigration consequences are the subject of a separate proceeding, however, and the defendant understands that no one, including his attorney or the district court, can predict to a certainty the effect of his conviction on his immigration status. The defendant nevertheless affirms that he wants to plead guilty regardless of any immigration consequences that his plea may entail, even if the consequence is automatic removal from the United States.

The defendant understands that he is bound by his guilty plea regardless of the immigration consequences of the plea and regardless of any advice the defendant has received from his counsel or others regarding those consequences. Accordingly, the defendant waives any and all challenges to his guilty plea and to his sentence based on those consequences, and agrees not to seek to withdraw his guilty plea, or to file a direct appeal or any kind of collateral attack challenging his guilty plea, conviction or sentence, based on the immigration consequences of his guilty plea, conviction and sentence.

## INTERNATIONAL PRISONER TRANSFER PROGRAM

If the defendant is eligible and applies to transfer his sentence pursuant to the international prisoner transfer program and meets all the terms and conditions set forth in this Plea Agreement, including the notification term described below, the United States Attorney's Office for the District of Connecticut agrees to support the defendant's transfer application. The United States Attorney's Office for the District of Connecticut further agrees that it will use reasonable, good faith efforts to support the defendant's transfer application by responding in a timely fashion to the Office of Enforcement Operations ("OEO") of the Criminal Division of the United States Department of Justice. The defendant acknowledges and understands, however, that the transfer decision rests in the sole discretion of the Office of Enforcement Operations ("OEO") of the Criminal Division of the United States Department of Justice and that the position of the U.S. Attorney's Office for the District of Connecticut is neither binding nor determinative of the positions of other federal agencies or on the final transfer decision of OEO. Defendant further understands that in addition to OEO, federal law and the underlying transfer treaties require that the foreign government must also approve the transfer. To facilitate his possible transfer, the defendant intends to request that the District Court recommend to the Bureau of Prisons that he be designated to serve his sentence of incarceration in MCC-Manhattan. The government will not oppose this request, but the parties understand that any designation is wholly within the discretion of the Bureau of Prisons and cannot be ordered by the District Court.

Prior to sentencing, the defendant shall notify the United Kingdom Ministry of Justice, in writing, that he will not contest the imposition of a term of supervision under applicable U.K. law, should he be transferred to the United Kingdom under the auspices of the International Prisoner Transfer Program.

8

## ACKNOWLEDGMENT OF GUILT AND VOLUNTARINESS OF PLEA

Babar Ahmad acknowledges that he is entering into this agreement and is pleading guilty freely and voluntarily because he is guilty of conspiring to provide and providing material support to terrorists. The defendant further acknowledges that he is entering into this agreement without reliance upon any discussions between the Government and him (other than those described in the plea agreement letter), without promise of benefit of any kind (other than the concessions contained in the plea agreement letter), and without threats, force, intimidation, or coercion of any kind. The defendant further acknowledges his understanding of the nature of the offense to which he is pleading guilty, including the penalties provided by law. The defendant also acknowledges his complete satisfaction with the representation and advice received from his undersigned attorneys. The defendant and his undersigned counsel are unaware of any conflict of interest concerning counsel's representation of the defendant in the case.

The defendant acknowledges that he is not a "prevailing party" within the meaning of Public Law 105-119, section 617 ("the Hyde Amendment") with respect to the count of conviction or any other count or charge that may be dismissed pursuant to this agreement. The defendant voluntarily, knowingly, and intelligently waives any rights he may have to seek attorneys' fees and other litigation expenses under the Hyde Amendment.

## SCOPE OF THE AGREEMENT

The defendant acknowledges that this agreement is limited to the undersigned parties and cannot bind any other federal authority, or any state or local authority. The defendant acknowledges that no representations have been made to him with respect to any civil or administrative consequences that may result from this plea of guilty because such matters are solely within the province and discretion of the specific administrative or governmental entity involved.

## COLLATERAL CONSEQUENCES

The defendant further understands that he will be adjudicated guilty of each offense to which he has pleaded guilty and will be deprived of certain rights, such as the right to vote, to hold public office, to serve on a jury, or to possess firearms. Finally, as described above, the defendant may be subject to deportation or removal from the United States as a consequence of his conviction as well as exclusion from admission or readmission to the United States. The defendant understands that pursuant to section 203(b) of the Justice For All Act, the Bureau of Prisons or the Probation Office will collect a DNA sample from the defendant for analysis and indexing. Finally, the defendant understands that the Government reserves the right to notify any state or federal agency by which he is licensed, or with which he does business, as well as any current or future employer of the fact of his conviction.

## SATISFACTION OF FEDERAL CRIMINAL LIABILITY; BREACH

The defendant's guilty pleas, if accepted by the Court, will satisfy the federal criminal liability of the defendant as a result of his conspiring to provide and providing material support to terrorists (which forms the basis of Counts One and Two of the Indictment in this case) and as a result of his conspiring to murder or maim persons overseas and conspiring to commit international money laundering (which forms the basis of Counts Three and Four of the Indictment in this case), all as charged in the District of Connecticut. After sentencing, the Government will move to dismiss Counts Three and Four of the indictment as they apply to this defendant.

The defendant understands that if, before sentencing, he violates any term or condition of this agreement, engages in any criminal activity, or fails to appear for sentencing, the Government may void all or part of this agreement. If the agreement is voided in whole or in part, defendant will not be permitted to withdraw his plea of guilty.

## NO OTHER PROMISES

The defendant acknowledges that no other promises, agreements, or conditions have been entered into other than those set forth in this plea agreement, and none will be entered into unless set forth in writing, signed by all the parties.

This letter shall be presented to the Court, in open court, and filed in this case.

Very truly yours,

DEIRDRE M. DALY
ACTING UNITED STATES ATTORNEY


_____
STEPHEN B. REYNOLDS
ASSISTANT UNITED STATES ATTORNEY


_____
ALEXIS L. COLLINS
TRIAL ATTORNEY, CTS-DOJ


_____
RAY MILLER
ASSISTANT UNITED STATES ATTORNEY

10

The defendant certifies that he has read this plea agreement letter and its attachment(s) or has had it read or translated to him, that he has had ample time to discuss this agreement and its attachment(s) with counsel and that he fully understands and accepts its terms.

_____     12/10/2013
BABAR AHMAD                 Date
The Defendant

I have thoroughly read, reviewed and explained this plea agreement and its attachment(s) to my client who advises me that he understands and accepts its terms.

_____     12/10/13
TERENCE WARD, ESQ.       Date
Attorney for the Defendant

_____     12/10/13
KELLY BARRETT, ESQ.      Date
Attorney for the Defendant

_____     12/10/13
JOSHUA DRATEL, ESQ.      Date
Attorney for the Defendant

Stipulation

1. The defendant, Babar Ahmad, and the government stipulate to the following offense conduct that gives rise to the defendant's agreement to plead guilty to Counts One and Two of the indictment in this case.

2. Babar Ahmad is a resident and citizen of the United Kingdom. During the entire period of this indictment he was resident and living in the United Kingdom.

3. Between 1997 and 2002, Mr. Ahmad helped to establish and operate a family of websites collectively known as Azzam Publications. During the entire period of its existence, Azzam Publications was an entity based in the United Kingdom. Azzam Publications was named after Sheikh Abdullah Azzam.

4. Azzam Publications established its first website in 1997. This website first went online on February 20, 1997 at www.webstorage.com/~azzam and then subsequently at www.azzam.com. From January 1997 until December 1998, Azzam Publications purchased web hosting services from Webstorage.com. Webstorage.com was owned by Internet Quality Services (IQS) in Nevada.

5. From February 1999 until September 2001, Azzam Publications purchased web hosting services from Alabama-based Allwebco.com. Allwebco was a reseller of internet web-hosting services who purchased and leased bandwidth and server storage space from OnLineMarketing (OLM), LLC, a web hosting company whose headquarters were located in Trumbull, Connecticut. OLM stored Azzam.com's data on its servers in Lisle, Illinois. Mr. Ahmad had administrative access to Azzam.com.

6. Azzam.com went offline on September 27, 2001 and was no longer hosted by Allwebco, on OLM servers. Azzam.com remained offline until November 20, 2001. In October 2001, Azzam Publications received donated web space on a server in Canada for Azzam.com. Thereafter, from late November 2001 until July 2002, when Azzam.com shut down permanently, it was hosted through a provider of internet webhosting services located in Indonesia.

7. The second website established by Azzam Publications was www.qoqaz.net. Qoqaz.net was established with and hosted by Swift Internet, a company located in the United Kingdom. Qoqaz.net went online in November 1999 and was primarily focused on the war in Chechnya. ("Qoqaz" is an Arabic term referring to the Caucasus region between the Black Sea and the Caspian Sea along the Russian border.). This English language site posted information from the Arabic language www.qoqaz.com. The home page of Qoqaz.net stated, "Qoqaz.net is an independent site and a translation of the Arabic Sawt-ul-Qoqaz. It has no affiliations or agreements with the latter." Qoqaz.net had mirror sites, that is, identical sites in English that published the same content as Qoqaz.net but with different internet addresses. Qoqaz.net and its mirror sites were hosted by Swift Internet in the United Kingdom and on web space donated from around the world. Qoqaz.net and its mirror sites were operated out of the United Kingdom. One of Qoqaz.net's mirror sites was hosted until September 2001 on donated web space belonging to a web hosting company in New Jersey named MindCraft, Inc., which utilized DNS servers resolving to CI Host in Bedford, Texas. Qoqaz.net shut down as an independent site on September 15,

2001. From November 2001 until the permanent shut down of Azzam.com in July of 2002, the Qoqaz.net domain automatically redirected users to Azzam.com. Mr. Ahmad personally helped to establish and had administrative access to Qoqaz.net.

8. Azzam Publications accepted web-based voluntary assistance from individuals around the world, including the United States. This assistance took the form of translation, proofreading, and donations of web space for the Azzam Publications websites. No administrators of the websites were based outside the United Kingdom.

9. From February 20, 1997 until April 04, 1998 www.webstorage.com/~azzam included a page entitled, "Who is Azzam Publications?" The page stated: "Azzam Publications has been set up to propagate the call for Jihad, among the Muslims who are sitting down, ignorant of this vital duty. . . . Our purpose is to respond to Allah's call in Sura Nisa, ayah 84 (which means): 'Then Fight (O Muhammad) in the cause of Allah, you are not accountable except for yourself, and incite the believers to fight along with you . . . .' Thus the purpose of Azzam Publications is to 'Incite the believers' and also secondly to raise some money for the brothers." In 2000, an updated FAQs section of the website stated: "Since the number of sites on the Internet dealing exclusively about Jihad are very small in number, we have taken this obligation upon ourselves . . . ." The websites were primarily focused on the wars in Bosnia and Chechnya. The sites posted articles on how to train for Jihad, how to support the Jihad and Mujahideen, and gave guidance on how women could participate in Jihad. The sites posted biographies of martyrs.

10. Azzam Publications also produced and/or sold a number of audio and video products that were advertised on the websites. Examples of these products included the audio cassettes entitled "In the Hearts of Green Birds" (1996) and "Under the Shades of Swords" (1997), which featured first-hand accounts of Muslim soldiers detailing their personal experiences on the battlefield in Bosnia during the 1992-95 war. These audio cassettes were produced in the United Kingdom. Mr. Ahmad was one of the narrators of these audio cassettes.

11. Azzam Publications also produced in the United Kingdom a VHS video cassette entitled "The Martyrs of Bosnia Part I" which was an English translation of a video originally produced by the 3rd Army Corps of the Bosnian Army. The video contained real combat footage from the war in the period 1992-93 and biographies and images of deceased soldiers.

12. Two other video products not produced by Azzam Publications were also advertised on Qoqaz.net. The first was a CD-ROM entitled "Russian Hell in the Year 2000," which was a 50-minute video of battles in Chechnya in 1999 and 2000 between the Chechen Resistance and Russian troops. The second was a CD-ROM entitled "Chechnya from the Ashes," which was a compilation of four videos: "A Library of Russian Crimes Against Humanity," "Massacres in Chechnya," "Martyrs of the Caucasus," and "Russian Hell Part Two."

13. Customers could purchase products from Azzam Publications by mail order. In order to do so, they had to mail a printed order form and cash or a UK Postal Order to Azzam Publications' post office box in London, United Kingdom. The post office box address was publicized on the Azzam websites.

14. Mr. Ahmad conspired to provide and provided material support for terrorism in three ways through Azzam.com: (1) he solicited and conspired to provide funds for the Taliban regime in Afghanistan; (2) he solicited and conspired to provide personnel for the Taliban regime in Afghanistan; and (3) he solicited and conspired to provide physical items for the Taliban regime in Afghanistan. Mr. Ahmad did so intending that such support or resources be used in preparation for or in carrying out violations of one or more of the following: Title 18 United States Code Section 956 (conspiracy to commit at a place outside the United States an act that would constitute the offense of murder, kidnaping, or maiming where one of the conspirators committed an act within the jurisdiction of the United States to effect an object of the conspiracy); or Title 18, United States Code, Section 2332(b) (attempt or conspiracy to kill a national of the United States while such national is outside the United States).

15. On February 1, 2001, Azzam Publications posted on its websites an article entitled "What You Can Do to Help the Taliban." This article provided detailed instructions on how to raise, transport and personally deliver over US$ 20,000 in cash to the Taliban government via its consulate in Pakistan. At that time the Taliban was engaged in an armed conflict with the Northern Alliance.

16. In bold red capital letters, the article read, "URGENT APPEAL FOR CASH DONATIONS." The article stated: "An appeal for cash donations is especially urgent at this time (Spring 2001) since a joint U.S./Russian chemical strike on Afghanistan is imminent . . . After U.N. sanctions and international isolation, the Taliban are wholly dependent on their Muslim brothers and sisters around the world to come to their aid . . . there are many things the Taliban is unable to do due to the lack of funds. As a reasonable estimate, at least $10 million a month are required in donations from outside the country to be of any meaningful use . . . . At present, it is relatively simple for either Muslim organisations or wealthy individuals, to assist the Taliban financially. The procedure is given below: (a) Muslim communities, organisations, mosques and centres should collect money for the people of Afghanistan through appeals, collections and fundraising events. It is advisable to hold the appeals in the name of the people of Afghanistan rather than the Taliban, since the enemies of Islam will try to prevent fundraising for the Taliban in the future."

17. The article stated, "(b) All the money collected should be converted into US$ in cash and deposited with two or three wealthy, trustworthy and respected members of the community or organisation. . . . (c) At the end of each month, depending on the amount of the money, two or three of the same trustworthy members or elders of the community should travel to Karachi, Pakistan with the money in US$ in cash."

18. The article stated, "If a large amount of money is involved, it is probably advisable to send one or two trustworthy, young, strong, fit Muslims with the delegation for protection of the money and the delegation. The delegation should carry an official letter on the letterhead of the organisation or centre, giving the full names of the members of the delegation and that they are carrying donations for the suffering people of Afghanistan. Sample text for such a letter is found below:

'To Whom it May Concern:

We would like to introduce our official delegation from the Islamic Centre of South Arlington who

are carrying monetary assistance for the suffering people of Afghanistan.
The members of this delegation are listed below:

1. Abdullah Muhammad Saeed, American Passport Holder
2. Ishaq Mansoor Al-Katib, American Passport Holder
3. Muhammad Abdur-Rasheed, Canadian Passport Holder

They are carrying a quantity of cash donations which have been collected by the Muslim community of South Arlington and are to help the suffering people of Afghanistan. We request all those whom it may concern to allow the bearers of this letter to pass freely without let or hindrance and to provide them such assistance and protection as may be necessary.

[Signed]

Chairman of the Islamic Centre of South Arlington, USA'"

19. The article stated, "UNDER NO CIRCUMSTANCES MUST ANY OF THE MONEY BE HANDED OVER TO ANY OFFICIAL OF ANY AIRPORT OR COUNTRY IN THE WORLD, EVEN FOR A FEW SECONDS. IF THERE IS A MAJOR PROBLEM, SAY THAT YOU WILL RETURN BACK TO YOUR COUNTRY WITH THE MONEY BUT THAT YOU WILL NOT HAND OVER THE MONEY TO ANYONE UNDER ANY CIRCUMSTANCES, EXCEPT ITS INTENDED RECIPIENTS. IF THEY OFFER TO KEEP THE MONEY SAFELY FOR YOU UNTIL YOU DEPART, REFUSE AND INSIST TO STAY WITH THE MONEY, EVEN IF IT MEANS STAYING IN THE AIRPORT UNTIL THE NEXT FLIGHT."

20. The article stated, "(d) Once safely in Karachi, Pakistan, the money should be handed over to the Official Taliban Consul-General, Mullah Rahmatullah, at the Taliban Consulate in Karachi, together with a copy of your official letter from your organisation . . . It may be necessary to go to the Consulate first in person with your official introductory letter and make an appointment with the Consul-General first. It is better not to make this appointment over the telephone since the enemies of Islam will try everything possible to prevent financial help from reaching the Taliban . . . . If you do call, it is better to call from a public call centre and not give your name or the name of your centre over the telephone . . . you will also have the opportunity to request anything specific you would like the money to be used for (if possible), ask questions about their current needs and perhaps arrange a visit into Afghanistan if you have time."

21. The article stated, "Although, there is no minimum amount to the donation that you can give, since the Consul-General will also be busy with other things, it is advisable that you wait until your donation reaches at least $20,000 before travelling to Pakistan."

22. The site solicited personnel and physical items in addition to funds. The website stated: "Money alone is not sufficient. . . . Rather, educated and experienced Muslims are required in the forms of consultants and managers who can visit Afghanistan, perform a study of a project . . . return back to their countries and research how much that project is going to cost, raise the finance for that project and return to Afghanistan to supervise the completion of that project."

23. Mr. Ahmad solicited and conspired to provide physical assets for the Taliban regime in Afghanistan. The Azzam.com website specifically asked for the donation of military suits and gas masks for the Taliban regime.

24. On a Canadian web server in use by Azzam Publications, there was a copy of a statement made by a Pakistani cleric, Muhammad Abdul-Qadir, called "Appeal to Pakistanis All Over the World." The statement read: "To Pakistanis in Pakistan, America, Britain, Canada, Australia, the Middle East, and all other countries of the World . . . . Under orders from America the Pakistani Government has been told to tighten the issuing of entry visas to everyone they suspect of going to help the Muslims of Afghanistan . . . . For this reason, an appeal has been made for Pakistanis all over the World to make arrangements to travel to Pakistan, then Afghanistan, to participate in this blessed Jihad and defend the Islamic land of Afghanistan . . . . Because it is likely that they are the only ones able to travel to Pakistan without any immigration difficulties . . . ."

25. The statement read, "On the visa application form, write that the purpose of your trip is to visit relatives . . . . Remember that the Pakistani Government is NOT on the side of the Muslims and they will not be sympathetic to your desires to go and fight in Afghanistan . . . . Try to avoid mentioning your plans to other people, including your family, if you suspect that they are careless with their tongues."

26. The written stipulation above demonstrates that Mr. Ahmad conspired to provide and did provide material support for terrorism in violation of 18 U.S.C. §§ 371 and 2339A by soliciting funds, personnel and equipment for the Taliban regime in Afghanistan. This stipulation is incorporated into the preceding plea agreement. Mr. Ahmad and the government reserve their right to present additional relevant offense conduct to the attention of the Court in connection with sentencing.

_____
STEPHEN B. REYNOLDS
ASSISTANT UNITED STATES ATTORNEY

_____
ALEXIS L. COLLINS
TRIAL ATTORNEY, CTS-DOJ

_____
RAY MILLER
ASSISTANT UNITED STATES ATTORNEY

_____
BABAR AHMAD
The Defendant

_____
TERENCE WARD, ESQ.
Attorney for the Defendant

_____
KELLY BARRETT, ESQ.
Attorney for the Defendant

_____
JOSHUA DRATEL, ESQ.
Attorney for the Defendant