```
 1                    UNITED STATES DISTRICT COURT

 2                      DISTRICT OF CONNECTICUT

 3   _____
     UNITED STATES OF AMERICA    )
 4               Government     ) NO: 3:04CR301(JCH)
                                )      3:06CR194(JCH)
 5                              )
     vs.                        ) July 16, 2014
 6                              ) 9:34 a.m.
                                )
 7   BABAR AHMAD                 )
     and SYED TALHA AHSAN        )
 8               Defendants. )
     _____
 9                                141 Church Street
                                  New Haven, Connecticut
10
                        SENTENCING HEARING
11

12
     B E F O R E:
13               THE HONORABLE JANET C. HALL, U.S.D.J.

14   A P P E A R A N C E S:

15
     For the Government  :    Stephen Benjamin Reynolds
16                            Raymond F. Miller
                              U.S. Attorney's Office
17                            157 Church Street
                              New Haven, CT 06510
18
     For the Defendant   :
19   Babar Ahmad                 Terence S. Ward
                                 Kelly M. Barrett
20                               Federal Public Defender's Office
                                 10 Columbus Blvd., 6th Floor
21                               Hartford, CT 06106

22                               Joshua L. Dratel
                                 Law Offices of Joshua L. Dratel,
23                               P.C.
                                 29 Broadway
24                               New York, NY 10006

25                        - Continued -
```

```
 1
     For the Defendant
 2   Syed Talha Ahsan     :     Richard A. Reeve
                                Anand Venkata Balakrishnan
 3                              Michael Sheehan
                                Sheehan & Reeve
 4                              350 Orange St., Suite 101
                                New Haven, CT 06511
 5

 6

 7   Court Reporter       :        Terri Fidanza, RPR

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1           THE COURT:  Good morning.  We're here this morning

2   in the matter of the United States of America versus Babar

3   Ahmad, Case Number 304CR301, and the matter of the United

4   States of America versus Syed Talha Ahsan, 306CR194.

5           If I can have appearances, please.

6           MR. REYNOLDS:  Good morning, your Honor.  Steven

7   Reynolds and Ray Miller on behalf of the government.  And

8   also with us at counsel table is Special Agent Craig Bowling

9   of the Department of Homeland Security and Special Agent Mike

10  Bush of the FBI.

11          THE COURT:  Good morning to all of you.

12          MR. WARD:  Terrence Ward from the federal defenders

13  office, with me is Kelly Barrett from the Federal Defenders

14  Office, Joshua Dratel from the New York City.  And Babar

15  Ahmad who is present.

16          THE COURT:  Good morning to all of you.

17          MR. REEVE:  Richard Reeve along with me is Anand

18  Balakrishna and Michael Sheehan and Mr. Ahsan.

19          THE COURT:  Good morning to all of you.

20          Today the Court intends to proceed to the sentencing

21  in these matters.  Before I do that, there are a number of

22  preliminary matters, I guess, that I need to address because

23  they relate to what facts I will find.

24          First is the question of whether and what of the

25  testimony of the cooperating witness the Court credits.  The

1    witness obviously testified to a great amount of evidence.  A

2    significant portion of it related to Mr. Ahsan and his

3    travels to Afghanistan, which I understand in principal part,

4    Mr. Ahsan acknowledges as roughly accurate.  By roughly, I

5    mean given the fact that it's been over 15 or 14-years period

6    of time and that people's memories are not perfect, that

7    essentially I understood Mr. Ahsan to say that the

8    recollections of the cooperating witness are essentially

9    consistent with his recollections.  And so in that respect, I

10    accept the testimony of the cooperating witness.  And I do so

11    primarily because it is corroborated by and accepted by Mr.

12    Ahsan.

13          With respect to the rest of his testimony, the Court

14    is in the difficult position of having no record of what was

15    shown to the witness and when it was shown to the witness.

16    In making that statement, I mean to suggest no improper

17    conduct by anyone at any time.  It is just a function of the

18    fact that when a person sees a document after incidents that

19    are accounted in the document, it is very easy for one's

20    memory to become the document and not the incident recounted

21    in the document -- at least as to specifics.

22          Further, the Court notes that none of what

23    corroborates, as claimed by the government, the testimony of

24    the cooperating witness, relates to the question of whether

25    Mr. Ahmad was in Afghanistan.  I don't believe that there --

1    in other words, I understand the argument of the government

2    is I should believe him about that subject because he is

3    corroborated in his testimony on other matters.  Those other

4    matters being matters as to which there are documents.  And

5    again, that brings me back to my initial observation of not

6    knowing when and what was shown to the witness before he ever

7    made a statement as to whether the documents are his memory

8    or whether his memory is consistent with, but not

9    supplemented or supported in his memory by the documents.

10           With respect to the travel of Mr. Ahmad to

11   Afghanistan, my understanding is there are no travel

12   documents despite the fact that he's alleged to have gone on

13   two occasions and for more than a few days on each occasion.

14   Further, there are records that he was in London in early

15   January of the year in question that the witness says -- now

16   says he saw him in Afghanistan in January.

17           Finally, in the course of the examination of the

18   witness, he testified most recently that he saw Mr. Ahmad at

19   the House of Pomegranates in Kandahar for less than a week in

20   January of 2001.  Prior to that testimony, he gave the --

21   well, I should correct myself.  We don't know what he said

22   previously because there either are no transcripts or the

23   transcripts were not turned over for various security

24   reasons, or because the UK government wouldn't turn them over

25   to the United States, and they, therefore, could not turn

1    them over to the defense.  The bottom line is, we do not have

2    transcriptions of what he said about Mr. Ahmad in '04 and '08

3    as to being in Afghanistan.  What we do have, and which the

4    government properly turned over given they finally got access

5    to them, are the summaries by law enforcement of what was

6    said by this witness in various debriefings.

7          And what was said by him in various debriefings is

8    that he saw Babar in Kandahar in December of 2000, and that

9    Mr. Ahmad spent one to three months training there, which it

10   is not clear was three months before December or after.  But

11   if after, that has problems with Mr. Ahmad's conduct and

12   appearance in London in the first week of January of 2001.

13   When questioned about that testimony at the deposition,

14   however, the witness said it was incorrect.  In effect, he

15   disavowed the law enforcement officer's summary of what he

16   said in 2004.  In another debriefing in '04, the witness is

17   reported to have claimed that Mr. Ahmad was in Julaybib in

18   2001, which city is hundreds of miles away from Kandahar, the

19   city in which he testified most recently to have seen Mr.

20   Ahmad in 2001.

21          Again, at the deposition, the witness denied that he

22   said that Mr. Ahmad was in Julaybib but, again, there are no

23   transcripts available to the defense or the Court to see if,

24   in fact, his recollection of what he said is accurate or that

25   law enforcement's recording of what he said is accurate.

1            At yet another debriefing in 2008, the witness

2    claimed to have seen Mr. Ahmad in January of 2000, which, of

3    course, is a year off of his most recent testimony.  The

4    witness denies that statement, claims that he interchanged

5    the dates.  Again, there are no transcripts to show whether,

6    in fact, he said 2000 or that's a mistranscription by someone

7    else or he misspoke.  The agent's notes reflect the 2000

8    date.  Also at other 2008 debriefings, the witness claimed to

9    have seen Mr. Ahmad in Afghanistan in February of 2000.  And

10   again in 2008, the witness claimed to have seen Ahmad in the

11   spring of 2000, none of which is consistent with his most

12   recent testimony in this case.  On cross-examination, the

13   witness again denied saying any of those things despite the

14   fact they are recorded by law enforcement as things that he

15   said.

16           Now the Court understands, I have seen too many

17   times, a situation where a witness gets on the stand and says

18   he was there on Monday and the defendant gets up and

19   cross-examines with the FBI 302 report, or the debriefing, in

20   which the witness said he was there on Tuesday.  The witness

21   says, I didn't say Tuesday.  I said Monday.  So I understand

22   there can be inconsistencies between what somebody listening

23   to a person hears and what he hears and then writes down

24   versus what the witness actually said.  But without the

25   benefit of transcripts, which I gather there were transcripts

1    but were not provided to us, us being anyone in the U.S.

2    Then they -- and the number of times in which it appears,

3    this misrecording of what this witness claims to have said in

4    relation to what he now says is the case, is quite a lot.  I

5    don't know that I can ever say I have seen somebody disavow a

6    law enforcement summary this many times.

7          Further, at a trial before a jury and under oath as

8    well as during the deposition in this case, the witness

9    claimed that he had been on the front lines near Kabul for

10   six weeks, from December 2000 to the middle or end of January

11   2001.  If that's the case, and if Mr. Ahmad was in London on

12   January 7 and 8, it strikes the Court as impossible for the

13   witness to have seen him in Afghanistan.  I believe at some

14   point the witness, when pressed about these inconsistencies,

15   indicated that he would really need a three-month window,

16   plus or minus three months, to be able to testify about when

17   things happened.  That may be the case.  We are talking about

18   events which occurred 15 or 14 or 13 years ago.

19         It does strike me that someone either is or isn't in

20   a place, that's a pretty simple fact, and that's pretty easy

21   to recall.  But I can only judge credibility based on what's

22   in front of me.  And it strikes me that from the various

23   versions given by the witness, at least as recorded by law

24   enforcement as to what he saw or didn't see or when he saw it

25   and where he saw it in relationship to what he's now

1     testifying to, that without further basis, i.e., transcripts

2     of the interviews and the debriefings, the Court is unable to

3     accept the testimony of the cooperating witness that he,

4     absent any other corroboration, as I say, that he indeed saw

5     Mr. Ahmad in Afghanistan.  And absent any other evidence

6     about that fact, the Court finds that he was not in

7     Afghanistan.

8              I accept what the cooperating witness has said about

9     Mr. Ahsan, but I do not accept his testimony that Mr. Ahmad

10    was in Afghanistan or that he funded the witness to go to

11    Afghanistan.  I find credible the evidence of the monies

12    withdrawn, the limited discovery the defendants had about

13    monies withdrawn by the cooperating witness from his own

14    account just on the eve of going to Afghanistan, and lastly,

15    I do not find what I think the witness claimed is that Mr.

16    Ahmad ordered the cooperating witness to go to Afghanistan.

17    Do I find that Mr. Ahmad was aware he was going to

18    Afghanistan, that he thought it was a good idea that he go to

19    Afghanistan, that he encouraged him to go to Afghanistan to

20    get training for Jihad?  Yes, I find those things.

21             The other issues that remain open relate to the six

22    documents that have been the subject of discussion over a

23    series of several days.  With respect to the explosives

24    document which was found in the common room in a hard drive

25    at the Imperial College area where Mr. Ahmad had his office,

1    the Court does not find by a preponderance of the evidence

2    that it is either his document or even that it is jointly

3    undertaken activity as that's defined in the Chapter 1.

4              First of all, it was not in his possession.  And

5    while it is in an area near him and while I don't have any

6    evidence of anybody else there that might like to talk about

7    explosives at the Imperial College computer facilities, I do

8    have a suggestion from the defense that people drop off

9    computer hard drives and other equipment and that it isn't

10   necessarily Mr. Ahmad's.  To be honest, though, the thing

11   that persuades me about it is that I see nothing else in all

12   of the thousands of pages that I have reviewed that ever

13   suggests that Mr. Ahmad was talking about explosives, or

14   there's nothing on the website about it, it's not in any

15   e-mails.  I'll refer to the classified record yesterday in

16   which there's something that might suggest he wasn't because

17   he didn't respond to a request.  So for all of those reasons,

18   I don't see how it is reasonably foreseeable to him, let

19   alone jointly undertaken.

20             With respect to the org chart, I find that is his

21   document.  It's not jointly undertaken, it is his.  It was

22   found in his parent's, it was created in January of 2000.

23   I'm not sure I know who everybody is on the chart, but I

24   certainly think that if he didn't actually create it,

25   certainly it is ascribable to him.  It involves names of

1    people, including himself, and activities, manning the dowa

2    to sell the videos, all of which is consistent with the

3    activity in the case.

4        With respect to the equipment document, that was in

5    the common room, however, it is consistent with equipment

6    which he's acknowledged he caused sent to Chechnya.  I do not

7    find it relates to anything to do with Al-Qaida.  I believe

8    he sent two sat phones and an encrypted laptop, and I read

9    the document to be involved in discussing that.  So in that

10   respect, I do ascribe that document to him, if not directly,

11   then as reflecting jointly undertaken activity because it

12   does reflect something he has acknowledged that he did.

13       With respect to the dec one document written in

14   2001, that was found in his locked office and I see no way

15   not to find that's his document.  However, I do not read it

16   the way the government wishes me to read it.  I went back

17   last night and again this morning and read it.  And I do not

18   find the reference to Abdullah to be to Osama bin Laden, both

19   by the absence of the Abu and also by the context of the

20   reference to the Abdullah.  I don't think it makes sense that

21   it's Osama bin Laden.  And the reference to the first Saif, I

22   do not believe is the number three Al-Qaida person because

23   later on that name is spelled out fully and properly.  So in

24   the beginning of the documents where I think the government

25   wishes to argue this is evidence of Al-Qaida connections, the

1    Court does not accept that argument.

2         Lastly, on the details and briefing documents.  And

3    I'm not really sure why I spent so much time worrying, I

4    guess, quote, unquote, over these.  There's a lot in these

5    documents that is similar to what Mr. Ahmad has admitted.  I

6    do not find them to be his personally.  One is definitely, by

7    just the whole context and how he's referred to, was not

8    written by him.  They are not found in his home or his

9    parent's home or his office, so they are not his in that

10   sense.  They are not prepared, I think, by him personally.

11   So the question really becomes, are they jointly undertaken

12   activity and reasonably foreseeable to him?  They talk a lot

13   about getting people into Afghanistan.  About being careful

14   in terms of getting people through Pakistan because

15   Pakistani's didn't want people going into Afghanistan.  A lot

16   of that is consistent with other documents about Mr. Ahmad

17   corresponding with his cousin, having contacts over there.  I

18   believe I date the document some time in 2000.  I don't know

19   if that's accurate.  I believe late 2000.  I'm going to find

20   that it is jointly undertaken activity.  I cannot find that

21   he wrote it.  I find he didn't write it.  I find he -- I'm

22   not even sure he was aware of it, but it is consistent with

23   some things that Mr. Ahmad, I find, was engaged in.  And

24   therefore, I will find it to be jointly undertaken activity

25   because it was reasonably foreseeable to him.

1          At this point, I intend to begin the process, which

2    will be very painful, of going through the PSR.

3          I suggest you have a pen ready and you mark it up

4    because when I'm done, I'm going to ask what objections, if

5    any, are there to the court's findings.  The court adopts the

6    cover sheet except that the sentencing date is altered to be

7    today's date, July 16 at 9:30.  There are three pages to the

8    cover sheet.  The court adopts paragraph 1.  The court adopts

9    paragraph 2 except the sentencing date is altered.  The court

10   adopts paragraph 3 except it inserts in the sixth line after

11   the reference to 3A1.4(b) of the sentence, the guidelines are

12   25 years.

13         Further, the next sentence two lines down refer to

14   the parties agree to.  I would insert in a maximum sentence

15   of 25 years.  With respect to the fourth line, the date for

16   the sentencing of Mr. Ahsan needs to be amended, otherwise I

17   adopt it.  I adopt paragraph 5.  I adopt paragraph 6.  I

18   adopt paragraph 7 except that there's a typo in the seventh

19   line.  There's a reference to the undersigned counsel.

20   Undersigned should not be there.  I adopt paragraph 8 except

21   I delete the last reference referring to an attachment that

22   doesn't exist.  Adopt paragraph 8 -- I'm sorry.  Paragraph 9,

23   paragraph 10 except in paragraph 10 at the top of page 7,

24   line 3, I delete the word attached which is not attached.  I

25   adopt paragraphs 11, 12, 13, and 14.  I include paragraph 15

```
 1    except that I alter the sentence about the probation office
 2    considers the government's version to be insert the word
 3    largely factually accurate.  I adopt that is not the court's
 4    adoption.  I'm stating what the probation officer's view is.
 5    I adopt paragraph 16.  I next adopt paragraph 2 of the
 6    defendant's version of the offense and relevant conduct.  Is
 7    that right?  Just a moment.  Strike that please.  I meant to
 8    say I adopt paragraph 3 of the stipulation.  I then adopt
 9    paragraphs 17 through 27 of the defendant's version which
10    appears at pages 4 and 5 of their 64 page version.
11         With respect to what is in paragraph 18, I first
12    adopt stipulations three through nine.  I then adopt a
13    portion of paragraph 18 beginning at approximately line 9
14    which reads among other things, the Azzam websites, colon,
15    then it iterates six things.  So in effect, paragraph 18 is
16    stipulation paragraphs three through nine and then the second
17    half of what is there.  I adopt paragraph 19.  With respect
18    to paragraph 21, I adopted edited as follows: only Ahmad was
19    involved with individuals who traveled to Afghanistan to
20    train for Jihad.
21         I adopt paragraph 24 except it will read edited as
22    follows: Ahmad asked an individual to join and become a
23    member of Azzam Publications, who assisted with orders
24    submitted from around the globe for Azzam Publications
25    products promoting Jihad.  The individual also attended a
```

 1   weekend camping trip with Ahmad.  The spelling should be

 2   correct of Mr. Ahmad's name, in the United Kingdom period.

 3   Ahmad subsequently helped this individual to go to

 4   Afghanistan to train for Jihad, period.  This individual

 5   received and observed Syed Talha Ahsan in training camps in

 6   Afghanistan.  Other than the individual and Talha Ahsan, the

 7   court does not find that Ahmad was involved in sending other

 8   persons to Afghanistan.  The individual observed Ahsan attend

 9   training camps together with Ahsan -- twice in Afghanistan.

10   The individual took an explosive training course together

11   with Ahsan during one such period that they overlapped.  The

12   second time he saw Ahsan in Afghanistan, Ahsan was ill.  The

13   individual took him to get medical care.  The individual who

14   is cooperating witness testified that Ahsan was 19 years old

15   in Afghanistan, was not in any Al-Qaida camp, was taken to

16   the front, it was not his choice, that he was naive and not

17   supportive of Al-Qaida or its actions, all of which the court

18   finds true.

19           Further, this cooperating witness testified that Mr.

20   Ahmad was there for one to three months and at a time when

21   Ahmad was in London, as I previously said, the court does not

22   accept the witness's testimony in this regard.

23           The court adopts paragraph 25, except that it amends

24   the fourth line of text there to read employed violence in

25   military action to kill, injure and maim Russians in an

1    effort to promote the political goals of its members which

2    included driving the Russians out of Chechnya and

3    establishing Chechnya's independence over Russia or from

4    Russia.

5         Paragraph 26 is adopted except it is edited at line

6    four as follows: It is the Chechen Mujahideen that

7    eventually, paren, '02 to '03 and later, end paren, employed

8    violence in military action to kill, injure and maim

9    civilians, to damage and destroy property, in an effort to

10   promote the political goals of its members at the time

11   Ba-si-aad (phonetic) engaged in this conduct, Mr. Ahmad was

12   no longer supportive of him.  Paragraph 27 I adopt.

13   Paragraph 28 I adopt.  In line 4, it should read steps which

14   he carried out against the United States both in the United

15   States and against U.S. abroad through Al-Qaida and its

16   affiliated organizations.  Three lines below that a sentence

17   begins during the time relevant to the indictment despite,

18   insert despite requests by the United States to turn over Bin

19   Laden, the Taliban allowed territory under its control in

20   Afghanistan to be used as a safe heaven and base of

21   operations for Bin Laden and Al-Qaida and continuing as it is

22   written.

23        Paragraph 29, 30, 31, and 32 are adopted.  I believe

24   that 33, 34 is duplicative so I'm not adopting them.  35 is

25   adopted.  I believe 36 is duplicative as what I have done as

1    is 37.  38 is adopted.  39 is adopted except at the end, the

2    court adds the following: the court does not find any

3    evidence sufficient to support the conclusion that Babar

4    Ahmad was involved in these websites such as Waagiah after

5    2002.

6         I next would insert the defendant's versions

7    paragraph 37 through 41 in part as follows: I would adopt the

8    second sentence in 37, the second sentence in 38, the

9    entirety of 39, the entirety of 40 and the entirety of 41.

10        Next the court adopts 42 at the end of which the

11   court asserts the defendant's version paragraph 47, which I'm

12   having trouble finding, a footnote at the bottom of the page

13   reads, quote, Azzam Publications is solely engaged in the

14   publication of material and the distribution of news.  It is

15   not linked in any form or manner whatsoever with any

16   Mujahideen group anywhere, end quote.

17        The court adopts paragraph 43, 44, 45 and 46.  The

18   court adopts 47 except it inserts at the beginning of the

19   paragraph the Azzam website, as did many Main Street media,

20   also publish the full content of Bin Laden's 1996 declaration

21   et cetera.

22        The court adopts paragraph 50, 51, 52, all the way

23   down through 63, the court adopts 66 through 73.  After 73,

24   the court inserts the following: the court finds that these

25   postings on the Azzam dot.net, Qogaz dot.net are attributable

1    to Mr. Ahmad and he's responsible for either directly or

2    indirectly these postings.

3         Paragraph 75 through 83 are adopted, paragraph 84 is

4    adopted to read that Babar Ahmad stipulated that he

5    personally helped to operate and administer Azzam

6    Publications which the two websites Azzam dot.net and Qogaz

7    dot.net.

8         Paragraph 89 is adopted except the second sentence

9    is amended as follows: while -- strike going to great lengths

10   to.  It should then read while concealing his involvement.

11        Paragraph 90 is a adopted.  Paragraph 91 is adopted.

12   Paragraph 95 is adopted.  Paragraph 106 is adopted except the

13   word locked is deleted in the last sentence.  Paragraph 107

14   is adopted in part as follows: the first sentence is adopted.

15   The fifth sentence is adopted except -- and the sixth

16   sentence is adopted except it is edited to read in short in

17   at least 2001 Ahmad was found in possession of, control of

18   and use of  the private encryption key necessary for

19   administration of the Azzam dot-com website.  Accordingly, as

20   he admitted, had control over the very sign register for the

21   website.

22        Paragraphs 110 through 117 are adopted.  Paragraph

23   121 is adopted except it is amended to say Hassan Abu-Jihaad,

24   the man who sent the battleship document, was eventually

25   convicted.

1              Paragraph 122 is adopted.  Paragraph 125 is adopted

2    except the phrase over 50 is deleted.  The paragraph 126 is

3    adopted and the following is added.  The battleship document

4    was found on a floppy disk at his parent's home.  The court

5    finds that Mr. Ahmad did receive it at sometime.  It was

6    opened, the last being August of 2001.  The court cannot find

7    who opened it.  It could have been opened before it arrived

8    at Mr. Ahsan's parents' house or after.  I do not know.

9    There's no evidence from which the court can reasonably

10   conclude.  In addition the court adds to that paragraph.

11   Sorry, I lost what I wish to add.  I believe that what I

12   wished to add there was that the evidence that has just been

13   adopted by the court as to the battleship document and in

14   particular Mr. Ahsan and Mr. Ahmad's treatment of it, causes

15   the court to conclude that neither of them had interest in

16   operational terrorist activities.

17              The paragraph 131 is adopted.  Except that --

18   paragraph 131 is adopted.  While I'm not sure it is

19   particularly relevant to the case, I do adopt 132 to 143.

20   144 is adopted with the additional language at the end that

21   the suits in question were meant for and sent to Chechnya.

22   145 is adopted except that in the middle with the reference

23   to the textured body armor plates should be inserted that

24   they were sold by Mr. Ahmad on Ebay in England and further

25   should be added that Mr. Ahmad acknowledges that in addition

1    to the camouflage suits that went to Chechnya, the sat phone

2    and encrypted laptops also went to Chechnya.  The kevlar

3    helmets were sold to Ebay, the vests were still in his

4    possession at the time of the search.  As to anything else,

5    there's no evidence other than the encryption laptop that

6    went to the Afghanistan.  There's no other evidence of

7    supplying material to the Chechens or the Afghanis.

8    Paragraph 146 is adopted.  The reference to locked is struck

9    and it should be edited to read recovered from computer

10   median in the outer office to Ahmad's office at Imperial

11   College, the equipment document was found.

12          Paragraph 147 is adopted.  Paragraph 148 is adopted.

13   Again the court has indicated that it does not find the

14   reference to Abdullah to be Bin Laden because he's referred

15   to as Abu Abdullah.

16          Further, the first reference in page one to Saif

17   that's not recounted on the PSR.  It was not included in the

18   government's version is not the number three head of Al-Qaida

19   at the time because he's later referred to by his full name.

20   The court does not find this document to suggest support for

21   other participation with Al-Qaida other than in connection of

22   reporting news.

23          The court adopts paragraph -- as I previously

24   indicated, I believe I found that the details and briefing

25   documents were jointly undertaken activity and therefore, I

1    will adopt the PSR except that in paragraph 150 again I don't

2    find that he wrote the documents, but they relate to matters

3    in which he was generally involved and foreseeable to him.

4         However, I would strike the references to fight in

5    in the two lines 3 and 4 where they appear.  I do not adopt

6    that.  I adopt 151 because they continue at long length to

7    recite and 152 the document in question.  153 is adopted.

8    163 is adopted.  164 is adopted.  Not really sure it is

9    relevant conduct.  It is background perhaps however the word

10   disguised at end of the first sentence is not adopted and

11   struck.  165 is adopted except the first sentence will read

12   as follows: the investigation also determined that Ahmad

13   organized a camping trip in the UK, period.

14        166 is adopted except it is in part.  It is edited

15   as follows: the second line where it reads Ahmad's Tooting

16   Circle where he was asked, strike recruited by Ahmad to take

17   on an ever increasing role and work of the Azzam

18   Publications.  157 is stricken as a typo.  The next sentence

19   is adopted up to the words cassette.  The rest is stricken

20   until it begins according to the individuals.  167 is

21   adopted, 168 is adopted.  170 is adopted as follows: the

22   individual also described him having personally traveled

23   after discussing it with Ahmad to Bosnia to hear firsthand

24   from Bosnian veterans, period.  The individual described

25   detailed instructions Ahmad gave to him and others about how

1  they were to travel to Bosnia.  What gear they should bring

2  with them.  While in Bosnia the other individuals received

3  very limited training on a number of different weapons, etc.

4  171 is adopted as edited as follows: The individual testified

5  that he discussed going to Afghanistan with Ahmad beginning

6  in late 1998 and to attend the training camp.  Ahmad in his

7  discussions with the individual talked about him being his

8  representative in the sense that, for example, he would

9  receive Syed Talha Ahsan when he planned to go for training

10  at a camp.  The individual identified Ahsan, who according to

11  the individual, was a recruit that Ahmad sent and who

12  attended camps in Afghanistan on one occasion and on the

13  second visit, did nothing because he didn't remain due to

14  illness.

15       The court adopts 172 except the court does not adopt

16  the last sentence of 172.  The court adopts 175, 176 and 177.

17  Similarly the court adopts part C.  All the paragraphs in

18  part C which are personal history which are personal history

19  and background, part F and part G.  I will take the

20  government's objections to the court's findings.

21       MR. REYNOLDS:  All I would say I think we made a

22  clear record of opposition.  We respectfully acknowledge the

23  court's findings.

24       THE COURT:  Attorney Ward.

25       MR. WARD:  Ms. Barrett is going the handle this part

1    of the proceeding, your Honor.

2         MS. BARRETT:  We have no objection just with the

3    clarification on part G, the probation officer's evaluation

4    we had received an updated.

5         THE COURT:  I'm sorry.  The officer asked me to deal

6    with that.  I didn't even address that section.  I should

7    have.  I don't know that I technically adopt part G.  It is

8    the officer's evaluation but he has asked me to indicate that

9    he has made revisions to paragraph 240 and 244 so if you have

10   the original report in front of you, he has revised the

11   sentence that begins about nine lines down, the probation

12   officer, he know wants it to read the probation officer, like

13   defense counsel, has reviewed the government's version of the

14   offense and relevant conduct and essentially agree that the

15   content, specifically the Taliban postings available on the

16   website, cannot be discounted from overall intent and purpose

17   that being to provide material support to the Taliban who

18   supported Al-Qaida will further at the end of that paragraph,

19   instead of the last two sentences, those would be deleted and

20   he would have it read the parties agree the defendants in

21   this case cannot be directly connected to any specific acts

22   of terrorism.  However, the operation of the Azzam

23   Publications was in support of the Taliban who supported

24   Al-Qaida and as such, their efforts to raise money and

25   material for the Taliban renders them indirectly connected to

1    Al-Qaida.  That's a part of the criminal conduct in this

2    case.  Further at the paragraph 44, he would delete the first

3    sentence and the word -- the first two sentences and the word

4    regardless all the way up to the word regardless.  He would

5    keep the last portion of 244 beginning with the court is

6    required to sentence.  I'm sorry.  Thank you for reminding me

7    of that.  That was Officer Lopez's request with respect to

8    his recommendation.  Is there anything else, Attorney

9    Barrett?

10            MS. BARRETT: No, your Honor.

11            THE COURT:  Then I will proceed to determine the

12    guidelines I think.

13            I should say what I always say in connection with

14    the sentencing.  It's my obligation to determine the sentence

15    here today, Mr. Ahmad, after considering all the material

16    that I have in front of me and all that I accept as true, and

17    considering the factors that our Congress has identified as

18    relevant to the issue of sentencing.  I will go over all of

19    those with you before I announce your sentence.  But we first

20    start with something known as the sentencing guidelines,

21    which are a device created by Congress to create a range of

22    sentence which it thinks is appropriate based on various

23    criteria for particular crimes committed by people with

24    certain criminal histories.

25            In this case, the guidelines have what I would call

1    automatic adjustments, which alter what would normally be the

2    guideline calculation.  So I'm just going to state them on

3    the record.  I will ask counsel if there's any objection.  I

4    will have some comments about the guidelines as I get to the

5    issues of unwarranted sentencing disparities and the

6    guidelines generally in connection with all of the factors.

7    Under the guidelines, because of the nature of the offense

8    with which you were convicted of two counts, Mr. Ahmad,

9    Section 2X2.1 sends me to Section 2A1.1 because it involves a

10   conspiracy to commit murder.  That becomes a 28 point level.

11   There is then under Section 3B1.4A, have I got that right?

12          THE PROBATION OFFICER:  Yes, your Honor.

13          THE COURT:  A 12 level enhancement because the crime

14   that you pled guilty to qualifies as a terrorism crime as

15   defined by Congress.

16          In addition, the Court finds under Chapter 3 that,

17   in fact, you were a leader of the activity at issue here, and

18   there were more than five people involved.  The

19   organizational chart, I guess, would be the first piece of

20   evidence to look to to support that finding.  That takes you

21   to a level 44.

22          Does the government recommend a two-level reduction

23   for acceptance of responsibility and move for the third point

24   under 3E1.1B?

25          MR. MILLER:  We do, your Honor.

1          THE PROBATION OFFICER:  I'm sorry, your Honor, just

2     to be clear, Paragraph 182.  3A1.4A, that's the Chapter 3

3     terrorism increase.

4          THE COURT:  My brain is not working at hyperspeed,

5     so let's start with what you were referring to.

6          THE PROBATION OFFICER:  I think you made a reference

7     to 3B1.4A.

8          THE COURT:  Yes.

9          THE PROBATION OFFICER:  The Chapter 3 adjustment for

10    the 12 level increase is 3A1.4A.

11         THE COURT:  Thank you.

12         On the government's recommendation and on the

13    defendant's guilty plea and admission that he committed the

14    two crimes to which he plead guilty, because of his support

15    of the Taliban at a time when the Taliban was protecting an

16    individual who was committing acts of terrorism and murdering

17    and maiming individuals around the world, the Court --

18    because of his guilty plea, the Court awards Mr. Ahmad a

19    two-level reduction for acceptance of responsibility.

20         Further, based on the government's motion under

21    3E1.1B, that Mr. Ahmad agreed to enter into a guilty plea at

22    a time that allowed the government to put its resources to

23    other investigations and criminal prosecutions, the Court

24    agrees and grants the motion and awards Mr. Ahmad a further

25    one-level reduction.  That results in a criminal history

1    level of 41.

2          In addition, because of the characterization of the

3    crimes Mr. Ahmad pled to as terrorism crimes, I believe,

4    again, 3A1.4 causes the criminal history to automatically

5    become VI.  Therefore, the guideline sentence applicable here

6    under level 41 and criminal history VI -- I should find first

7    that Mr. Ahmad has no criminal history personally.  He has

8    never been convicted of a crime.  But the guidelines call for

9    him to be treated as if he's in a Category VI, which

10   typically is a person who has committed, at a minimum, three

11   and up, could be more, serious felonies.  Treating him as a

12   Category VI and a Level 41 results in a guideline range of

13   360 months to life.

14         However, because he pled guilty to two counts, each

15   of which carry a maximum -- statutory maximum of 15 years

16   each, his maximum sentence is 30 years.  Therefore, by

17   operation of the maximum, that sentence of 30 years becomes

18   his guideline sentence.

19         However, the plea agreement called for under 11C1C,

20   the parties had agreed that his maximum sentence would be 25

21   years.  And the Court accepts -- has accepted that agreement.

22   And therefore, I deem that, in effect, a Fernandez departure

23   of the guideline sentence from 30 down to 25.

24         Does anyone disagree with the guideline analysis,

25   calculation or conclusion stated at the end as to what the

```
 1    guideline sentence and departed guideline sentence is?

 2              MR. MILLER:  The government agrees with the Court's

 3    analysis and agrees with the Fernandez departure.

 4              THE COURT:  Attorney Ward.

 5              MR. WARD:  No objection, your Honor.

 6              THE COURT:  I must now turn, Mr. Ahmad, to all the

 7    other factors that I alluded to very briefly a moment ago,

 8    which Congress has identified as relevant to a judge's

 9    consideration of what would be a fair and just sentence in

10    this case.  Before I turn to those factors, which I will

11    outline, I wish to make a few preliminary remarks about your

12    case in general.

13              In this case, the government has expressed a view of

14    what was involved and indeed has argued that you have falsely

15    denied some measure of your responsibility, or perhaps put

16    another way, minimized what you did and in some respects

17    accused Mr. Ahsan as well of shaving around the corners or

18    minimizing what he did.  On the other hand, the defendants

19    have spent quite a bit of time, in effect, seeking to

20    minimize what their clients have done -- and I don't mean

21    that in any way as a criticism -- but effectively criticizing

22    the government for imprinting on this case the term

23    "terrorism" then attempting to imprint terrorism upon the

24    defendants when, in the defendant's view, that's not

25    supported by evidence or reasonable inference.  I have spent
```

1    a lot of time looking at what was put in front of me, what

2    evidence the government has, what arguments each side wishes

3    to make, what inferences you want me to draw.  And I have to

4    say that it has not -- it has been an extremely difficult

5    task.  And I'm not sure I have come close to succeeding in

6    fully understanding Bosnia and its impact on Mr. Ahmad, or

7    Chechnya and what was, at times, and at other times -- at one

8    time maybe people acting for the good and at other times

9    people becoming evil.  Or in Afghanistan, where I will never

10   understand the views of the Taliban, particularly their views

11   towards women.  And yet they occupied their land, and they

12   were fighting to defend their land.

13           But that isn't why you are here, Mr. Ahmad.  You are

14   here because of what they then went on to do beyond that,

15   which was to protect a man who, even if it wasn't understood

16   by the world or by you, was responsible for two horrific acts

17   of terrorism, was in Afghanistan being enabled to proceed to

18   commit what, at least in the United States's view, is the

19   most heinous act of the terrorism of 9-11.  The problem I

20   feel as I've spent weeks going over this material is that

21   we're standing here in 2014, looking back through the glasses

22   that we own in 2014, at facts that occurred, in some

23   respects, more than 20 years ago, some of which are highly

24   contested as to what they mean and who did what.  We have

25   almost too much, in some respects, information.  And I

1    really, in my self sense, a limited ability to be able to

2    understand what was happening in the context of when it was

3    happening.  I look back in the context of what I know now.

4    But I don't feel that I have been capable of looking back and

5    saying to myself, this is what Mr. Ahsan was thinking when he

6    said I will help the website, or Mr. Ahmad was thinking when

7    he put up an appeal to Pakistanis to fund the Taliban who had

8    enabled Osama bin Laden to blow up 3,000 people including

9    someone he knew.  That I cannot understand.

10           I guess my final remark will be that I think that

11   in, as is often the case in an adversary system, which is

12   what our system is, and the job of both lawyers on each side,

13   that the government argues, and I find sort of too wide, in

14   describing what Mr. Ahmad did.  And in some respects the

15   defendants, especially Mr. Ahmad, seeks to have me view this

16   too narrowly.  And so I will undertake the job that is

17   assigned to me in this system of justice, which is to attempt

18   to decide the facts that are applicable to the sentencing, to

19   draw reasonable conclusions from the same, and then to that

20   take all of that into consideration to address the factors

21   Congress has identified to arrive at a fair and just

22   sentence.

23           There are two -- there's always a challenge

24   sentencing any human being.  I effectively have the power to

25   take away someone's liberty.  Obviously, these two men have

1    had their liberty taken away for a long time, but they can

2    continue to have their liberty taken away by what I do today.

3    So it's always the most difficult thing we do as judges.  But

4    here, today, it seems to me the challenge -- there's two

5    other aspects to this that I want to mention just so that the

6    defendants, I guess, in the first instance, and the counsel

7    also understand that it is my goal that neither of these

8    challenges will affect my judgment.

9         One is that I don't believe I can sentence these two

10   men out of a fear of some general notion of terrorism and an

11   assumption that because these two men have been charged with

12   a crime that we categorize as terrorism, that they will

13   somehow be involved in the future in terrorism.  Of course,

14   as I say that, it causes me great pause.  I always think

15   about, when I sentence anyone, will I wake up 5, 10, 15,

16   whatever the sentence is I give someone, I wake up some

17   morning and read in the newspaper that the drug dealer that I

18   let out in that time period just killed a three year old in a

19   drive-by shooting.  That's not the only reason sentencing is

20   difficult, but that's something that weighs on judges' minds.

21   If you make a mistake, what are the consequences of your

22   misjudgment of the character of the defendant or his

23   likelihood of repeating what he did in the past?

24        Of course, in this instance with the mantle of

25   terrorism, that concern is enormous.  If I wake up, I don't

1    know, whatever time it is, whatever sentence I give Mr.

2    Ahmad, five years after he's out and on the front page of the

3    New York Times is his name associated with, I don't know, the

4    bombing of something, the sense of responsibility for that on

5    me is enormous.  And I'm only human.  I can only make the

6    judgments as best I can, but I understand, and I have to be

7    conscious of this, that if I misjudge these defendants, that

8    it could be the cause of great harm.  But I don't think it's

9    right to act on what I would call an unfounded fear that a

10   defendant might do something, like a terrorist act, and

11   therefore we should just lock that person up forever.

12          In this case, even the government doesn't seek that.

13   Doesn't view, I think, these defendants as people like the

14   Blind Sheikh or Ramzi Yousef, or I guess I could name a few

15   others, whom I don't think anyone would release because

16   there's no question that have committed -- the nature of the

17   acts they committed is such that we can't allow the risk that

18   they might do the same thing.  In a moment, I'm going to

19   discuss the nature of the acts that Mr. Ahmad and Mr. Ahsan

20   committed, but they don't come close to those types of acts.

21   And so, merely because the word "terrorism" is associated

22   with this case, I think I need to be conscious of assessing

23   the nature and circumstances of what the defendants did and

24   not merely react to that title as ascribed to this case.  It

25   seems to me there must be distinctions between and among

1    people who do acts which make them guilty of material support

2    under 371, 339A, 956, even 2332B, we can't treat all of the

3    material support cases the same.

4         This is not an operational case.  I believe the

5    government agrees that there were never any plots even

6    discussed by these defendants.  There was never any aid given

7    by these defendants to effectuate a plot.  By plot, I mean a

8    terrorist plot.  A plot to go out and purposely harm

9    civilians.

10        What these defendants did is that they gave material

11   support, or they sought to raise and get material support,

12   they wanted material support to flow to the Taliban at a time

13   when the Taliban was protecting Osama bin Laden.  Which, of

14   course, allowed Osama bin Laden to be protected and to

15   proceed to plan for and carry out the 9-11 attacks.  But the

16   defendants, I should say, never, that I can see, had any

17   knowledge of that.  I'm not even sure they had knowledge of

18   the true nature of Mr. bin Laden.  Perhaps by the summer of

19   2001, which makes the posting in the fall of '01 more

20   troubling as to Mr. Ahmad, but certainly did not know what

21   was being planned at the time.

22        The other aspect I think I mentioned, too, in

23   connection with the challenge I face, it has been mentioned

24   in some of the papers, it seems to me it would be

25   inappropriate for me to sentence these two defendants out of

1    a fear that somebody observing this court would view my

2    action as unjust and that, therefore, I should sentence in a

3    certain way so I wouldn't be subject to that criticism.

4    There's a reason they give me life tenure in this country.

5    And the brilliance of our constitution is that I don't care

6    about that.  What I care about is that my sentence reflect my

7    best judgment after considering all the factors I'm required

8    to consider and weighing them in my best judgment and

9    explaining them to the public as to why I sentence a

10   defendant the way I do.  It's my hope that if I do that

11   right, if I perform my job responsibly, then my sentence will

12   be seen as reasonable and just.  Doesn't mean everyone will

13   see it that way, but I cannot -- how can I put this?  I

14   cannot let my judgment be affected by the fact that someone

15   or another -- and this could be from either side of the aisle

16   which isn't quite an aisle in this courtroom -- but will be

17   critical of what I do.

18           So, Mr. Ahmad, we'll turn to those factors that I

19   talked about that I need to address.  I should state, I think

20   I said this earlier -- I'm sorry, there's another

21   housekeeping detail, Ray.  The addendum to the Presentence

22   Report should contain Attorney Barrett's letter.

23           THE PROBATION OFFICER:  It should, your Honor, to

24   add to that, getting back to the PSR real quickly, Paragraphs

25   229 and 230 which deal with restitution, those will be

```
 1   amended to state that restitution is not applicable in this
 2   case.
 3              THE COURT:  That would be correct.  Thank you.
 4              Mr. Ahmad, I'm going to start with the nature and
 5   circumstance of what you did to commit this crime.  You
 6   obviously were very actively -- you don't need to stand, this
 7   is going to take awhile I'm afraid, apropos of my desire to
 8   have people understand why I'm doing what I'm doing.
 9              In my view, the nature and circumstance of what you
10   did, Mr. Ahmad, starts with the fact that you were very
11   involved with and actively engaged in Azzam Publications and
12   the two websites we have spoken about, Azzam.com and
13   Qogaz.net.  The two websites and as well as the products from
14   Azzam Publications appear to have been extremely popular,
15   likely because they were in the English language.  They
16   disseminated information that was of interest to Muslims who
17   were in the English-speaking world, and they provided
18   information, and unfortunately, at some times, propaganda to
19   that audience about what was happening in what you view to be
20   the struggles that Muslims were engaged in in both Bosnia,
21   Chechnya and then Afghanistan.
22              I believe that the two websites were principally
23   comprised of material relating to the struggle in Bosnia by
24   Muslims against the Serbs and their efforts to ethnically
25   cleanse Bosnia of Muslims.  And then later, in Chechnya, in
```

1    what were really a two-step attack by Russians on Chechens

2    and the response by Chechens supported by foreign Mujahideen,

3    including General Khattab, to fight back or to drive out

4    Russians from Chechnya.

5           And then lastly, of course, it eventually turns to

6    Afghanistan where the Taliban, of course, if we go back with

7    our history, was initially fighting the Russians with support

8    by the United States.  That eventually evolved into an

9    internal struggle between the Taliban and the Northern

10   Alliance as to who would be in control of which parts of the

11   country, then finally evolved into a dispute with the United

12   States and the Taliban, in particular surrounding the fact

13   that the Taliban allowed Osama bin Laden to return to

14   Afghanistan and, in effect, protected him, allowing him to

15   continue his operations and to develop and grow Al-Qaida.

16          The period in question that I look at is roughly

17   from 1997 to 2002.  It followed the time that you had spent

18   in Bosnia as a young man, which I understand is really not

19   the relevant conduct in this case.  I mention it, though,

20   because of the impact I believe it had upon you in deciding

21   what it is you wanted to do when you returned to the United

22   Kingdom.  And, in my view, you determined that you would try

23   to use media, videos, recordings, website publications as a

24   way to communicate with your fellow Muslims about what was

25   happening in Bosnia and then in Chechnya, and then eventually

1    in Afghanistan, and to encourage your fellow Muslims to

2    fulfill their -- I'm not going to use the right word here, it

3    will reflect my ignorance, Mr. Ahmad -- but to address Jihad

4    and what it means to a Muslim.

5           Now, I have to say, and I say this as an American

6    citizen who firmly believes in the First Amendment and

7    people's rights to say what they want to say as far as

8    expressing their opinion, there is much content on the

9    website and as published by Azzam Publications that I find

10   offensive.  I think I could say it's fair to say it's

11   disrespectful of other people, people who aren't Muslims.  I

12   don't agree with it.  But I can't say you didn't have a right

13   to say it.  I wish you hadn't.  I mean, to show a picture of

14   a Chechen Mujahideen holding the liver of a Russian soldier

15   in the context of what you think is a righteous war, I don't

16   know.  I don't see that as righteous.  I don't see killing an

17   unarmed prisoner of war and then displaying that to the

18   public, I don't see that as right or righteous.  Publicizing

19   to the world the atrocities that occurred in Bosnia, yes.

20   Yes, they are graphic.  And yes, they are harsh, but they

21   were wronged by the other side and the world needed to know

22   about it.

23          As to the Taliban aspect, which is really, I think,

24   why you are here in front of me convicted of two counts of

25   material support, I don't know to what extent you were

uninformed or you didn't want to accept the truth or you
really just bought into the propaganda of much of what's on
there about Osama bin Laden, but that's sort of the nature of
what you had on your website.  Now most of the material you
had up there was about Bosnia and Chechnya, which I don't
think relates to your offense of conviction conduct.  As I
say, it might be offensive, but I don't believe it's what
makes you guilty of the crime that you are front of me on of.
And a lot of the material you had up there was just
reproduction of other people's material.  At the same time,
however, for example, Osama bin Laden's declaration from '96,
yes, it was published in popular media, but you made it
available at a site that attacked Muslims readily available
and available for a long time.  Now, again, it's First
Amendment, I have a right to read it, to possess it, but to
the extent of what it represents and what it calls for people
to do, it's an abomination.

          I did want to mention, I have mentioned briefly, but
I do not accept the government's view that the postings about
Chechnya are somehow related to material support.
Fortunately, we don't have to resolve the issue because I
find material support that satisfies the statute and makes
Mr. Ahmad guilty of the crime that arises from what he did
vis-a-vis the Taliban and their protection of Osama bin Laden
and their fighting against the United States.  To the extent

 1    he provided camouflage suits and two sat phones and two

 2    laptops and he provided "news reporting on videos extolling

 3    what was happening in Chechnya," I find that this support

 4    occurred at a time prior to when the Chechen Mujahideen,

 5    became what really were terrorists akin to Osama bin Laden.

 6    They were banned, this group was banned by the United States

 7    in '03.  They were a splinter group of the Chechen

 8    Mujahideen.  They engaged in the horrific acts, which you all

 9    may remember, the Moscow Theater hostage and murder situation

10    and taking of a school in a town whose name I'm not going to

11    remember.  But this is not what Mr. Ahmad was covering.  It

12    didn't occur at a time he was involved in the websites.  So

13    while I appreciate that it's in the case, it's background

14    because it's what was on the websites and what -- the videos

15    that were being sold.  Again, I don't view that as part of

16    his offense conduct.  Maybe I'm influenced by the fact that I

17    believe that at various times, the U.S. supported the rebels

18    against the Russians in Chechnya, that we spoke about how the

19    Chechens were not terrorists at the time they were trying to

20    expel the Russians, which is the time that Mr. Ahmad was

21    doing what he was doing on the web with respect to Chechnya.

22    There's nothing on the web to extol the terrorist acts that

23    the splinter group engaged in in '03.  And I don't find that

24    Al-Qaida was any part of the Chechen rebels.

25              In that regard, I just wish to make a general

1    observation, this is really out of order, but after reading

2    the various expert reports, it's my conclusion that there

3    were many Muslims from the United Kingdom who traveled to

4    central Europe, Bosnia, Chechnya and Afghanistan at various

5    times in the '80s and '90s and into 2000, to either fight for

6    or to attend training camps.  It's this Court's view, I hope

7    I'm not mistaken, I believe I'm correct, that of those

8    thousands of U.K. Muslims, a very small number of them ended

9    up in Al-Qaida.  That for the most part, they, like Mr.

10   Ahsan, went to Afghanistan, for example, went to a training

11   camp.  In Mr. Ahsan's case, I do not find he went to an

12   Al-Qaida training camp, but even those who went to Al-Qaida

13   training camps, not all of them joined Al-Qaida.  In fact,

14   the Court's view is that very few did.  Most of them returned

15   home and went back to what I would call normal lives.

16           So there has been the use in this case of the phrase

17   "violent Jihad" and the use of the word "terrorism" and the

18   use of the word "Jihad."  In my view, the Jihad does not

19   equal terrorism.  All terrorists appear, over the last 20

20   years, to carry out acts under a banner of Jihad.  They claim

21   that.  In my view, they misappropriate that phrase.  And

22   indeed, their use of the word "Jihad" is a perversion of what

23   Islam teaches.

24           As I understand it, and I could be very wrong, but

25   my understanding is that the concept of Jihad in Islam is

1    struggle, and it's both an internal and a defensive struggle,

2    but it's never what happened on 9-11.

3            So turning back to the nature and circumstances of

4    what Mr. Ahmad did, it really brings us to Afghanistan.  And

5    he has admitted responsibility, I'm going to ask him later to

6    confirm that I'm accurate in this respect, for various

7    postings on his websites for which he was an administer and

8    for which he admits responsibility and control.  I'm going to

9    point to two in particular, one on February of 2001, what I

10   can do to help the Taliban.  More importantly, one in the

11   fall of 2001, the appeal to Pakistanis, which was up from

12   late '01 to the middle of '02, and which called for people to

13   funnel substantial amounts of money into the Taliban to

14   support them in their fight against the United States and in

15   their fight which was, in effect, on behalf of Osama bin

16   Laden in the sense of protecting him.  All of this after it

17   was clear that Al-Qaida was responsible for the terrorist

18   acts of the embassy bombings, the terrorist attack on the

19   Cole, and the terrorist attacks of 9-11.

20           These sites were very, as I said, popular.  They

21   were a source of information for English-speaking Muslims.

22   They contained propaganda, they contained religious

23   information.  And they had rants against, among others,

24   Zionist crusaders.  But relevant to this case, those two

25   postings, I think, are sort of Exhibit A and Exhibit B of why

1    Mr. Ahmad is guilty of the crimes he has confessed to.

2            There's no question that by 1999, which predates

3    these postings by two years, the United States government had

4    demanded that Osama bin Laden be turned over by Afghanistan.

5    Now, just a way of background, Osama bin Laden was a hero in

6    Afghanistan for his fighting in the first war that the

7    Taliban waged against the Russians to expel them from

8    Afghanistan.  He subsequently appears to have fallen a bit

9    out of favor and went to -- I think I misspoke the other

10   day -- not Yemen but the Sudan.  But he was thrown out of

11   there.  My sense is nobody really wanted to take him except

12   the Taliban took him.  The Taliban continued to protect him

13   for several years.  After having committed the Cole and

14   embassy bombings, even though he had not publicly

15   acknowledged that, but it became known that he accepted

16   responsibility for those bombings by the middle of 2001.

17   Again, before the posting in the fall appeal to Pakistanis.

18           The Taliban refused to turn over Osama bin Laden

19   the -- which was a subject of writings on the website for

20   which Mr. Ahmad is responsible, in fact, applauds the Taliban

21   for not turning him over and denies that bin Laden was

22   responsible for the first two of the terrorist attacks I keep

23   mentioning and then goes on to seek to raise money and to

24   encourage people to go fight shoulder to shoulder with the

25   Taliban in their fight against the United States, and against

1  the United States because Osama bin Laden would not be turned

2  over.

3          As to the defendant's claim that there's no evidence

4  that money ever flowed as a result of his conduct.  Given the

5  instructions provided on the website, the Court does not find

6  it surprising that there is no evidence.  The whole nature of

7  the instructions given to people who wish to give money is to

8  proceed in a highly secretive manner, independent of banks or

9  other traditional manners of carrying and transporting and

10 transferring money, but rather to do it secretively,

11 personally, without trusting anybody and not telling anyone

12 about it.  The fact is, I have nothing in front of me to show

13 whether Mr. Ahmad was successful and he raised $20,000 for

14 the Taliban or he raised $2 million for the Taliban.  I don't

15 know.  What I do know, though, is that Mr. Ahmad wanted to

16 raise money for the Taliban.  He wanted the Taliban to have

17 money.  He wanted them to be supported so that they could

18 continue to protect Osama bin Laden, and they could continue

19 to fight the United States of America.

20         We spent a lot of time yesterday and last week and

21 in the hundreds or thousands of pages that have been filed

22 with the Court over the issue of whether Mr. Ahmad directly

23 supported Al-Qaida.  And I'm really not sure where the

24 government is right now on that position, whether it's still

25 their view that he did that.  If it is, it's not this Court's

1    view.  To the extent he wrote about Al-Qaida and he sought

2    support for the Taliban who would protect Al-Qaida, the way I

3    read his writings and postings and appeals are he was

4    supportive 100 percent of the Taliban.  He was supportive of

5    them when they protected Osama bin Laden.  He was supportive

6    of them when they fought the United States.  But I don't see

7    in that any support for Al-Qaida in the sense of he believed

8    in, subscribed to, wanted to write about, never wrote about,

9    what I would call Al-Qaida views of the world.

10         He knew the relationship between Al-Qaida and the

11   Taliban in 2000, 2001, into 2002, and despite knowing that

12   and despite knowing what Al-Qaida had done, his support for

13   the Taliban did not flag.  But I don't see that as fairly

14   representing that he supported Al-Qaida.  In my view, his

15   material support was support for the Taliban in the form of

16   seeking to raise money for them and urging people to fight

17   alongside them at a time when they were fighting the United

18   States after 9-11, and at a time when they were here

19   harboring Al-Qaida and Osama bin Laden.

20         As to other aspects of the nature and circumstance

21   of Mr. Ahmad's conduct, the Court does find that he engaged

22   in, as did Mr. Ahsan, operational security.  They used code

23   names, they encrypted things, they had passwords.  They

24   avoided the use of things that most people use every day like

25   checking accounts and bank records and deposits.  There was a

1    double connection in terms of the P.O. box, a double step and

2    it led to a person that -- in the name of Mr. Ahmad's

3    classmate in university.  The government urges that I view

4    this, in effect, consciousness of guilt.  The difficulty I

5    have with that is that they were engaged in these kinds of

6    activities when most of what they were talking about was

7    Bosnia and Chechnya, and much of it was not illegal.  In

8    other words, they didn't just start doing this when they

9    started supporting the Taliban.  I think in my view, that

10   yes, they had concerns and that's why they acted the way they

11   did.  They didn't wish to be detected, but I do not see that

12   as evidence that they, from '98, thought they were committing

13   crimes.  I see it -- and again, this is part of the struggle

14   of trying to look back in hindsight and figure out what was

15   going on -- but there's no question, for example, the

16   Pakistanis would not have rolled out a welcome mat to allow

17   people to move into Afghanistan through Pakistan.  The U.S.

18   would not have allowed that, would not have been happy with

19   it.  There's evidence that he was approached by Russians who

20   weren't happy with what he was doing about Chechnya.  There

21   was the British government who, rightly so, was nervous about

22   terrorist attacks on their own land and might be inclined to

23   want to question people, much like the United States did, and

24   holding people as material witnesses because they thought

25   they knew something.  I don't know whether I would call it

1    paranoia, but many paranoids are right.  In my view, what --

2    the whole operational security was not evidence of

3    consciousness of guilt.  It was evidence of consciousness

4    that what they were doing, while not necessarily illegal, was

5    conduct that would cause people to pay attention to them and

6    then ultimately hassle or harm them.

7         It doesn't necessarily mean that what they were

8    doing was good, but I don't draw from it sort of the negative

9    inference of consciousness of guilt that the government wants

10   me to draw from it.  I guess I just don't view it as so

11   nefariously covert.  I mean, it's not exactly James Bond.

12   Some of the covert steps are easily defeated, not very

13   sophisticated.  But I think -- again, I may have time wrong,

14   but I know now if I write an e-mail and it says -- have the

15   word "bomb" and "World Trade Center" or the "Brooklyn Bridge"

16   in the same e-mail and I wrote that in Scandinavia, that

17   someone somewhere is probably going to take a look at that

18   e-mail, and I don't want them to take a look at the e-mail.

19   Because maybe I use the word "blast" and really what the

20   sentence says is, I had a blast when I visited the Empire

21   State Building.  It was a wonderful time.  Maybe I will think

22   that I better pick a different word for "blast" because

23   somebody might think I mean something else.

24        I don't see that what they were trying to cover up

25   was so illegal at the time that their covert or secrecy steps

1    were clearly undertaken and should cause me to draw the

2    conclusion that it shows that everything they were doing,

3    they were guilty of something.

4         I also don't find the government, uses the phrases

5    frequently, "recruiting and radicalizing people."  As to the

6    recruiting -- again, it's very hard for me to be confident of

7    how I understood the relationships, and I will talk a bit

8    when I get to Mr. Ahmad and his history and

9    characteristics -- but recruiting to me is a fairly strong

10   and specific word.  It includes kind of overwhelming a

11   person's individual decision-making.  It includes conscious

12   activity to cause them to come to view what you want them to

13   do as being the thing they should do.

14        If what the government means that Mr. Ahmad believed

15   that every Muslim should fulfill his responsibility under the

16   concept of Jihad to be trained to defend themselves and their

17   family and he spoke about that, I would agree with the

18   government.  In that sense, yes, he recruited Muslims to

19   fulfill their responsibility.  But in the same sense, I

20   suspect we could say he recruited Muslims -- I'm not familiar

21   with the practices of Islam -- but in terms of praying so

22   many times a day or in a certain way and in a specific

23   attitude, he probably recruited them to do that as well.

24        As to whether he radicalized anyone, I don't

25   understand that.  I think that the only person radicalized in

1    this case is the cooperating witness.  It's pretty clear to

2    me that Mr. Ahsan is not responsible for radicalizing him.

3    He may have played a role in getting the cooperating witness

4    to go to Afghanistan to get training, but even the

5    cooperating witness acknowledges that, unlike what Mr. Ahmad

6    wanted him to do, which was to return to England to complete

7    his education, he turned away from that and was, in fact,

8    radicalized by colleague Sheikh Mohammed and Osama bin Laden

9    whom he met in Afghanistan.

10          Now you could say that, well, Mr. Ahmad wanted him

11   to go to Afghanistan, so it's his fault he met those people

12   there and he became radicalized by them.  I don't think that

13   would be fair.  Mr. Ahsan went to Afghanistan and I don't

14   believe he was radicalized by his experience or the people he

15   met there.  So I think to say that Mr. Ahsan is responsible

16   for radicalizing people is to mischaracterize his conduct.

17          As to whether other people went to Afghanistan, the

18   Court, I don't think, has a basis for it other than the

19   cooperating witness assuming that when certain people showed

20   up who were from the Tooting Circle, that Mr. Ahsan must have

21   sent them.

22          I'm sorry.  Mr. Ahmad, I apologize.

23          With respect to the battleship -- the Battle Group

24   Document about which we spent a lot of time and which was the

25   subject of the case previously in front of Judge Kravitz.

1          The Court has found that -- obviously, I will get to

2    Mr. Ahsan about the Battle Group Document later -- but I have

3    also found that Mr. Ahmad had the floppy disc which had that

4    document on it.  I don't have any evidence in front of me as

5    to his opening it, reading it, what he thought about it.

6    What I do know is that nothing was done with the information.

7    And I don't even know if he opened it.  And if the government

8    wishes me to find that he opened it, then I would suggest

9    that from that finding would follow the next finding:  And

10   that is that the Battle Group Document, besides showing that

11   the Navy enlisted man was a traitor to his country, it also

12   shows that Mr. Ahmad and Mr. Ahsan had absolutely no interest

13   in operational terrorist actions that would harm the United

14   States.  Because in their hands was what appeared to be, and

15   what the government proved at Abu Abu-Jihaad's trial, was

16   highly classified information, sensitive, movements of what

17   could be vulnerable battleship and related vessels through

18   the Straits of Hormuz, with a suggestion of how to take one

19   of the ships down.  And yet what we have in this case is

20   neither defendant does anything with it.  I can only draw the

21   conclusion that it supports what I have concluded and will

22   conclude generally, that neither of these two defendants were

23   interested in what is commonly known as terrorism.

24          I guess in conclusion I would say, as to the nature

25   and circumstances of Mr. Ahmad's conduct, that he did support

1    the Taliban.  He supported the Taliban knowing that they

2    protected a terrorist, Osama bin Laden.  He supported the

3    Taliban after Osama bin Laden engaged in 9-11.  He didn't

4    shut down or disavow or walk away from the appeal to the

5    Pakistanis until, the middle at least, of 2002.

6         What the nature and circumstance of his offense is

7    not is that he never supported or believed in or associated

8    with Al-Qaida or Osama bin Laden.  He never fought in

9    Afghanistan at a time when they were fighting the Americans

10   or protecting Osama bin Laden.  And he never engaged in

11   operational planning or operations that could fall under the

12   term "terrorism."

13        There's some question -- the government argues that

14   while the defendant claims by mid to late '02 he was out of

15   this, out of Azzam Publications, out of the website work,

16   that the government questioned that.  As I thought about that

17   last night, I was struck by something.  We have, thanks to

18   Agent Bowling, a tremendous amount of material recovered from

19   what are deleted files, files that were wiped.  Files that

20   shouldn't have been able to be retrieved, or were encrypted

21   and thus were retrievable in limited fashion.  Nonetheless,

22   we have all of that material from the period around 2000,

23   2001 and into 2002.  I did not see anything from mid to late

24   '02 to the time he was first arrested.

25        Now, it could be my fault, I overlooked it.  I don't

know.  But it strikes me as odd that somehow in the middle of
2002, Mr. Ahmad would become so capable at destroying
electronic data that he could completely wipe and eliminate
everything he ever touched or wrote about or put on his
computer from then until the moment he was arrested.  In
other words, he didn't know he was going to be arrested.  It
means he's constantly deleting and destroying and writing
over and throwing into fire cans to burn up electronic media
every day of his life from mid '02 to '03 when he's first
arrested, and yet he leaves on his computers all of these
fragments, I will call them, of data and electronic material
that can then be found by Agent Bowling.  The conclusion I
draw from that is that's not what happened, but rather what
happened is that he did indeed step away from this activity
in the mid to the third quarter of 2002.

          I next, Mr. Ahmad, need to turn to the need for your
sentence.  In the country, we sentence people because we
think it will serve a purpose.  We don't do it just because
we wish to be mean, we wish to ruin their lives, keep them
from their families.  We do it because we think that it will
serve certain purposes.

          The first need for the sentence is to reflect the
seriousness of what you have done.  Because if I were to
sentence everyone to the same sentence regardless of what
they did, whether they stole a loaf of bread or they murdered

1    a three-year old child, and I gave both of those people the

2    same sentence, no one would view that as just and therefore

3    there would be no respect for our criminal justice system.

4    So I have to start in the need for this sentence in

5    addressing and considering how serious is the crime that you

6    committed.

7         I will start by saying that I view what you did as

8    very serious.  It's not the most serious crime that can be

9    committed.  There are others, even within the range of

10   material support or even beyond that, actually committing

11   acts of terrorism, that are much more serious and probably at

12   the very end of the spectrum.  Nonetheless, I think what you

13   did is serious because -- and, again, I cannot lay -- I think

14   Attorney Reeve stood up early on last week and made some

15   remark about mixing up intentions with consequences, was it

16   something like that?  But you can't walk away from the fact

17   that what you were doing was enabling bin Laden to be

18   protected in Afghanistan and to train the men who actually

19   boarded the flights that drove into the Pentagon and the

20   World Trade Center.

21        Now if I'm to believe you, you agree with me that

22   that is among some of the most heinous acts ever committed.

23   And I don't believe that you knew that was going to happen,

24   that you wanted it to happen, you intended it to happen, but

25   it's a consequence.  There are a lot of other people who did

1    things that allowed that to happen.  Yours is a very small

2    piece of it, but nonetheless is a piece.  You were, both by

3    your voice and by what you were asking people to do,

4    encouraging the Taliban to protect bin Laden.  And indeed to

5    fight against the United States who were trying to get bin

6    Laden.

7            On the other hand, it's not the same as fighting for

8    Al-Qaida, being a member of Al-Qaida.  It's not saying what

9    you did is not equivalent to joining Al-Qaida and doing what

10   it is we now know they did.  But as the government has said,

11   and I don't disagree with them, the power of your website,

12   given -- I mean, the nature of websites, there's so much out

13   there now.  It's kind of like, how does anybody ever find

14   anything?  But clearly your websites, people found them,

15   English-speaking Muslims found them.  And they were a source

16   of information to those people unlike anything that had been

17   on the web before.  And in your website, you were encouraging

18   people to do whatever they could to support the Taliban and

19   acknowledging that all levels of support are important.

20           So while you didn't fight with Al-Qaida, while you

21   didn't send a check to Al-Qaida to pay for the plane trips of

22   Mohammed Atta to come to the United States or get flight

23   training, as you yourself said in the web posting, anything

24   anybody does is needed to help support, in your view, Jihad.

25   I guess at the end of day, even though there are more heinous

1    versions of the crimes that you pled to, the material support

2    crimes, doesn't mean that your crime is not a serious one.

3         Another need for the sentence is to provide

4    deterrence, and that has several meanings.  One is if the

5    sentence is known to people and they were thinking of doing

6    what you did, they would, if the sentence serves the purpose

7    of deterrence, they would say to themselves, well, it's not

8    worth it to have happen to me what happened to Ahmad or

9    Ahsan, so I'm not going to do this.  I will be deterred by

10   the fear that I will suffer the same consequence, this

11   sentence.

12        I have to say that I have little to no confidence

13   that the sentence I impose today will deter people who are

14   terrorists.  I think that's why we give life sentences to

15   terrorists, people who blow up buildings because we don't

16   think that they can be deterred.  As to whether this sentence

17   can deter people like yourself and Mr. Ahsan who provided

18   support to people who became terrorists, I think that's

19   possible.  As to another aspect of deterrence, that's really

20   a specific aspect of deterrence in deterring you, Mr. Ahmad,

21   from engaging in criminal conduct in the future.  In effect,

22   protecting the public from you until you are deterred, that's

23   another need for the sentence.  I have to say I think that's

24   probably the most difficult question I face here today.  And

25   I am going to put it off until I speak first about your

1    history and characteristics and draw some conclusions from

2    that.

3            There's also a need to provide you whatever

4    appropriate treatment or educational or programming that's

5    appropriate, and I don't see that as relevant in this case.

6            Among the other factors I'm supposed to consider are

7    the guidelines and avoiding disparities between and among

8    cases that are similar to yours.

9            First of all, I find the guidelines are not helpful

10   here, and indeed I find the plea agreement entered into by

11   the government and the defendant agree with me, that the

12   guidelines are not helpful.  The guidelines called for 30

13   years to life.  And the government, and you agreed, that a

14   sentence of no more than 25 years was appropriate.

15           I think that at the risk of causing someone in

16   New York to be unhappy with me, I will make a few comments on

17   the guidelines.  The Second Circuit I'm mindful of in

18   Meskini, has commented that the automatic six level of

19   criminal history is appropriate in terrorism cases because it

20   reflects the fact that terrorists recidivate.  Again,

21   language is important here.  Time and language in this case

22   is a challenge every time I open my mouth.  But while this

23   case is categorized as a terrorism case by definition, and

24   therefore this Category VI applies to Mr. Ahmad and to Mr.

25   Ahsan, I don't believe that it is appropriate in the sense

1   that I don't believe that people who provide material support

2   like Mr. Ahmad will necessarily recidivate.  I believe that I

3   have the government in my corner on that because if they did

4   believe that he would recidivate, like the Blind Sheikh or

5   like Yousef Ramzi, then they would not have pled to the

6   maximum sentence of 25 years.

7            Now, as Attorney Reynolds said yesterday, he and I

8   may disagree as to how much time is necessary to protect the

9   public in the sense of recidivism, but my view of people who

10  are terrorists is if I lock them up for 10 years or 25 years

11  or 30 years, they will still be terrorists.  And as long as

12  they are physically capable when they get out, they will

13  still seek to blow someone up.  So to the extent that the

14  Meskini case talks about terrorists, I agree with them if

15  it's that type of terrorist.  I do not agree that anyone who

16  is guilty of a material support count is in that category of

17  terrorists.  And therefore, I view the guidelines to the

18  extent they put someone like Mr. Ahmad, who has no criminal

19  history into a Criminal History Category VI, which drives him

20  up to 360 years to life, is mistaken in that the principle

21  that terrorists will recidivate I do not believe applies to

22  all people providing material support.  If nothing else, the

23  600 defendant summary provided by the defense in sentencing

24  cases, when you look at the material support cases, I would

25  suggest that there are a lot of courts that agree with me.

1          Also I understand that Congress and the guideline

2     commission can make judgments, as they do, with Category VI

3     or the 12-level enhancement, but I will note that I do not

4     believe there was any empirical basis for what they did, that

5     Meskini recognizing specifically that there is discretion to

6     depart under 4A1.1, and of course now under Booker.

7          So I guess to the extent that I understand the

8     guideline right now, departed to under Fernandez to be 25

9     years, in a general sense as to the guideline originally

10    being 360 to life, I do not find that a helpful measure of

11    what a reasonable sentence is, nor do I find it helpful as I

12    usually do in applying guidelines to address the question of

13    disparities between and among people.  Normally, the

14    guidelines can be helpful in that regard.  And I guess all of

15    what I have just said about the guidelines is to say that the

16    guidelines are not helpful in the avoidance of disparity.

17         I have -- in connection with the cases that are out

18    there in determining and attempting to avoid disparities

19    between and among person's with similar records and similar

20    conduct, I read quite a few cases, I reviewed the defendant's

21    summary chart.  I read the cases the government has pointed

22    me to.  It's times like this when I realize my inadequacies.

23    I try to analyze or rationalize the cases that are out there.

24    I thought if I looked at Al-Qaida versus -- not Al-Qaida

25    cases, I looked at acts on U.S. soil or against U.S. citizens

1    versus acts against other people.  If I looked at, like,

2    cooperating witnesses, you know, where you get someone to say

3    they want to blow up the Brooklyn Bridge but it's because

4    some undercover officer is working with them and it's never

5    going to really happen versus actually planning an actual

6    event and it being discovered, fortunately, by law

7    enforcement.  I tried to look at the cases in all of those

8    lights and many more.

9        I have to say that no matter how I looked at the

10   cases, there's absolutely no way to rationalize the

11   sentencings that have been imposed around the country, on

12   persons who have given material support or committed acts of

13   terrorism.  I mean, there's no question that when the

14   courts are faced with the worst of the worst, pure terrorists

15   who kill innocent civilians or who cause that to happen,

16   Blind Sheikh and Ramzi Yousef are two good ones to start

17   with, that it is very easy to know what to do, and there are

18   no disparities.  It's life in prison; and if not, life plus

19   something else.  Or if we have people who are trying to plan

20   to blow up metro stations or other locations in

21   Washington D.C. like Farooque Ahmed; or a person by the name

22   of al-Kassar, whom I had never heard of before, but who was

23   associated with FARC and who was trying and exchanging large

24   amounts of drugs to obtain surface to air missiles and

25   grenades.  He received 360 months.

 1              There are people who met with Osama bin Laden and

 2      Sheikh Mohammed and who conspired to blow up things like the

 3      Brooklyn Bridge and the shopping mall who received 240

 4      months, less that the government seeks in this case against

 5      Mr. Ahmad.  There are people like Khalid Ouazzani who

 6      transferred money, actually did the transfer of the money to

 7      terrorist groups and attempted to recruit people, to train

 8      them in bomb making who received 14 years.  There is Syed

 9      Hashmi, again a material support case who conspired to send

10      money and military gear to Al-Qaida.  He received 15 years.

11      Or Syed-Haris Ahmed, again material support who used Internet

12      web forums.  There we have one that's similar here, using the

13      web to reach many people.  In his case, inciting and

14      conspiring with others in an active web forum to provide

15      military support.  He tried to join a training camp, and he

16      videotaped landmarks around D.C. apparently for the purpose

17      of blowing them up.  He received 13 years.

18              I could go on.  I think someone said there were 600

19      of these cases listed.  Someone who was videotaping, went to

20      Canada, met with people who wanted to do violent Jihad, made

21      videos of potential targets, traveled to Pakistan to train.

22      He received 156 months.  Ali Saleh Kahlah al-Marri in

23      Illinois.  He attended training camps, he offered his service

24      to Khalid Sheikh Mohammed.  He was ordered by the Sheikh to

25      enter the United States before 9-11 and await instructions.

He received 100 months.  Mohammed Sulumna Alnalfi created a company at bin Laden's request as a cover for getting explosives, chemicals and weapons.  He conspired to destroy national defense materials.  He may have turned against bin Laden, which may explain why his sentence was 121 months, but that's not clear from the record.

I have Ilyas Ali for Al-Qaida, was attempting to get four stringer missiles to sell to the Taliban, 57 months.  I have Khalid Awan who introduced an inmate while in custody on a fraud count as a recruit for the Khalistan commando force, raising money to go India intending for it to be used to build bombs to blow up and murder people.  Received 168 months, which obviously with a prior criminal history.

Lastly, someone by the name of Begolly from the Eastern District of Virginia, who was an active administrator of an English forum, which was an internationally used Islam extremist internet forum.  He solicited Jihadists to use firearms and other weapons against police forces, post offices, Jewish schools, and day care centers.  He wanted people to write their legacy in blood and promised a special place in afterlife for violent actions in the name of Allah. He posted a comment praising the shootings at the Pentagon and the Marine Corp museum in the October 2010 and expressed hope the shooter had followed his previous advice encouraging similar acts of violence.  When arrested, he assaulted an

1    agent and attempted to shoot.  He received 102 months.

2         I cite those not because they are purely

3    representative in some respects.  They are, in many respects,

4    below what the government seeks for Mr. Ahmad.  I can't say,

5    I don't mean to say that they are comparable to Mr. Ahmad

6    because they are all sui generis.  These cases are all

7    different.  But I do know that many of the ones I just cited,

8    even the ones who received 10 years or 15 years or 20 years,

9    engaged in or thought they were engaging in, wanted to engage

10   in actual acts of terrorism themselves.

11        And so it's difficult, I guess, to address this

12   aspect that I'm required to address, Mr. Ahmad, to avoid

13   disparities between and among people who have committed the

14   same crime as you with your same history.  I don't really

15   know of anyone who's committed the same crime as you with

16   your same lack of criminal history.  I do know the person I

17   just mentioned who maintained a violent Internet forum

18   encouraging terrorist acts, I know what his sentence was, and

19   I do not equate your conduct to that.  But I can't say that

20   the review of the cases has been of much help in informing me

21   about consideration of avoidance of disparities.  Again, my

22   inability to correlate sentences with conduct, either as to

23   Al-Qaida versus other terrorist groups, what part of the

24   country the sentence was involved in, whether it was action

25   or encouragement, it's very difficult.  But I think generally

1    I would say that, at least of the cases that I just surveyed

2    just now and many others that are in that summary and many

3    others that I read, that in certain situations certainly

4    people have received lower sentences than the government

5    seeks in this case for conduct which, at least as sparsely

6    written about as I'm aware of what it is, I don't know all of

7    the details, but would appear to be more serious than what

8    you did.

9         I'm going to turn now to your history and

10   characteristics, which I have adopted findings from the

11   Presentence Report, but I wish to sort of highlight and

12   mention the things that will then cause me to come to certain

13   conclusions.

14        I will note that you were born in London and you

15   were a first generation Brit.  Your parents, I believe, came

16   from Pakistan.  Have I got that right?  You have one brother

17   and two sisters.  You were raised in a very loving family.

18   You were not wealthy, but you were well enough off.  You were

19   well provided for by your hard working father and mother.

20   You received your primary education and you were encouraged

21   in your education by -- particularly by your mother, but I

22   would say generally supported by your entire family, which

23   continues to be very supportive of you.

24        You demonstrated a strong work ethic early.  You

25   engaged in activities such the Cadet Force which is sort of a

1    junior ROTC from the ages of 12 through 18.  You did very

2    well in school likely due the encouragement of your mother,

3    but also probably due to your own innate abilities.  You

4    attended an extremely prestigious public school and did very

5    well there, the Emmanuel School.  That led to your admission

6    to Imperial College, another highly regarded institution in

7    the United Kingdom where you received a bachelor's and a

8    master's degree.  The last in 1996 in aeronautical

9    engineering.  It almost goes without saying that you are, by

10   all accounts and by anyone who has met you, described as a

11   very intelligent man.  You are very bright.  You are well

12   thought of, and you appear to -- I will stop at that.

13          In terms of your personal background, you were

14   married.  You were divorced.  It appears to be because of the

15   fact you have been incarcerated, and you have no children.

16   You have no criminal record.  As far as your mental health,

17   you do suffer from posttraumatic stress disorder which

18   followed your arrest in 2004 in England.

19          As a child, you grew up in Tooting Circle, which

20   sounds to me like a very poor area of London.  I'm not

21   familiar with it myself.  It's not, you know, on the guide

22   tours probably of England, or of London, but nonetheless,

23   again, as I said, you grew up surrounded by a loving family

24   and by relatives and friends of your family who, I suspect,

25   were supportive and protective of you in that neighborhood.

1          You do appear to be a leader.  It developed that you

2     had, I think, what was originally a Sunday night group of

3     friends that met, I think, in someone's living room that

4     eventually out grew.  But as a midteen, 14 or 15, and some of

5     these other boys, who might have been a year or two younger

6     than you, in addition to hanging out, in addition to talking

7     about your religion, you also engaged in, and probably you

8     caused them to engage in, what I would call good acts.  You

9     helped an elderly woman in cleaning out her yard.  You helped

10    to bury an elderly man who had no family, which was

11    described, I found quite interesting, in the description of

12    the gentleman who apparently was younger than you who ended

13    up in a precarious position with the casket.

14          So the picture that emerges from the hundreds of

15    letters that I received and the videos that I watched and

16    your relatives who spoke of you and your friends who spoke of

17    you, is that you had this circle, it was a very supportive

18    thing.  It eventually, it appears, developed into what became

19    known as the Friday circle after prayers, Friday prayers, in

20    which religion was discussed and in which you socialized.

21    You are also -- it was reported that you spent what seems to

22    me to be an enormous amount of time, I have a little

23    difficulty comprehending how you found the time to do this,

24    but it appears that you spent a lot of time tutoring other

25    younger students.  There are many letters and videos which

1    mention this.  By tutoring, I mean supporting them,

2    encouraging them, helping them learn and study for exams

3    which would make the difference in their lives between

4    whether they would end up at a prestigious school like you

5    did and like Mr. Ahsan did, or whether they would end up in

6    some mediocre institution which would mark their trajectory,

7    or lack thereof, of their life from that point forward.

8            So what I see is that through your efforts you are

9    the cause, at least as claimed in these testimonials, of a

10    very large number of people who were the beneficiary of your

11    tutoring and encouragement and support and, indeed, they went

12    on to very productive lives.  I think one of them made the

13    comment that if it weren't for you, he would either be dead

14    or a drug addict, because those were the choices in Tooting

15    Circle at that time.

16            So I don't know whether they are engaging in

17    hyperbole, Mr. Ahmad, because of the circumstance you are in

18    and they're desire to support you, but I certainly do credit

19    that you did what they said you did.  That is, that you took

20    your time and generously gave it to other people to help them

21    become better.  Indeed you succeeded because they did become

22    better.  They became very productive, successful members of

23    British society.  They, at least, attribute that success to

24    you.  I have written down just two names, the Abasee (ph.)

25    brothers -- I don't know why I wrote those down -- and the

1    Malik family.

2              Also people speak of your empathy.  They

3    distinguished it between people who are sympathetic, people

4    who can feel sorry for you when you are in a bad situation,

5    but they say that you were more than that, that you actually

6    identified with and were empathetic to them when they faced

7    difficult situations.  That you were caring and thoughtful.

8    I'll mention only two, I don't mean to diminish all of the

9    other circumstances that were recounted, but I'll mention two

10   that particularly struck me.  One was the Ali family that

11   lost -- the woman who lost her sister, and the mother that

12   lost her daughter in the 9-11 bombing.  The girl was on the

13   106th floor of the, I think the North Tower, I could have

14   that wrong.  You reached out to that family as soon as you

15   heard about it, which, of course, is consistent with the

16   reports that you also denounced the 9-11 bombings.  But the

17   nature of the support that you gave to this family in -- both

18   in helping them try to find out what happened to their sister

19   and daughter and in supporting the mother, for example, while

20   the daughter traveled to the United States to try to find out

21   what happened, and your constant remembrance of the

22   anniversary and letting them know that you are still thinking

23   of and remembering this murdered sister or daughter is

24   evidence to me of what others have generally categorized as

25   your caring, thoughtful and empathetic nature.

1           The other situation, I think, arose while you were

2    in prison.  And there are a lot of prisoners who take up

3    correspondence with people because I guess there's not a

4    whole lot else to do.  But I believe it's the Pagani (ph.)

5    family, in particular, that the mother I found very moving in

6    speaking of how she felt that your support of her daughter as

7    she struggled through cancer and eventually lost her fight

8    with cancer was so very important to that girl, and indeed

9    important to the surviving mother.  Those were both very

10   powerful stories to the Court in carrying home sort of the

11   general theme that pervaded the hundreds of letters and

12   videos that I received on behalf of Mr. Ahmad.  And I guess

13   at the end of the day, I would say that it appears to me that

14   he is a generous, thoughtful person who is funny and honest.

15   He is well liked and humane and empathetic.  He was described

16   as a nice man, a generous man, a soft-hearted man.  He's

17   selfless.  And despite his circumstances, continues to be

18   happy for people when good things happen to them.

19           In that respect, and I think this is an important

20   aspect of deciding the sentence here today, Mr. Ahmad has

21   been in prison for what is now almost 10 years.  I think

22   we're short by a matter of a couple of days or weeks.  And he

23   has been in prison that long because, as was his right, he

24   fought his extradition which eventually he lost.

25   Nonetheless, at the end of the day, he has spent 10 years in

1    prison.

2           I never asked the government about this, maybe I

3    wished I had, but I will just say my reaction to that.  I

4    will say essentially the same thing about Mr. Ahsan.  I find

5    it remarkable that Mr. Ahmad appears to have kept the

6    characteristics that everyone speaks of him as having despite

7    having been in prison for 10 years, including the last two

8    under circumstances that I'm not sure I could keep whatever

9    good I have in me over that period.  People report that from

10   prison he has, at least when allowed to in England in his

11   custody, to correspond and to telephone others, to express

12   his happiness for what they are going through, his concern

13   for what they may be suffering or on enduring without, in any

14   way, dwelling on or focusing on his own circumstances.  While

15   in the United Kingdom, he worked in prison.  He served on a

16   key committee, which included the warden, in attempting to

17   maintain dialogue between and among what I can only assume

18   are warring factions within the prison, if they are anything

19   like U.S. prisons.  He participated in the Dr. El Sharkawy's

20   course, which I view to be a course designed to educate and

21   to enlighten people about the things I spoke of at the

22   beginning, that is the hijacking by some people of Islamic

23   principles of Jihad and using them to justify acts of

24   terrorism.  And Dr. El Sharkawy reports that he was a good

25   student and reported upon his views and the development of

1    his views in this regard.

2         He's obviously extremely well read and has kept

3    himself constructively busy in prison, including his work in

4    creating masterpieces made out of matchsticks, one of which

5    is quite impressive looking and received a prize.

6         I say all of this because -- and I guess when I hear

7    from the defendant and the government as to their positions,

8    I would ask the government to address whether there's

9    anything within the last 10 years that would suggest that Mr.

10   Ahmad would do this, this being what brings him before this

11   Court again.

12        So I've gone a bit out of order, but because I have

13   listened you to folks for so long, I determined to address

14   the factors that I needed to address.  Now I would like to

15   hear from the defense first, then from the government as to

16   what -- I guess whether you disagree with my assessments in

17   this respect.  And then secondarily, what you think the

18   appropriate sentence is.

19        And I would want to specifically tell Mr. Ahmad that

20   it is his right in this proceeding to address the Court

21   directly, and I would be pleased to hear from you.  I have

22   read your very lengthy letter to the Court.  If you don't

23   wish to address the Court, I understand it, but I would like

24   to hear from you if you do.

25        Attorney Ward.

1          MR. WARD:  Yes, your Honor.  No objections to the

2     Court's findings, your Honor.

3          Let's start with the crime.  Mr. Ahmad supported the

4     Taliban.  He tried to raise money for the Taliban.  He

5     conspired to get equipment, such as gas masks and nuclear

6     biological suits for the Taliban.  He published appeals of

7     people to defend the Taliban.  He gave support to the Taliban

8     at a time when they were giving shelter to Mr. bin Laden.

9          Mr. Ahmad admits all those things.  He's sorry for

10    all of those things.  He was entirely wrong in all of those

11    things.  It was a crime.  No excuses.  It was a crime.

12         This man, as the Court has found, is not Al-Qaida.

13    He's not going to fly a plane into our buildings.  He does

14    not believe in that.  He's not advocated for that.  He's

15    never been part of that.

16         He spent a quarter of his life now in prison.  You

17    have seen the classified material.  What were his goals, what

18    were his concerns, what were his priorities?  Look at his

19    record, and we're not talking obviously about a criminal

20    record because he has none, but not even an arrest prior to

21    this case.  Not even a point off his driver's license.

22         How has he spent his time incarcerated?  As the

23    Court pointed out, he acted as a go-between between inmates

24    and wardens.  He spent his time studying, reading, taking a

25    course that he didn't have to take.  And, in fact, he had to

1     petition to get into from Dr. El Sharkawy, a religious

2     scholar who runs a course in anti-extremism.  He's

3     re-examined his views, he's read Gandhi.  He's read Mandela.

4     This is not a person who is inflexible in his thinking.  He's

5     thoughtful.  He's reflective.

6          How else has he spent his time in jail.  Again,

7     despite 10 years in various forums of isolation, including

8     two years in solitary confinement in our horrendous super max

9     facility at Northern.  If you haven't been there, you should

10    go there.  Sensory deprivation is in the design of the

11    building.  I swear, years from now people will look back at

12    places like Northern and marvel at how we could have ever

13    been so heartless as to house human beings in such a place.

14          Again, look at his record.  How has he lived his

15    life?  Letter after letter after letter.  He's a person who

16    has demonstrated he deeply cared about the misfortune of

17    others.  And again, as a young teen he organized boys, boys,

18    in his community to go out and help those in need.  You

19    recounted a couple of incidents.  It ranged from helping

20    elderly people who couldn't care for their yards and were

21    having problems with their neighbors because their yards were

22    overgrown to go in and clean those things up.  To attend a

23    funeral where there wasn't -- I don't know if minion is the

24    right word, but there weren't enough people to have a

25    funeral.

1          THE COURT:  Minion is definitely not the right

2     word.

3          MR. WARD:  I know, but an equivalent -- but to bury

4     the casket.  Going to weddings where there weren't -- wasn't

5     enough money to pay for servers or dishwashers and

6     volunteering to do that.  Not for money, he didn't ask for

7     money.  He didn't get paid.  He did it because he wanted to

8     do something good for other people.  It was in the hearts of

9     these kids to do something good for others.

10          Again, these letters, remarkable letters, from

11     people from many different walks of life commenting on all

12     stages on Mr. Ahmad's life.  Ms. Barrett and I met most of

13     the people that wrote these letters.  They were eager to

14     write.  They welcomed us into their homes and offices.  It

15     was like they were coming out the woodwork in London wanting

16     to talk to us, wanting to help, being eager to help, talking

17     about this man that they love.  You don't get this kind of

18     response unless you have earned it.

19          The letter writers told us one after another about

20     acts of kindness, charity, little things he did to help

21     others.  Again, even when he had a mountain of his own

22     problems to deal with.  Mrs. Dan (ph.) sat there through --

23     alternating through tears and through smiles about him,

24     talked about the importance of those letters that he wrote to

25     Nash Pagani (ph.) during her illness.  She told us how those

1   letters brought her daughter comfort and made her feel "not

2   so alone" when she endured those painful arsenic treatments.

3        Another mom told us about how he tutored her

4   children during the time when the family was going through a

5   terrible divorce with lots of domestic violence, where they

6   were thrown out of their house and they were homeless and

7   that Babar would take the children to his home.  He would

8   take them on little outings, go to museums, anything to make

9   their lives a little less unpleasant at that point.  And one

10  of those kids who was in the video, now grown, came to court

11  last Friday and sat here because she could not bear the idea

12  that he could be alone in his time of need.

13       The theme of all of these letters is consistent,

14  there's true kindness in this man.  There is true empathy for

15  other people.  He's gone out of his way to care for others,

16  to do work for others, to work on humanitarian projects, big

17  and small, because that's who he is.  Ms. Barrett and I

18  attended Friday circle.  It's still going on after 25 years.

19  He started that.  The two brothers, the Abasee brothers, the

20  doctors, they did a video reference, they wrote letters, a

21  lengthy video.  Consistent with our experience, we sat with

22  them for over an hour.  They wanted to tell us -- it was hard

23  to get them to stop talking, but they wanted to tell us how

24  much they learned from him as teenagers.  And the one that

25  heads the health service in South London says that he learned

early on from Babar that there is great satisfaction in helping others.  Those are the easiest letters and interviews I have ever tried to get.  Again, people wanted to talk about him.  What they most wanted to say is how much they want him back.

Again, this is a deeply empathetic person who was shaken to his core by the slaughter of Muslims in Bosnia.  He went there at the age of 18 to bring relief.  He brought clothing, he brought toys.  He brought whatever he could to help.  He collected all of those things himself.  He paid for his own way.  He went by himself.  He wasn't part of a group. He just did this and went by himself.  When he was there, he saw the suffering, he heard these pleas.  He was still just a teenager himself, impressionable, emotional, and just full of the youthful desire to take some action.

The government has said all along that this case is not about Bosnia.  They have been educated about Bosnia now. But they put Bosnia in their indictment.  They point to the videos about Bosnia, that these were terrorist recruiting tools.  This is the place where an a 18-year-old Babar Ahmad decided that he could not sit by and watch what was going on. It changed his life.  The world community had turned a deaf ear to Muslim cries for help.  Incidentally today is the 19th anniversary of Srebenica.  It occurred in the presence of U.N. peacekeepers who did nothing.  He put his life on the

line to stop ethnic cleansing.  He has the scars and he has

the shrapnel in his body to prove it.  He spent much of the

next six years telling the world about Bosnia.  He spoke at

his university, he spoke at his mosque.  He spoke in Tooting.

Many of his publications were about Bosnia.  His website is

overwhelmingly about Bosnia and Chechnya.  The U.N., through

the findings of the International Criminal Tribunal for the

former Yugoslavia, has apologized to Bosnia.  The government

wants you to forgot about Bosnia and punish him for 25 years

as if Bosnia played no role in his life.  3553(a) commands

that you look at his history and characteristics.  This was

the most significant event in his life.  They want you to

pretend it didn't happen and give him 25 years.

Fresh off of Bosnia, the Russians invaded Chechnya.

The Russians imposed and enforced a total media blackout so

that their atrocities would not come to light.  They were a

major super power sending one of the most fearsome armies in

the world against guerrilla fighters.  Putin directed the

army.  And the savagery and the brutality were overwhelming,

thousands upon thousands of people were killed.  Babar didn't

fight in Chechnya, but he was moved no less by the plight of

the Chechens.  So he took to the internet to publicize what

was going on.

Our own neocons, our former high-ranking political

figures, urged our government to get involved.  Who were the

1   terrorists in Chechnya?  Are we going to say that Putin was

2   wearing the white hat here?  Thousands died in Grozny, they

3   devastated the city.  Khattab killed a Russian soldier who

4   was wounded.  That was a war crime.  Again, no excuses.  Wars

5   make people hardened.  It was a terrible act.  Mr. Ahmad

6   should never have sold the video that had that act in it.

7            When you add up the postings on the websites, I

8   think the calculation is somewhere close to 98 percent of the

9   postings were about Bosnia and Chechnya.

10            The crime here was supporting the Taliban.  Mr.

11   Ahmad lost his way.  He got caught up in the idea that the

12   Taliban would fix Afghanistan.  He lost sight of the

13   principles that he had always believed about in defense of

14   Jihad.  He supported the Taliban despite U.N. sanctions,

15   despite the cruel acts that the Taliban committed against

16   other Muslims, despite the fact that the Taliban was not then

17   engaged in the defense of Jihad.  He's sorry for that

18   support.

19            As a young man, he thought he knew everything.  He

20   was young.  He was wrong.  You should sentence him for

21   supporting the Taliban.  But, again, bear in mind, he's not

22   Al-Qaida.  He did not advocate for Al-Qaida.  He thought that

23   the Taliban would create the Muslim equivalent of the State

24   of Israel.  He thought the Taliban could be a force for good.

25   He didn't appreciate the complexities of the situation.  He

1  didn't see the Taliban for what they were.

2          Again, the government's theory is that by supporting

3  the Taliban, he directly supported Al-Qaida.  That ignores

4  the differences that the experts have pointed to between

5  Al-Qaida and the Taliban.  The Taliban was also about

6  Afghanistan and Al-Qaida was all about global issues.

7          So what would 25 years represent?  Is it in the

8  ballpark of cases resolved by plea?  The government says I

9  have cherry picked.  We gave you over 600 cases to look at.

10 That's a boat load of cherries here.  You won't find any 25

11 year sentences for cases analogous to this like you have

12 already said.

13         Even the deposed witness says that Mr. Ahmad was not

14 about operational plots or attacks on civilians or advocating

15 that others join Al-Qaida or support Al-Qaida.  Babar wanted

16 the deposed witness to get training and come home.  He wanted

17 him to go to university and to finish there.  He was

18 horrified to learn what the deposed witness agreed to do.

19 That's not what he stands for.  That's not what he's ever

20 believed.  He wanted different things.  He's already served

21 150 percent of what the deposed witness got for a sentence.

22         Now, you asked yesterday, your Honor, about

23 martyrdom, would he support something look the U.S.S. Cole or

24 encourage suicide bombings.  No.  He doesn't support that

25 kind of martyrdom, he never did.  The sites didn't have

1    planes flying into buildings or anything similar to that.  No

2    attacks on civilians.  His idea was always martyrs on the

3    battlefield.

4         He would go even further now, I think, having gone

5    through Dr. Sharkawy's class, having thought and reflected on

6    this.  Wars are for nations to declare, not for individuals

7    to declare.

8         In short, your Honor, he never thought there was

9    anything heroic, religious or moral about flying planes into

10   buildings, about killing noncombatants or civilians.  That is

11   not what Islam is about.  This man wanted to live, not to

12   die.  He wants to be with, to enjoy -- to be with his family.

13   He wants to make life better in his community.  He wants to

14   be the person again that all those people wrote to you about,

15   to affect people's lives as he did in the past.  All those

16   letters, that's the person he wants to be.  Again, there's

17   genuine goodness in this man.  He's being wasted sitting in a

18   jail cell.

19        Here's what I think, I think here you have a person

20   who, as a very young man, was moved to his very soul to try

21   and help suffering people, but he failed ultimately to

22   distinguish the complexities of the developing conflicts.  He

23   thought he knew all the answers.  He didn't.  For the past 10

24   years, he's learned a very hard lesson.  But even so, he's

25   tried to learn and to understand.  Two counter-terrorism

experts, Dr. Sageman in the United States, Dr. Hassan in the

U.K. believe he's a very low risk of recidivism.  His conduct

for the last 10 years supports that assessment.  He has been

a model prisoner.  He's studied, he's thought, he's learned.

He's not young anymore.  He matured.  He re-examined his

views.  I think he's been punished enough.  The good in this

man, I think, far, far outweighs the bad.  He cares about

others.  He can be an asset to his community.  Think what

he's lost, 10 years in harsh conditions of confinement.  Lost

his spouse.  They loved each other.  She's now remarried, and

moved on.  What a terrible loss for both of them.

He took a terrible beating in his arrest.  There's

enough punishment here.  He's lost his career, he's lost his

youth.  There simply has been enough punishment here.

There's no terror case exception to the idea that

there has to be proportionality in sentencing.  We look at

the history and characteristics of the person, not just the

offense.  We do not punish excessively, only what is

sufficient and not one day more.

This courthouse stands on the grounds -- it's the

first United States Court.  George Washington appointed

Richard Law to be the first United States district judge in

1789 here.  We stand for something.  We stand for fairness.

We stand for proportionality.  It is really now time to send

this man home.

1          Your Honor, his sister would like to address the

2     Court briefly.

3          THE COURT:  I would be pleased to hear from her.  If

4     she would come forward, please.

5          THE COURT:  Good afternoon.

6          THE WITNESS:  Good morning, your Honor.  My name is

7     Ama Ahmad.  I'm the sister of Babar Ahmad.  I'm a medical

8     doctor by profession, but currently I'm on break because I'm

9     looking after my five beautiful children.

10          As you would have read from our letters and as you

11     mentioned, we're a very loving family.  We grew up very close

12     to each other.  And that's not abnormal of many loving

13     families, but what was perhaps a bit extraordinary for us is

14     the even when we grew up and went to university and got

15     married, we still maintained that closeness with each other

16     despite our other relationships.  We lived within a few

17     minutes of each other.  We would visit each other.  We would

18     eat together.  We would socialize with each other.  We've

19     always been very, very close.

20          When Babar was plucked out of our lives in 2004, we

21     were completely shattered.  And the last 10 years have

22     been -- have been a very difficult ride, but we've supported

23     him and he supported us throughout that 10 years.  I had

24     three of my children whilst he was in prison.  And as soon

25     as, you know, he would get the news of that baby in prison,

1   that we would immediately send him photos.  And the moment I

2   recovered from childbirth, I would make sure that we could

3   make a trip to the prison and he could meet his new niece or

4   nephew.

5        We visited regularly.  I would take all the

6   children.  And through that process, my children, the eldest

7   is -- which is 11 and my youngest is 14 months, have formed a

8   deep love and bond with their uncle despite the

9   circumstances.  They write to him.  They regularly pray for

10  him.  They like to tell him of their progress.  And just as

11  an example, like, my son who is 10, he's giving exams in

12  September and Babar wrote him a beautiful letter just a

13  couple of weeks ago, which he was really proud to read a few

14  times over, and he's put it up on his wall.

15       So as a family, despite the circumstances, we have

16  maintained that loving relationship.  And more than anything,

17  we just want him back in our lives.  I feel that -- like my

18  parents, they are getting -- excuse me.

19       THE COURT:  Take your time.

20       THE WITNESS:  I've been the only sibling looking

21  after them, and it's been very difficult to see them go

22  through the pain of not having their son.  But we look

23  forward to a time where we'll be able to be that family again

24  together.  We'll be able to have those dinners together.

25  We'll be able to laugh.  When he comes home, he'll be able to

1    play with the children and be a part of their lives again.

2         I feel that once he gets out, that's the most

3    important thing to him, to be able to just make up for that

4    lost time with the family.  And to hopefully go on and have

5    his own family because he absolutely adores children.  That's

6    a part of his personality.  He absolutely adores children.

7    If I could have brought my children here today and brought

8    them all up one by one, they would have said the same thing

9    to you.  They love him and they adore him because he gives

10    them that love despite have been in solitary confinement.

11    He'll speak on the telephone.  He'll even speak to my little

12    one.  That's really all I want to say.

13         THE COURT:  Thanks very much.

14         MR. WARD:  Mr. Ahmad would like to address the

15    Court.

16         THE DEFENDANT:  Good morning, your Honor.

17         THE COURT:  Good morning.

18         THE DEFENDANT:  I would like to start by --

19         THE COURT:  You have listened to a lot of people say

20    a lot of things about you.  As I indicated, I watched your

21    interview because I felt like I don't know you in the sense

22    of I haven't heard from you.  So I'm pleased that you have

23    decided to address the Court.  And I hope you know you don't

24    have to, but if you wish to, it's your right.

25         THE DEFENDANT:  Thank you for that opportunity.  I

1    also wanted to start by saying thank you for the courtesy

2    with which you have addressed me.  I wasn't quite sure what

3    to expect when I came to the U.S.  I mean, judges in the

4    United Kingdom, they tend not to even look at the defendants,

5    let alone say good morning to them or try to pronounce their

6    name correctly.

7            THE COURT:  Well, I haven't done very well on that.

8            THE DEFENDANT:  You have, you have pronounced my

9    name correctly.  There's many different ways to pronounce it.

10   You have said it correctly, so I appreciate that.

11           You and I are standing here today because I

12   committed crimes.  I committed crimes in supporting the

13   Taliban, and calling upon others to support them at a time

14   when they were not only engaged in a civil war against the

15   Northern Alliance, but they were also giving sanctuary to bin

16   Laden and failed to prevent him and his group from attacking

17   other people and other countries; namely, the United States.

18   And I continued to support them after the coalition invaded

19   Afghanistan in October 2001.

20           In the next few moments I hope to -- I will try to

21   explain how it is I came to commit these crimes, why it is

22   that today, all of those years on, I'm sorry for committing

23   these crimes.  And how they went against everything that I

24   stood for, or that I had stood for in my life, and how it is

25   that I feel about them today.

1          THE COURT:  Before you move on, may I ask a

2   question?  You heard the government yesterday describe you as

3   barely admitting to a technical crime.  Is that how you feel?

4          THE DEFENDANT:  No, your Honor.

5          THE COURT:  Okay.  Sorry to interrupt.  Go ahead

6   then.

7          THE DEFENDANT:  You mentioned, your Honor, you have

8   read thousands of pages in this case.  You read my letter,

9   obviously.  I may touch upon a few things I mention in my

10   letter, but I will try not to bore you with the same

11   repetition.

12          Your Honor, as it's on the record, when I was 18, I

13   saw a news report about Bosnia.  A few moments ago, I heard

14   you say about, you were interested to know perhaps how that

15   impacted on me.  Up until that point, I had lived the life of

16   a normal teenager.  I saw this news report.  And that

17   prompted me to go to Bosnia as an aid worker when I was 18

18   years and about six months of age.

19          When I went there, your Honor, I saw things that I

20   hope most people would never want to see or hope most people

21   never see in their lifetime.  I am -- sorry, could I take a

22   moment?

23          THE COURT:  Take your time, sir.  I understand it's

24   not easy.

25          THE DEFENDANT:  I have traveled around the country,

1    your Honor, and I saw refugees -- refugee camps.  I met

2    survivors, I spoke to people who told me about -- I spoke to

3    people who told me about the atrocities, and it was quite

4    overwhelming.  I mean, it's been 22 years now, but as I speak

5    about it, the thoughts, they come back.

6         One of the things I realized when I spoke to

7    Bosnians that had been through atrocities, they had this look

8    in their eyes, which, I don't how to describe it, it's like

9    the eyes of someone who has been through unimaginable

10   suffering.  They see straight through you.  They're talking

11   to you, but their eyes are seeing straight through you.  They

12   told me stories of how the men were being physically

13   castrated.  How I met women that had been gang raped by up to

14   15 men.  Children had had their throats slit.

15        There was one particular story that stuck out for me

16   that was told to me by a man in a school in the City of

17   Travnik that been converted into a refugee center.  One

18   evening he told me the story of what happened to a lady in

19   his village where a three year old -- a woman and her

20   three-year-old daughter, the three-year-old daughter was gang

21   raped by the Serbs.  After that, they slit the throat of the

22   child and put the body of the child into a meat grinding

23   machine.  They then cooked the body of -- the meat, the

24   ground meat of the child and forced the mother at gun point

25   to eat it.  I heard this and I went back to my room where I

1    was staying, and I was not able to sleep that night.  I still

2    have a memory of what I was wearing that night, where I was

3    sleeping on the first floor of a house, a wooden floor in a

4    sleeping bag.  That was one of the longest nights in my life.

5    And I was just thinking about what had actually happened,

6    what had transpired in the last couple of weeks that I had

7    been in Bosnia.

8          In the morning, I decided I wanted to do something

9    to stop it.  And I walked to the nearest Bosnian Army base,

10   and I said I want to fight to defend what is happening, and I

11   want to protect these people.  I took up arms, and I took

12   part in some battles.  A few weeks later, I came back to the

13   U.K.  I continued with my college education.  And over the

14   next few years, I would return to Bosnia on several

15   occasions.

16         A few weeks after the Srebrenica massacre, I

17   returned to Bosnia again.  And I met some survivors of the

18   Srebrenica massacre.  They told me stories and accounts about

19   how the women and children had been placed on buses.  And how

20   most of the men had been told they were just going to be

21   asked a few questions, and they would then be released.  Your

22   Honor, I won't go into the details of that.  Over the last

23   two decades, there's been reports and rulings and movies and

24   documentaries and books written about Bosnia, about the

25   Srebrenica massacre.  Of course, my personal experience there

1    was quite different.   I took part in more fighting to

2    liberate the Muslim towns linked to Srebrenica.   I received

3    injuries.   I return to the U.K.

4            Thereafter, major decisions that I took in my life

5    over the next few years, at the back of my mind was how am I

6    going to prevent the next Srebrenica from happening.   I

7    rushed head long -- perhaps I was -- at least in England, I

8    was amongst the first people to respond.   When I went to

9    Chechnya the following year, I wanted to go there and to

10   fight the Russians, but by the time I managed to get there,

11   the war had ended.   And I spent some time in an orphanage and

12   I came back.   I made audio and video cassettes of friends

13   that I had lost in Bosnia.   There was about 30 or so friends

14   that I lost in the fighting in Bosnia.   Books, websites, I

15   set up the books -- I published books, I set up websites

16   telling people about what had happened in Bosnia and about

17   how Muslims need to stand up and defend themselves.

18           A couple of years later, war began in Kosovo.   I

19   tried to the help the Kosovo Liberation Army.   A year later

20   in 1999, the war began in Chechnya.   I set up the Qogaz

21   websites.   I sent them satellite phones, encrypted laptops,

22   other things that even haven't come in this case.

23           And then, your Honor, by the end of 2000, was --

24   Muslim clerics began to issue appeals to support -- that

25   people should support the Taliban.   And I called upon -- I

1    used the websites, I responded to that call, and I used the

2    Azzam websites to call -- to solicit support for the Taliban

3    regime.

4         Now, looking back, I do feel quite, in a way -- I

5    mean, there's no other way to say them, dumb or stupid in

6    terms of postings that were put on the websites saying that

7    bin Laden himself had said that he didn't have anything to do

8    with Embassy bombings, that he didn't have anything to do

9    with the Cole -- this is after the Cole.  And I find it quite

10   stupid that I actually believed that.  I genuinely believed

11   that.  If I believed that he had anything to do with those

12   things, then I would not have supported the Taliban's failure

13   to take action to prevent him from doing these things.

14        So these calls went out, and I was amongst the

15   first.  I was under this impression that just like the

16   Muslims in Bosnia or the ones in Chechnya that were under

17   attack, A, you have the Taliban, that they are being

18   victimized by the international community.  This man, all he

19   did was fight the Russians in the eighties.  He hasn't done

20   anything to anyone.  He's just making belligerent statements,

21   and they are unfairly targeting him.  And as a result, the

22   international community is putting sanctions on the Taliban.

23   This's not right.  They need to be helped.

24        And, of course, with the benefit of hindsight and

25   with the benefit of 9-11 and what happened, there was a -- I

```
 1    mean, naive is the not the word.  I mean, it's a pretty dumb
 2    thing to actually -- you know, I find it strange how I
 3    actually bought into that.  That, A, you had the regime that
 4    was essentially allowing someone to go and attack other
 5    countries.  And then you had the Embassy bombings, you had
 6    the Cole, and then when 9-11 happened, there was still that
 7    state of denial initially.  He's denying, oh, I didn't have
 8    anything to do with 9-11.  How can I do that?  I'm sitting in
 9    a cave in Afghanistan.  And there is all these -- I bought
10    into the conspiracy theories, like the whatreallyhappened.com
11    type stuff, which was, it was internal job and stuff like
12    that.
13             THE COURT:  So when you posted in the fall of '01,
14    you still accepted that the Taliban was protecting someone
15    who wasn't doing these things?
16             THE DEFENDANT:  At that time, your Honor, I think
17    once the coalition invaded -- I mean, I don't mean any
18    disrespect, but for -- in the Muslim world, at least, people
19    forgot about 9-11 and it all became upon, Afghanistan is
20    about to be attacked.
21             Now looking back, they were attacked because
22    Al-Qaida went and attacked 9-11 first.  It wasn't like
23    Muslims in is Srebrenica are just sitting there and living
24    their lives and just someone came and just massacred them.
25    Someone went from Afghanistan, they went, they attacked the
```

1    United States.  Well, of course, the United States is going

2    to invade Afghanistan.

3            So at that time, I solicited -- continued to solicit

4    support for Taliban regime and the coalition of troops -- not

5    because I supported Al-Qaida or 9-11, but because it was a

6    Muslim land and it was under attack.

7            Soon after that, obviously, your Honor, I mentioned

8    9-11.  On 9-11, the world changed.  As you said, it's

9    sometimes difficult to imagine, a two-hours drive from ground

10   zero, that there ever was once a world before 9-11, in which

11   9-11 had not happened.  There's a lot of things that we

12   learned.  I mean, when 9-11 itself happened, I remember when

13   I saw the screens on -- I was at work, and I went to the

14   break room with my co-workers just to watch the news.  I

15   remember one shot in particular.  That there was one young

16   woman and she was just describing about what happened, and

17   she had this phrase, she said there was just people jumping

18   out the windows.  I remember that this woman had a look on

19   her face which reminded me of the looks on the faces of the

20   Bosnia Muslims that I had met on my first visit to Bosnia.

21   She had that stare in her eyes which looks straight through

22   you.  And immediately for me, that wasn't -- there was no

23   discussion about that.  Whoever was responsible, whatever --

24   whoever had done that, these were just people who went to

25   work and who were on their way to work and someone had done

1    this to them.  This was a crime.

2         It didn't even occur to me that any -- this was done

3    in the name of Islam or it was somehow something to do with

4    Jihad.  That thought was much, much further away from me.

5    Eventually, your Honor, the situation became more difficult

6    to keep the websites open.  Things became more clear.  Things

7    were in haze, who had actually done this.  Initially, I

8    thought that no -- you know, God knows who had done this.  It

9    hadn't been these people in Afghanistan.  And as time came

10   out and they began to issue, like, videos of hijackers and

11   the words of the 9-11 hijackers where they were effectively

12   saying it was us.  The websites, I shut down -- we shut down

13   the websites in July of 2002.  I had lots of other things

14   going on personally in my life at that time as well.  And I

15   decided to just take a little step back with what was

16   happening to try and digest everything.

17        I put my efforts, then, in the last couple of years

18   before I was arrested, into -- my cause became obtaining

19   rights for the detainees in Guantanamo Bay.  There was some

20   people from our community that had been caught in Guantanamo

21   Bay that were later released without charge.  There was a lot

22   of hassle upon the Muslim community, what you would call stop

23   and frisk.  And lots of people, especially in that post 9-11

24   period, a lot of people were getting hassled in the Muslim

25   community.  I put in efforts to educate them about their

1    rights and the legal rights.  I myself had a negative

2    experience with the police.  Thereafter I spoke to people in

3    our community about what happened.

4         Then August 2004, I came to prison.  Prison, your

5    Honor, for me was a completely different world to what I had

6    been living in.  From working in a university, I was now

7    living with criminals and drug dealers and murders and all

8    types of people.

9         The 10 years I spent in prison have been the darkest

10   years of my life.  I did try -- I have tried to learn from

11   this experience, from these last 10 years.  You mentioned

12   these committees that I sat on in prison.  I learned from

13   them about communication, about how people just need to talk.

14   It's not difficult.  It's not rocket science.  There's two

15   opposing people who have different views.  They just need to

16   talk.  They might not agree with each other, but they will

17   definitely stop attacking each other.  I saw that happen over

18   several years in the prison.  I read many, many books.  I

19   read books of people that had gone through previous

20   struggles.  I read Mandela's book.  I read several books of

21   Mandela.  Ghandi.  I've read books of the Northern Ireland

22   troubles and their peace process.  Your Honor, as you

23   mentioned, the course by Dr. Sharkawy, which taught me --

24   over nine months, I learned, in essence, I will say the

25   biggest thing that I learned from Dr. Sharkawy was that not

1    every conflict in the world is Bosnia.  The world is

2    complicated.  And it's not for individuals, like I would do,

3    to head long rush into a foreign conflict and to get involved

4    and to help because these things are just beyond one person

5    or two or three or five or ten people to do, to resolve.  And

6    states have to resolve these problems.

7           Your Honor, you asked, I think it was on Friday, you

8    mentioned earlier today as well, you spoke about recidivism,

9    you spoke about -- I mean, obviously, these are one of the

10   concerns, one of the questions that you need to address.

11          Of course, your Honor, there's many things that I

12   want to do in the future.  I have lost a lot of time with my

13   family, being away from my family, that's something that I

14   want to make up the lost time for.  But for me, another way

15   of answering this question, as well as the way my thoughts

16   have changed and as well as what I want to do with my family

17   is, am I prepared to go through this again?  By that, I mean,

18   ten years of strip searches, humiliation, isolation,

19   lockdowns.  Ten years of picking up the prison phone to find

20   out that my grandmother has died, or an aunt or uncle has

21   died, or a friend has died and I am not going to be able to

22   attend their funeral.  Ten years of putting on a brave face

23   and going and meeting my family on a visit only to come back

24   and to count the minutes until the morning.

25          I remember, your Honor, one thing that Nelson

1   Mandela once said.  He said, years pass like minutes in

2   prison, but sometimes the minutes pass like years.  And I

3   spent a lot of these years and minutes in the last ten years.

4        Last night, your Honor, I did the same routine that

5   I have done for the last two years at Northern.  Northern is

6   a place I have been living next to death row inmates for the

7   last two years.  I see them every day.  The inmates bang and

8   shout and scream all day, all night.  And for me to sleep, my

9   bedtime routine consists of five pairs of socks and an empty

10  shampoo bottle.  You might wonder what does five pairs of

11  socks and an empty shampoo bottle have to do with sleep?

12  Well, half an hour before I sleep, I will get the pairs of

13  socks, I will fold them, and I have to make an airtight seal

14  all the way around the door.  It has to be done in a certain

15  way with a plastic fork, which takes about 15 minutes in

16  order to stop the noise.  Then I will get the empty shampoo

17  bottle and I'll balance it at a certain angle on the air vent

18  so it has like a wind tunnel effect and makes like a white

19  noise.  Only then I can sleep.  And several times throughout

20  the night, if the shampoo bottle, if it falls, then the

21  banging will wake me up.  And I have to go and I need to go

22  and balance it back before I can sleep.  I did it last night

23  and the night before, and it's been like that for the last

24  two years.

25        So quite simply, one of the ways for me to answer

1    that question is, am I prepared to go through all of that

2    again?  No, your Honor, I'm not prepared to go through all of

3    that -- I'm not prepared to go through all of that again.

4          Your Honor, there's not much, I guess, not much more

5    left for me to say.  There's just one last thing that I

6    wanted to say, if I may, your Honor.

7          I wanted to say something about my representation.

8    Your Honor, it would appear today that the Federal Defender's

9    Office in Connecticut is on a furlough today, but they have

10   actually all come here with their friends and families to

11   come and support me.

12         Your Honor, over the last couple of years, Mr. Ward

13   has spent his weekends and evenings, he's come to visit me

14   all the way at Northern.  He has -- he came to see me the day

15   after Thanksgiving.  I probably shouldn't say this, but I'm

16   going to anyway, that -- that someone close to him told me

17   that in his 25 years as a federal defender, they've never

18   seen him work as hard on a case as he worked on my case.

19         Your Honor, Ms. Barrett here has spent, over the

20   last two years, perhaps 5 or 600 hours in legal visits with

21   me, driving up to Northern up to four times a week coming to

22   see me.  She came to see me the morning after Christmas.  She

23   even came to see me on a weekend on a surprise visit on my

24   40th birthday, which was just a few weeks ago.  She said that

25   I didn't want you to spend this alone, so I just came to see

1    you.

2           Your Honor, I'm not going to lie to you, I did not

3    have a very positive opinion of America before I came here.

4    But I must admit that my experiences with my attorneys and

5    with the Federal Defender's Office here in Connecticut has

6    completely changed the way I look at America.

7           And whatever sentence you pass upon me today, I

8    shall remain grateful to them for the rest of my life.

9    That's all I have to say, your Honor.

10          THE COURT:  Thank you very much.

11          Attorney Reynolds.

12          MR. MILLER:  With the Court's permission, Raymond

13   Miller for the government.

14          THE COURT:  Yes, certainly.

15          MR. MILLER:  I will address the Court briefly.

16   Given the Court's rulings today, perhaps I have some heavy

17   lifting to do.  I want to keep the government's remarks

18   short, your Honor.  And given your Honor's ruling, we're

19   going to refocus our argument a little bit.

20          We made our points, and we respect your Honor's

21   ruling.  In many instances, advanced a different point of

22   view.  But I think, in your Honor's -- my understanding of

23   your Honor's ruling this morning, your series of rulings on

24   factual situations, the one thing I want to focus on is the

25   comments and the import of your comments on the seriousness

1     of the crime when it comes to imposing what's a fair and just

2     sentence in this case.

3            What the Court has defined the crime here as is

4     support of the Taliban who, at that time, was harboring Osama

5     bin Laden in Afghanistan.  And --

6            THE COURT:  At the time after he had committed two

7     heinous terrorist attacks and was planning the third.

8            MR. MILLER:  Exactly correct, your Honor.

9            And what you said, and this is a paraphrase of your

10    words, your words control, but that the defendant's

11    solicitation of funds, which I will talk more about in a

12    minute, but contributed to the training of men and people who

13    committed terrorist acts against the United States.  He owns

14    a piece of that for the rest of his life.  That's the crime

15    that he committed.  I think everyone in this courtroom has

16    agreement on that.

17           His provision of support to the Taliban, who was

18    harboring then Osama bin Laden, is a serious crime that

19    warrants a significant punishment.

20           THE COURT:  Is it significant that he didn't -- in

21    doing what he did, his intention or his objective was not to

22    enable Osama bin Laden to blow up the World Trade Center.

23    His intention, as I understand it, which I wouldn't

24    necessarily agree with, but was to support what he viewed as

25    an Islamic state government.  That his view, at the time was,

1   a good thing.  I think he now would agree perhaps more with

2   my view, that it wasn't a good thing, but that was his view

3   at the time.

4          MR. MILLER:  When you look at the support though --

5   I want to make sure I have my dates correct.  I checked with

6   the agents in the interim after we started this morning.

7   That if you look at the attack on the World Trade Center,

8   which obviously occurred in September of 2001.  The FBI

9   informs me, if I have this right, that in October 2001, a

10  video of Osama bin Laden, Sulaiman Abu Ghayth had taken

11  responsibility for the bombings on 9-11 and explained why the

12  U.S. deserved air populate.  I believe I have that correct.

13  That's in October 2001.

14          And if you look at the Azzam website, and in

15  November 2001, it was updated with the appeal to Pakistanis.

16  Excuse me.  It was updated in the Jihad in Afghanistan

17  section.  I want to make sure I have this right, too.  That

18  there's a link that -- that there's an update in the Jihad to

19  Afghanistan.  And with that was the link on the appeal to

20  Pakistanis, which I think we're agreeing is the support to

21  the Taliban of money and contributions.  And in that link,

22  that Afghanistan page which your Honor has focused on, what

23  I'm going to call the World Trade Center bar graph.  I don't

24  know what to call it.  Call it a box.  I don't know if

25  there's a particular apt word for its description.  But what

1    that did is it compared civilian deaths I think in

2    Afghanistan to the civilian deaths in the World Trade Center.

3          In the appeal to Pakistanis, which was linked on

4    this page, which was updated in November of 2001 -- excuse

5    me, the page that was updated in November of 2001 contained

6    the link to the appeal to Pakistanis.  So in November of

7    2001, the website is continuing to support the Taliban.

8          When you think about material support cases -- and I

9    agree with your Honor.  When we looked at all of these cases,

10   and like a lot of areas of law, quite frankly, there is

11   sometimes not consistency.  With the guidelines, the 3553(a),

12   the guidelines tell us to strive against that.

13         If you look just at material support cases, one

14   thing your Honor said I think was particularly important,

15   this is not the material support case of an individual

16   contributing material support.  I forget the name of the

17   defendant, but I think there is a case I think your Honor

18   cited to.  It was a cab driver in Los Angeles that provided a

19   sum of money to Locke before Locke was killed.

20         That's not this case.  And this case is obviously a

21   website case, where a website is appealing to everyone else.

22   But this is not just a website case.  When it is updated in

23   November 2001 saying that Jihad in Afghanistan with a link

24   with the appeal to Pakistanis, hey, come support the Taliban,

25   this is at a time when there weren't a lot of English

1　　language websites.  So it was a material support case in some

2　　ways, as the government has said, is unprecedented in its

3　　scope.  It's not an individual.  It's not just a website.

4　　It's one of the first websites in 2001.  When I think about

5　　the internet usage in 2001, it's very different than it is in

6　　2014.  So this is a pioneering website.  This is a website

7　　reaching out across the world in English in November 2001

8　　asking individuals to -- asking Pakistanis to support the

9　　Jihad in Afghanistan given the difficulties the case brought.

10　　　　　　It's a difficult case with a lot of factors, your

11　　Honor.  And given your Court's ruling and the seriousness of

12　　the crime, the government believes should be an important

13　　consideration in whatever sentence you determine.

14　　　　　　Could I have one moment, your Honor?

15　　　　　　With that, the government has nothing further, your

16　　Honor.

17　　　　　　THE COURT:  Could I ask you a question?

18　　　　　　MR. MILLER:  Certainly.

19　　　　　　THE COURT:  I don't know how to put it.  How do you

20　　view the last ten years of Mr. Ahmad's life?  What does it

21　　say to what's before the Court today?

22　　　　　　MR. MILLER:  Can I have another moment?

23　　　　　　THE COURT:  Yes.

24　　　　　　MR. MILLER:  Your Honor, the government doesn't have

25　　any evidence contrary to what's presented in the last ten

1    years of his life when he's been incarcerated.  But I think

2    we continue to believe strongly that the nature and

3    seriousness of the offense warrants an appropriately

4    significant sentence.

5            But as far as specific insight into what's going on

6    in Mr. Ahmad's life in the last ten years, we don't have

7    anything to add other than we've already argued in the last

8    couple of days.

9            THE COURT:  I guess I'll put it this way, do you

10   think it's a charade?  Do you think he's a really

11   evil-intending man who when free will want to continue to act

12   as he acted in 2001 in supporting the Taliban that protected

13   the world's worst terrorist?  If it is, it's an incredible

14   act on his part.  I guess I can't get around the last ten

15   years.  I honestly, if it were me, I would not be ticket

16   free.  I would be very angry.  And I would have acted on that

17   anger.  Yet, I see a man who didn't.  Maybe he has tremendous

18   self-control.  Maybe he's really some disciplined, secret,

19   covert terrorist, and that once free, will spring free and

20   become the next Osama bin Laden.  But I -- if so, he's done a

21   heck of a good job of pulling the wool over my eyes.

22           While I think the seriousness of what he does merits

23   a serious sentence, I have to consider other factors.  One of

24   them is wrapped up and ultimately comes down the issue of

25   recidivism.  What will he do when released?

1          MR. MILLER:  Your Honor, nobody has a crystal

2     ball.

3          THE COURT:  No, I know.  If I did, I wouldn't have

4     spent the time I spent over the last three weeks on this

5     case, if I had a crystal ball.

6          MR. MILLER:  I know the government as well as

7     defense counsel appreciates your comments.  And the Court's

8     struggle in every sentencing, not in set cases, unique cases

9     like that.  But every day, wire fraud, mail fraud, bank

10    robbery cases and struggling with it.  We don't have a

11    crystal ball.  I will stand by Mr. Reynolds's comment

12    earlier.  The government has concerns about this individual's

13    return, not to the operational violent Jihad.  That's not the

14    government's argument.  There's not that concern.  That's not

15    what he did before.

16          Systemic material -- significant material support.

17    And I can't get my head around why the World Trade Center's

18    were attacked in September.  In October, there's publication,

19    wide publication according to the FBI, by bin Laden and his

20    associates telling why the U.S. deserved it.  And why you

21    would post on a website, send help to the Taliban a month

22    after that.  Two months after 9-11.  That, I think, is

23    something that hasn't been addressed.  That's something that

24    the government has concerns about, this defendant returning

25    to a material support position as Mr. Reynolds' explained

1     either yesterday or Friday.

2          THE COURT:  I had one other question for, Mr. Ahmad.

3     If he doesn't wish to answer it, he doesn't have to.

4          I happen to have made a note in looking through the

5     piles of materials I looked at.  I'm not sure why I'm

6     bothering to ask the question, but it bothered me when I saw

7     it.

8          Among the materials submitted as to his art work in

9     Exhibit L of the plaintiff's submissions, one of them is a

10    gift I think he gave to someone who worked with him in

11    England.  It's of a sailboat.  The title of it is "Sailing

12    Through Injustice."  I would ask what injustice you were

13    referring to.

14         THE DEFENDANT:  That was a gift, your Honor, to my

15    attorneys that represented me in the U.K  And that was my

16    attorney who represented the Guildford Falls.  They have done

17    a lot of cases.  So that was just to -- it was like a gift to

18    the office to appreciate their work.

19         THE COURT:  I see.

20         MR. WARD:  Your Honor, the attorney he is speaking

21    of is Garrett Pierce, the solicitor from London.  She was

22    actually here yesterday as well.  She came just to support

23    Mr. Ahmad.

24         THE COURT:  All right.  I had thought I would be

25    able to finish Mr. Ahmad's sentencing.  I'm sure he wishes I

1    could before lunch, but I'm having a revolt by my reporter

2    for the first time in 15 years.  In addition, to having gone

3    for three and a half hours without a break, she's freezing.

4    So her fingers will not move.  So I would have avoided the

5    complaint about the lack of break, since this is Judge

6    Dorsey's former courtroom, but I can't if she can't take down

7    what's being said.

8              So unfortunately, we'll take a half an hour lunch

9    recess.  And come back after recess.

10             (Whereupon, a recess was taken.)

11             01:32 PM.

12             THE COURT:  Please be seated.  And good afternoon to

13   you.

14             Having heard from both sides and having considered

15   and discussed the various factors the Court has an obligation

16   to consider, the Court would like to just say a few final

17   remarks before proceeding to impose sentence.

18             I think taking all of the factors into

19   consideration, as I must and as I have.  In my view, the two

20   factors really which are the most significant here are the

21   nature and circumstance in that respect, the seriousness of

22   what Mr. Ahmad did which makes him guilty of the crimes for

23   which he stands before the Court when balanced against his

24   history and characteristics, which also go to the question of

25   the need for deterrence, or put the way I have been putting

1    it, his likelihood, if any, of recidivism.

2         With respect to the crime which he committed, as I

3    have already said, I view it as a serious crime, particularly

4    as it related to his operation of and support of a website

5    and support for a website which after Osama bin Laden took

6    responsibility for terrorist acts, that website continued to

7    call for support of the Taliban, which was and had been

8    protecting Osama bin Laden.  I suspect that but for that and

9    the timing of that, we wouldn't be here today.

10        And it's a serious offense, as I have already said,

11   and merits substantial punishment.  Balanced against that,

12   however, and I have already spoken at length about his

13   history and characteristics, but what in sum amounts to a

14   very upright, positive and well-meaning life lived by Mr.

15   Ahmad.

16        It's this Court's conclusion, and I hope I am not

17   wrong, that Mr. Ahmad has a low likelihood of recidivating,

18   if any at all.  I rest that very difficult decision, which is

19   really the pivotal decision in my opinion in this sentencing,

20   on a number of things.

21        One is the nature of what his crime was.  It's not a

22   crime of action.  It's not a crime of murder or harm or

23   attempt to cause harm to a person.  It was a wrong support of

24   bad people.  Second, I look at what not only he did in his

25   life before he became involved with the website and Azzam

1    Publication, but I also look at the last ten years of his

2    life.  As I said, unless one believes that Mr. Ahmad is

3    engaged in the charade, which I do not believe, I doubt that

4    I could have had the open heart and the lack of anger which

5    he evidences here today and he has evidenced throughout the

6    ten years in custody.

7         That's not to say he wasn't upset that he was being

8    sought to be extradited.  He wasn't unhappy about his

9    circumstance, but as measured in the correspondence he

10   maintained and the communications he had with his family and

11   his friends, people he sought out to support in times of

12   need, they all inform my judgment that this is a good person

13   who does not and will not seek in the future to harm other

14   people.  Even people who are different than himself.

15        I guess finally, although I often get some letters

16   of support from people in support of a defendant and they are

17   almost always very positive about the person, I must say that

18   the outpouring that I received on behalf of Mr. Ahmad and the

19   nature of what they said and the examples that they cited and

20   the history they told of Mr. Ahmad, both before he was

21   incarcerated and after he was incarcerated, all of that

22   supports this Court's judgment that he's not likely to engage

23   in criminal activity again.

24        In my view, and I don't profess to have tremendous

25   amounts of insight in this respect, but I think someone else

1    has, indeed himself, may have used the expression that

2    colored by his experience in Bosnia and his view of things

3    after that experience, and caught up in what was happening in

4    the world, in Afghanistan and with bin Laden, and the world's

5    view against this Islam state known as the Taliban, that he

6    lost his way.  In my view, I think he lost sight of what I

7    understand to be basic Islamic principles.  He lost sight of

8    those and that those that he professed to be his beliefs.  I

9    think if -- and again, I -- you know, this is really two

10   cents, it's not even worth two cents, but it's my two

11   cents -- I think he got caught up in the concept that Muslims

12   were struggling around the world, but unfortunately lost

13   sight of and intended to help Muslims who were engaged in

14   very bad conduct which, in my opinion, has nothing to do with

15   Islam.

16          In my view, these people -- Islam was hijacked by

17   Osama bin Laden.  And the banner of Islam was waved to

18   justify what he did and to engage in unspeakable acts, which

19   I am persuaded this defendant believes has no place in Islam.

20   As I said earlier, I think all terrorists wave the banner of

21   Jihad, but not all Jihad is terrorism.  I think that the

22   terrorists, those who have acted out against this country,

23   have done so by twisting and warping the Koran to provide a

24   false doctrinal support for Jihad, terrorist Jihad, against

25   people like Americans and around the world.

1          It's my conclusion that this defendant does not

2     subscribe to those views.  If I'm wrong, then I have failed

3     in my job today.  I do believe that there was a time,

4     approximately 2000 to 2002, when Mr. Ahmad wrongly supported

5     the Taliban.  He did so at a time when he knew the Taliban

6     was protecting Osama bin Laden and Al-Qaida.  And he did it

7     at a time when he had to have known that eventually what

8     Osama bin Laden and Al-Qaida had done.

9          So I don't mean in any way to suggest that he hasn't

10    done something wrong, and therefore doesn't have to pay a

11    price for what he did wrong.  At the same time -- and my

12    sentence will reflect that.  At the same time, the sentence

13    must consider, and principally does, his history and

14    characteristics, which, as I say, drive me to the conclusion

15    that the likelihood that he would ever engage in anything

16    like what brings him before this Court is small.

17         Mr. Ahmad, I would ask if you would please rise,

18    sir, so that I might impose sentence.

19         It's the sentence of this Court to impose upon you a

20    period of incarceration of 150 months on Count 1, and 150

21    months on Count 2 to be served concurrently with credit for

22    time served from December 2 to December 9 of 2003, and from

23    August 5, 2004 until today.

24         With respect to a period of supervised release, the

25    Court imposes a period of five years on Count One and five

1    years on Count Two to be served concurrently.

2         The Court imposes no fine because it finds you

3    cannot pay one.  The Court imposes no restitution because I

4    do not find it applicable, or if it is applicable, none has

5    been proven or sought.

6         The Court imposes a special assessment on Count One

7    of $100 and $100 on Count Two for a total of $200.

8         With respect to the period of time designated to the

9    Bureau of Prisons, it's strongly recommended to the Bureau of

10   Prisons that you be designated to MCI in New York City to

11   facilitate the agreed to transfer of supervision of your

12   sentence, or what remains, to the United Kingdom.  If you are

13   not designated to MCI, the Court strongly recommends you be

14   designated to either a minimum or medium security facility

15   all in keeping with your safe keeping.

16        With respect to the period of supervised release,

17   it's my understanding that you have agreed to supervision as

18   required under U.K. law when you return to the United

19   Kingdom.  I'm going to impose conditions of supervised

20   release, however as they would apply if you were here.  The

21   Court imposes the standard conditions of supervised release

22   as well as the mandatory ones, that you not commit another

23   crime, you not unlawfully possess a controlled substance, you

24   pay the special assessment I have imposed, and you cooperate

25   in the collection of a DNA sample.

1          Further, the Court imposes the following special

2    conditions:  That you be subject to your person, residence,

3    office or vehicle to search conducted by a probation officer

4    at a reasonable time and in a manner based upon reasonable

5    suspicion of contraband or evidence of a violation of a

6    condition of release.  Failure to submit to that search may

7    be grounds for revocation of your supervision.  The defendant

8    shall warn any other residents or occupants that the premises

9    or vehicles may be subject to search pursuant to this

10   condition.

11         Second, the defendant shall provide the probation

12   officer with access to requested financial information.

13   Third, the defendant shall not possess ammunition or a

14   firearm or other dangerous weapon.  And fourth, as directed

15   be the probation officer, the defendant shall notify third

16   parties of risks that may be occasioned by the defendant's

17   criminal record or personal history and shall permit the

18   probation officer to make such notifications and to confirm

19   the defendant's compliance with the same.

20         Is there anything about the sentence, Ray, that's

21   unlawful or that I overlooked?

22         THE PROBATION OFFICER:  No, your Honor.  I know you

23   intend to address appellate rights.

24         THE COURT:  I'll do that in a moment.

25         MR. WARD:  Your Honor, a couple of things, if I may.

1    The facility in New York is actually MCC.

2              THE COURT:  Thank you.

3              MR. WARD:  I would ask the Court to please make --

4    in addition to the judgment, that says that all time spent in

5    United Kingdom custody was in relation to these charges, and

6    that you intend he should have credit for that time.

7              I think that's it, your Honor.  Thank you.

8              THE COURT:  All right.  Is there anything that the

9    government wishes to comment on or add?

10             MR. MILLER:  No, your Honor.

11             THE COURT:  Anything further, Attorney Ward, from

12   you?

13             MR. WARD:  No.  Thank you, your Honor.

14             THE COURT:  Mr. Ahmad, you have the right to appeal

15   a sentence that's imposed by this Court.  However, I believe

16   that you gave up your right to appeal the sentence I have

17   just imposed because it's below the limits that you agreed to

18   waive your right to appeal.  However, if you think you gave

19   up your right to appeal without knowing what you were doing

20   or because someone forced you to do so, you can try to

21   appeal.  I would urge you to speak to your counsel today if

22   you wish to consider an appeal.  If you do, to tell them or

23   direct them to file a notice of appeal.

24             The reason I urge you to do that is because the time

25   to file such a notice is very short.  It will be 14 days from

1    today.  If it isn't filed by then, then it's as if you never

2    filed it at all.  It can't be extended at that time.

3         Do you understand the short period of time to have

4    the Notice of Appeal filed in the Clerk's Office?

5         THE DEFENDANT:  I understand, your Honor.

6         THE COURT:  There is one other matter, the clerk

7    advises me that the motion to preclude the unreliable

8    evidence having to do with the deposition of the cooperating

9    witness, Number 175, is still pending.  I think I'm going to

10   terminate that as moot.  I have addressed various aspects of

11   his testimony.  I think I indicated last Friday that I didn't

12   intend to rule on the motion, per se, and I would address it

13   as I made my findings.

14        Is there any objection to proceeding that way?

15        MR. MILLER:  No, your Honor.

16        MR. WARD:  No, your Honor.

17        THE COURT:  Anything else that needs to be addressed

18   with respect to Mr. Ahmad?

19        MR. MILLER:  Not from the government.

20        THE COURT:  Are there counts to be dismissed?

21        MR. MILLER:  Pursuant to the plea agreement, your

22   Honor, the government moves to dismiss three and four of the

23   indictment as they pertain to this defendant.

24        THE COURT:  With respect to the government's oral

25   motion, the Court grants the motion to dismiss the remaining

1  counts in the indictment which I believe are numbered three

2  and four.

3        Is there anything else, Ray?

4        THE PROBATION OFFICER:  No, your Honor.  I know it's

5  clear that the sentence imposed is a nonguideline sentence.

6        THE COURT:  It is a nonguideline -- I departed under

7  Fernandez, but obviously it's below that.  So it is a

8  nonguideline sentence based upon consideration of all of the

9  3553(a) factors, which I think I discussed fully.

10        THE COURT:  Is there anything further?

11        MR. WARD:  No.

12        THE COURT:  I would like to thank the probation

13  officer for all of the time he spent on this matter, and I

14  thank counsel for all of their help in helping me reach a

15  judgment in this case.

16        The Court imposed a sentence of 150 months on each

17  of Count One and on Count Two to be serve concurrent.  I

18  previously indicated that that is with credit for time

19  served, including all time spent, not only in the United

20  States, but also in the custody of the United Kingdom in

21  relation to these charges, the dates of which I understand to

22  be December 2 of '03 to December 9 of '03, and August of '05,

23  2004 to the present.

24        It's this Court's view and its understanding in

25  imposing sentence reflects its view that Mr. Ahmad will

1    receive credit for that time which the Court estimates,

2    including good time credit, to be approximately 137 months.

3    I'm not -- the Court does not expect to be held to the

4    precise calculus, but it wishes anyone who should decide to

5    read this transcript to understand that the sentence of 150

6    months is reflective of the approximate ten years Mr. Ahmad

7    has been in custody and recognizing that good time credit is

8    earned in connection with time served.

9             I think that completes Mr. Ahmad's case.  I don't

10   know whether he wishes to stay -- I'm going to proceed to

11   take up Mr. Ahsan at this time.

12            THE COURT:  You wish to be relieved and go back to

13   New York?

14            MR. DRATEL: I have a train.

15            THE COURT:  You don't like Connecticut, I guess.

16            MR. DRATEL:  It's been great.

17            THE COURT:  There's -- nobody needs to stay.

18            I need to know, or the marshals need to know what

19   you are doing.

20            MR. WARD:  We would like to stay, your Honor.

21            .

22            THE COURT:  All right.  I am prepared at this time,

23   unless the parties wish to address the issues further, to, in

24   effect, state what my findings are by of way of reference to

25   the PSR and to the defendant's version.  Obviously, I will

1    give you an opportunity once I have done that to object.  But

2    if you wish to be heard before that, now is the time.

3         MR. REEVE:  Thank you, your Honor.  I would only

4    indicate that we obviously have been here and heard your

5    Honor's findings, and I'm not requesting that your Honor make

6    additional findings or go through every paragraph of the pre.

7    Obviously, if your Honor feels like that's a necessary step,

8    I'm not saying otherwise.  I just think that your Honor's

9    findings, in a large part, are applicable here.  Obviously,

10   your Honor has some different findings with respect to Mr.

11   Ahsan's specific conduct, but in terms of addressing all the

12   paragraphs, I would just simply accept the findings that your

13   Honor has made with respect to Mr. Ahmad's case insofar as

14   they apply to Mr. Ahsan.

15        If that expedites the proceeding, fine.  If it just

16   complicates it, I withdraw it.

17        THE COURT:  Does the government have a view?

18        MR. MILLER:  I agree with Mr. Reeve.  If the most

19   expeditious way is maybe to reference the other proceeding so

20   that Mr. Lopez can amend the PSR, then address findings that

21   are unique to this defendant.

22        I agree with Mr. Reeve, whatever is simplest.

23        THE COURT:  I didn't do it that way, so it's not

24   simple for me.  What I will do is, Mr. Lopez made a separate

25   PSR.  It doesn't line up exactly with the paragraphs in the

1    first PSR.  Then Attorney Reeve made his version, which, of

2    course, isn't anywhere near like the version of Mr. Ahsan's

3    counsel.  So I'm inclined to do what I did the first time

4    around.

5              So this is what I'm going to do.  I adopt the cover

6    page with respect to Mr. Ahsan's PSR except for the date of

7    the sentencing should be today's date.

8              I adopt Paragraphs 1 through 5, except for Paragraph

9    2 should be changed to reflect today's date.  I adopt

10   Paragraph 7 except it should read that, from about early

11   2001, not from at least 1999.

12             Similarly, I adopt Paragraph 8 only insofar as it

13   would read from approximately 1999 through September -- to

14   mid 2002 Ahmad and others supported the Taliban, including

15   indirectly their protection of Al-Qaida because the Taliban

16   was protecting Al-Qaida by conspiring to provide and

17   providing various assistance and seeking support for the

18   same.

19             Paragraph 9 is adopted except that the word "Jihadi"

20   is stricken in the second line.  And the names of the

21   websites Azzam and Qogaz .net should be added.  The Court

22   adopts Paragraph 10.  The Court adopts Paragraph 11 beginning

23   with the word Ahmad and other members of Azzam Publications,

24   it does not adopt the first sentence and the beginning of the

25   second.

1          Paragraph 12 should read that Ahmad and his

2     associates made efforts to secure additional equipment, cold

3     weather camouflage, combat uniforms for Chechnya, and GPS

4     devices, Kevlar helmets, ballistic devices, none of which

5     appear to have made it to Afghanistan or Chechnya.  And

6     satellite phones and laptops preloaded with encrypted

7     software.

8          13 is adopted.  15 is adopted as amended, another

9     individual joined and was a member of Azzam Publications.

10    The language designed in part to groom and recruit

11    individuals to be sent to train and fight violate Jihad

12    abroad is stricken.  The next sentence would read, the

13    individual went to Afghanistan to train for the Jihad, and

14    there he subsequently received and observed several other

15    individuals from Tooting.

16         The rest of the next three lines is stricken.  I

17    would adopt the sentence that individual observed Ahsan down

18    to the words medical care.  The rest is stricken and not

19    adopted.

20         Paragraph 18, 19, 20, 21, 22, 23, is adopted.  24 is

21    adopted with the introductory statement that its provided for

22    background only and that Mr. Ahsan was not involved at the

23    times recounted here.

24         Paragraph 25, 26, 27.  Again, 28 is provided for

25    background only, but adopted.  29 is adopted.  31 is adopted.

1    34 is adopted.  35, 36, 37, 38, 39, 40, 41 through 46, 47

2    through 51 through 55.  59 is adopted, as I find that was on

3    the website in early 2001.  60 is a adopted.  61 is adopted.

4    65 is adopted.  66 through 72 is adopted.  73 through 75 is

5    adopted except that the last sentence should read, as

6    previously stated, prior to providing the Battle Group

7    Document to Ahmad, Ahsan removed the original until metadata

8    and manually input a false name, John Green, as the author.

9    76, 77, 78, 79, 80 are adopted.

10        84 is adopted with the insertion to describe Hassan

11   Abu-Jihad "who sent the Battle Group Document was eventually

12   convicted."  85, 86, 87, 88 are adopted except the phrase

13   over 50 in 88 is not adopted.  89 is adopted.  106 is

14   adopted.  113 is adopted except that description of the

15   additional material should be (120 gigabytes).  Paragraph 15

16   is adopted except it should begin by reading, recovered from

17   Syed Talha Ahsan's room were three pages on loose-leaf paper,

18   obviously among others.

19        16 is adopted as amended as follows -- 116.  There

20   were 120 gigabytes of material found in Ahsan's possession

21   during the February '06 search of his residence.  The

22   material was highly organized, unusually organized.  Some of

23   the material referenced Jihad.  Some referenced violent

24   Jihad.  Some referenced what I would describe as moderate or

25   peaceful views of Islam.  Some referenced self or defensive

1    Jihad.

2           At this point I would insert the defendant's

3    Paragraph 56, which describes material found in his room,

4    which effectively rejects Al-Qaida's view of Islam as a

5    justification for terrorist acts.

6           The Court adopts 117, which is the letter to his

7    father.  The Court adopts 120 as background because it

8    predates his involvement, but he was involved with the

9    publications that are mentioned there later on.  121, 126,

10   127.  The Court also as adopts the defendant's proposed

11   findings Paragraph 4 through 7, Paragraphs 10 through 11,

12   except -- it adopts the first sentence of Paragraph 10.  It

13   does not adopt the introductory language in Paragraph 11.  So

14   my 11 would begin, Mr. Ahsan agreed to assist Mr. Ahmad.

15          I also adopt paragraph -- sorry -- 48, except I

16   would amend it as follows, evidence of Mr. Ahsan's

17   involvement in criminal activity ended as of September 21.

18   And strike to the time of his arrest.

19          I would also adopt Paragraph 56, which I have

20   already mentioned, I believe.  Paragraphs 64 through 68.  And

21   there are more that the defense offers.  I'm only adopting or

22   finding certain of these as an example of what was found in

23   Mr. Ahsan's room being, I think, a broad spectrum of material

24   and not necessarily focused on one, and certainly not an

25   extremist focus on Jihad.

```
 1              I adopt 68, which -- with the following addition,
 2    Mr. Ahsan also had material in hard copy relating to various
 3    prospectus on the Islamist concept of Jihad, including copies
 4    of which are found in the library of the school he attended.
 5    The school where he Oriental and African studies at the
 6    University of London.  In addition, the Court adopts
 7    Paragraph 80, 81, 82, and Paragraph 83 and 86.
 8              Further, the Court adopts Part B as to the lack of
 9    criminal history, which is up through Paragraph 150.  The
10    Court adopts all of the paragraphs in Part C without edit.
11    And the Court adopts Part D, sentencing options, Part E and
12    Part F.
13              With respect to the probation officer's evaluation,
14    the officer has indicated he wishes to amend his evaluation
15    at Paragraph 168.  The second sentence would be stricken and
16    would read instead, what isn't contested is that Azzam
17    Publications served to raise and provide material support to
18    the Taliban who supported Al-Qaida, a terrorist organization.
19              Then he would continue through the next sentence
20    unchanged.  Then he would edit the remainder of the paragraph
21    to read as follows: the probation officer, like defense
22    counsel, has reviewed the government's version of the offense
23    and relevant conduct and essentially agrees that the content,
24    specifically the Taliban postings available on the website,
25    cannot be discounted from the overall intent and purpose.
```

1    That is, to provide material support to the Taliban, who in

2    turn supported or protected Al-Qaida.  The parties agreed

3    that the defendants in this case cannot be directly connected

4    to any specific acts of terrorism.  However, the operation of

5    Azzam Publications was in support of the Taliban who

6    supported Al-Qaida and, as such, their efforts, meaning the

7    defendant's efforts, to raise money and material for the

8    Taliban renders them indirectly connected to Al-Qaida.

9    That's the probation officer's evaluation, Paragraph 188.

10          Paragraph 90 has been amended to delete the first

11   sentence and to delete up -- delete the second sentence and

12   the beginning of the third regardless, and to continue the

13   beginning of 190 would be to begin with, the Court is

14   required to sentence the individual.  Other than that,

15   there's no further changes.

16          Are there objections by the government to the

17   findings made as -- oh, I'm sorry.  There's one other finding

18   I wanted to make.

19          I intended to insert after Paragraph 129, which I

20   believe is a place -- well.  I intended to assert the

21   following finding, the cooperating witness testified that

22   when Mr. Ahsan traveled to Afghanistan, he was described by

23   Ahmad on an encrypted disc as naive.  He, the cooperating

24   witness, was asked to take care of him.  That's Mr. Ahsan.

25   The cooperating witness also testified that Mr. Ahsan was not

1   particularly skilled at the matters being taught at the camps

2   that he attended, which the Court finds were not Al-Qaida

3   camps.  He was not suited to the work in the view of the

4   cooperating witness, the work of the camps.  The cooperating

5   witness also testified that Ahsan did not support Al-Qaida or

6   its terrorist actions against civilians.  And unlike the

7   cooperating witness, Mr. Ahsan did not join Al-Qaida.

8           I know that we are going to mix the record up, but I

9   actually meant to mention in sentencing Mr. Ahmad, that I was

10  relying in part on my judgment about what might happen with

11  respect to Mr. Ahmad in the future upon the matters we

12  discussed on the classified record yesterday.  And the

13  comments that are reflected in that record, which I cannot

14  repeat here today, as to his lack of involvement in certain

15  things.

16          The same, of course, can be said about Mr. Ahsan,

17  although that was not particularly said about Mr. Ahsan in

18  those classified materials, but the cooperating witness said

19  it about Mr. Ahsan.

20          I think the last thing I have to reference in

21  connection with the facts that I have just found is in the

22  classified materials.  There's a reference to Mr. Ahsan in a

23  certain time period that relates to a paragraph that I found

24  as to Mr. Ahsan.  And the Court is mindful of that in

25  considering that finding.

```
 1            Sorry that's so cryptic, but that's what happens
 2   with classified material, you can't talk about it.
 3            Is there objection by the government to the facts as
 4   found by the Court by adoption of certain of the Presentence
 5   Report paragraphs and certain of the defendant's paragraphs?
 6            MR. MILLER:  No additional objection other than
 7   what's already stated, your Honor.
 8            THE COURT:  Attorney Reeve.
 9            MR. REEVE:  Your Honor, I'm not sure it's an
10   objection, but I guess I would ask for a clarification.  Your
11   Honor had alluded to the date of September 21.  There was no
12   year when you referred to that.  I think I misheard it.
13            THE COURT:  Did I mean to say September 2001?
14            MR. REEVE:  I think you might have meant to say
15   September 1, 2001, but I hear September 21.
16            THE COURT:  Can you tell me the context, what was I
17   saying at the time?
18            If it relates to my finding of Mr. Ahsan's
19   involvement in the matters at issue in the case, I find that
20   he became involved with Azzam Publications and was responding
21   to people who were placing ads for materials as seen on a
22   website known as Azzam Publications from some time in early
23   2001, whether it's February or April, I'm not sure it matters
24   much, and it ended, I think, by agreement with the
25   government, no later than September 1, 2001.
```

1          MR. REEVE:  Thank you.  That clarifies it, and I

2     have no objections.

3          THE COURT:  Unless there's an objection, I think

4     what I'm going to do is what I did this morning with Mr.

5     Ahmad, which is a little different than the normal.  I

6     haven't heard quite so much from folks about Mr. Ahsan, but I

7     would proceed to deal with the guideline calculation and then

8     to talk about the factors before coming to a conclusion about

9     sentencing, then permit both sides to be heard.

10          Is that all right, or would you like to do a more

11     traditional approach?

12          MR. REEVE:  That's fine.

13          THE COURT:  First the Court needs to calculate the

14     guidelines.  And again, under 2X2.1 referring over to 2A1.5A,

15     a conspiracy to commit murder, the base offense level is 28.

16     Because of the nature of the crime and how it's characterized

17     under 3A1.4A, the enhancement for a crime of terrorism of 12

18     is added.

19          The officer -- the probation officer did not

20     recommend a minor role, but I am considering that.  And I

21     would ask if the government objects to the awarding of the

22     two-level reduction for a minor role?

23          MR. MILLER:  If your Honor is talking about the

24     calculation for the conspiracy count?

25          THE COURT:  I guess.

1          MR. MILLER:  There's no objection.  The operation of

2     the Azzam Publications, the defendant -- this defendant

3     clearly had a minor role.  No objection.

4          THE COURT:  So I am going to award a two-level

5     reduction, which results in a 38.

6          Does the government recommend acceptance of

7     responsibility and move for the third point of reduction?

8          MR. MILLER:  We do, your Honor.

9          THE COURT:  The Court agrees with the government,

10    that the defendant has accepted responsibility for his

11    offenses, and further finds that he pled guilty at a time

12    that allowed the government to avoid the expense of trial,

13    prosecution, and therefore awards and grants the motion for

14    the one-level reduction.  That results in a total offense

15    level of 35.

16          Once again, while the defendant has no criminal

17    history points, because of 3A1.4B, he's automatically placed

18    in a Criminal History VI.  And if I'm correct, I believe a

19    level 35, Criminal History VI results in a guideline range of

20    292 to 365 months.

21          However, I believe that based upon the offenses of

22    conviction that Mr. Ahsan pled to, that the maximum penalties

23    total 15 years.  And therefore, the guideline sentence

24    becomes 15 years.

25          Is there any objection or gently suggested

1    correction of the Court in that respect, that I made a

2    misstatement?

3              MR. MILLER:   That's exactly correct, your Honor.

4              MR. REEVE:   No, your Honor.   Thank you.

5              THE COURT:   We have a guideline sentence of 15

6    years.

7              For those of you who have been here since this

8    morning, you are well aware, and I hope you are, too, Mr.

9    Ahsan, that it is my obligation to sentence you after

10   considering a number of factors that the law requires me to

11   consider, and it's my intention to do that now.

12             I'm going to start with the nature and circumstances

13   of your offense.   And as I view you, you served as a mail

14   clerk for Azzam Publications.   You did that from some time in

15   the first quarter, say, of 2001 until September 1 of '01.

16   And by mail clerk, you undertook the responsibility for Azzam

17   Publications of going to the mailbox, getting the orders,

18   filling the orders and dealing with whatever appeared in the

19   mailbox.

20             And indeed, one day something did appear in the

21   mailbox, I believe in April of 2001, and that is

22   correspondence from Mr. Abu-Jihaad and transmitting to you

23   what was or became what is known as the Battleship Group

24   Document.   I find that you were not an administrator of the

25   website.   I find you were aware of the website and what was

1    on it, and that you were assisting Azzam Publications in

2    furthering its work, but that you did not place anything on

3    the website.  And I don't think that you were involved, and

4    the government can correct me later, in answering e-mail.

5         You did possess a document that described

6    operational security.  And indeed in connection the

7    Battleship Group Document, you acted in a way which reflects

8    a view that you should treat this in a secure fashion.  I

9    will get later to the question of perhaps why you did that.

10   The Court also finds, although it's not really -- it wasn't a

11   crime, but it certainly tells me something about the nature

12   and circumstance of what you did, you traveled to

13   Afghanistan.

14        You carried with you an encrypted disc from Mr.

15   Ahmad.  You attended training camps, although I specifically

16   find they were not run by Al-Qaida.  You did not sympathize

17   with Al-Qaida.  You didn't want to fight for Al-Qaida.  You

18   were taken to the front, although I don't find that that was

19   voluntary on your part.  You certainly didn't fight in

20   Afghanistan.

21        In my view, I think you went there to fulfill what

22   you viewed as a religious obligation, but that you didn't

23   intend to engage in the fighting that took place there.

24        I hope I haven't offended you, but as I have said on

25   several occasions, it doesn't appear that you were very good

1   at this terrorist camp training or camp training and that you

2   were, and it's not surprising given your age, fairly naive

3   about things.  You did go a second time, but apparently not

4   much occurred there because of an illness.

5           So I guess in sum, the nature and circumstance of

6   your offense is that you provided, you aided, you supported

7   Azzam Publications and their websites at a time when they

8   were supporting the Taliban, which I have already gone on a

9   great length about what was wrong with supporting the

10  Taliban, even up to September 1 of 2001.  For example, the

11  document that was posted, I believe, in February of 2001,

12  it's what can you do for the Taliban, I think is the name of

13  it, but it seeks money for the Taliban, to support the

14  Taliban, to fight with the Taliban in their fight.  And at

15  that time, the Taliban was affirmatively protecting Osama bin

16  Laden, who, at least by the summer of 2001 when you were

17  still supporting Azzam Publications, had been identified and

18  indeed in a recruiting video, was taking credit for terrorist

19  acts.

20          I need to spend a little bit of time on the

21  Battleship Document.  Again, I view that the person who sent

22  that document to have an extremely high degree of

23  culpability.  He owed a duty to his country to safeguard that

24  information, and he did not.  Indeed he placed it in the

25  hands of, mistakenly in my view, people he thought would do

1    something with it because of the nature of the videos that

2    you were offering.  It arrived in the mailbox and in your

3    hands, Mr. Ahsan, unsolicited.

4            I truly believe you never expected to open that

5    document and find what you found.  You then, rather oddly,

6    spent ten days typing it up.  I am not really sure what all

7    of that is about, whether that relates to your mental health

8    issues, or your mental issues, your attention to detail,

9    which is evidenced in your materials organized in your room,

10   whether it was you were just busy with other things and you

11   didn't get around to it.  I really don't know.  You also

12   changed the author's name to be other than you.  And you

13   affirmatively deleted metadata that would have shown things

14   about the document to anyone like the agent here, not to me,

15   but to people like that.  I really cannot draw any

16   conclusions about why you did that.  The government obviously

17   wants to argue that you knew how important this was, you

18   didn't want anybody to realize you had it in your possession,

19   it was a crime to possess it, even though you didn't solicit

20   it.  That's why you took all of these steps.

21           What I draw from it is that -- and there's part of

22   it that I can't draw anything from, whether it's your

23   excessive compulsive behavior that led you to do certain

24   things, I don't know.  What I do know is that neither you or

25   Mr. Ahmad did anything with the information in the document.

1    To me, that tells me something important, which is that it

2    evidences that you had, and have, a nonviolent, I guess,

3    outlook on life.  If your view had been to be a terrorist, to

4    help Osama bin Laden, to join the violent Jihad, shall we

5    say, in blowing up innocent people, and/or even in blowing up

6    a target of military might of the United States of America

7    like Osama bin Laden did with the Cole, you had within your

8    power, information that could have made that much more likely

9    to happen.  And yet what you did is you spent ten days to

10   type it up.  You then put it on a disc and apparently gave it

11   to someone, presumably Mr. Ahmad, because eventually it ends

12   up in his possession, but you certainly didn't give it to

13   anybody who made any use of it that can be seen.  No

14   operations were planned based upon it.  Nobody talked about

15   it.  There's no e-mails or anything that's suggesting that

16   was a great find for Azzam Publications and something they

17   would want to run with.

18            So to me actually, the Battleship Group, although it

19   sounds bad, I guess, I don't know what other word to use,

20   here you are in possession of classified military movement

21   information.  That's bad.  But the fact is you did nothing

22   with it.  In my view, the conclusion I draw is that that's

23   evidence that you never intended to be a part of what I will

24   call the false Jihad of terrorism.

25            I also will conclude my discussion of nature and

1    circumstance of what you did by saying what you didn't do.

2    You never engaged in any violent actions.  You never spoke

3    about, other than the letter to your father, which I will get

4    to a moment, which I'm not sure if it would fall into this

5    category, about engaging in any violence, certainly not any

6    terrorist activities.  You didn't engage in any planning for

7    any of those things.  You did not support the bombings at

8    9-11 or the July London subway bombings.  Indeed, before you

9    were arrested, you are on record as denouncing them.

10          The question then becomes, sir, what is the need for

11   your sentence?  As I have already said to Mr. Ahmad, I start

12   with really the seriousness of what you did because only in

13   that way hopefully will I come to a just punishment.

14          There's really two aspects to analyzing that.  Your

15   support of Azzam Publications and the website given what they

16   were doing in '01 vis-a-vis the Taliban is serious.  Your

17   involvement with that, however, was quite limited.  You were

18   not involved in posting things.  You didn't write things.

19   You didn't choose what went up on the website.  I think what

20   the government would say at this point, and I would agree

21   with them, is you associated yourself with Azzam

22   Publications.  And therefore, in effect, vouched for or stood

23   with those beliefs because you helped them to continue to

24   operate and to exist.

25          But it has to be recognized that you did it for a

1    very limited period of time.  That to the extent the

2    government -- and rightly so, I think, when after Mr. Ahmad,

3    as to what he did after mid 2001 and after 9-11, which makes

4    his crime much more serious than Mr. Ahsan's -- that wasn't

5    the case with Mr. Ahsan.  Even his limited involvement ends

6    in September of 2001.

7         The posting I mentioned, I think it went up in early

8    '01, that would have been on at the time that Mr. Ahsan was

9    supporting the Azzam Publications I think is, what can I do

10   to help the Taliban, I think, if I have that correct.

11        I guess Mr. Ahsan left his engagement with this

12   activity before 9-11, but the seriousness of what he did,

13   even if his role was as minor as I've already said it is, is

14   evidenced by -- and this is where Attorney Reeve's comment

15   comes in -- is that there's a consequence to even this minor

16   role played in support of a website and a publications

17   organization that call for support of a Taliban, which in

18   turn allowed Al-Qaida to exist and to then do what it did in

19   September of 2001.

20        Again, please don't misunderstand me, Mr. Ahsan is

21   not responsible for the World Trade Center, not by a very

22   long shot.  But as was said on a posting on the website,

23   everybody can do their little bit will add up to advancing

24   the cause.  And I guess what I would say is, Mr. Ahsan did

25   his little bit.  It was relatively minor, even as compared to

the Mr. Ahsan, and certainly minor compared to people who

actually sent money in large amounts to the terrorist or who

actually went to fight with the terrorists or who actually

became the terrorists.  But I guess just because there are

more heinous versions of the crimes that Mr. Ahsan pled

guilty to, doesn't mean that his crime is not a serious one.

The next need for the sentence is deterrence.  I've

already articulated my view of the general deterrence here of

what I would call true terrorists I think is probably zilch.

As to people like Mr. Ahsan, I think there is some measure of

deterrence if they were to hear of what happened to him based

upon the nature of his conduct.

As to deterring Mr. Ahsan, or the other factor is

really the flip of that, protecting the public from further

crimes by Mr. Ahsan until he is deterred, I will address in

connection with my discussion of his history and

characteristics.

As for treatment, it would be my intention to add a

provision for that in his supervised release conditions.

If it is all right with everyone, I would adopt what

I discussed about the guidelines in these kinds of cases as

well as what I discussed about cases generally in comparing

sentences that have been imposed in other cases from Mr.

Ahmad's sentencing to here, if that's all right with

everyone.

1          MR. REEVE:  Yes, your Honor.

2          MR. MILLER:  Yes, your Honor.

3          THE COURT:  I would really just say the same thing,

4     other than in this particular instance, again, I don't find

5     the guidelines helpful.  I don't think that the government

6     found them helpful because the government has permitted the

7     defendant to plead to a maximum sentence of 15 years when the

8     guidelines indeed are approximately 25 years to 30 years.

9          And I think also in searching for cases that would

10    be comparable to Mr. Ahsan, I have had difficulty finding

11    any.

12         Turning to his history and characteristics.  Mr.

13    Ahsan was born in the London.  Again, he's also a first

14    generation Brit.  His family was educated and caring and hard

15    working.  He was brought up in a religious home.  He has, and

16    continues to have, support of his family, who unfortunately

17    are unable, I believe, to be with him today.  But it's clear

18    from the letters that I read and the materials that I

19    received, the videos, et cetera, that he's very much still

20    supported by his family.

21         Mr. Ahsan was a very good student, very intelligent.

22    He took his exams and attended, again, like Mr. Ahmad, a very

23    prestigious college.  What we would call high school, but

24    college, from the ages of 11 to 18.  He then went on to study

25    at the school of Oriental and Asian Studies at the University

1   of London.  Graduating with a bachelor's in 2004.

2        He studied abroad to advance his skill and

3   understanding of Arabic in Damascus.  Then went for one year

4   in pursuing a master's in linguistics, which he did not

5   complete, which I understand because he decided it was not

6   the area of study he wished to pursue.  He was married but is

7   divorced and has no children.  He has worked at various jobs

8   in his young life.  He worked for such things as a telephone

9   survey company and a security guard while he was in school.

10  He has done private tutoring.  He's volunteered at human

11  right organizations.  And most particularly has worked for

12  his father in his business, which is, I would call,

13  forwarding agent or shipping company.

14        Prior to his arrest, he was pursuing and interested

15  in becoming perhaps a librarian.  Since he has no criminal

16  history prior to the arrest in this case, while in prison he

17  worked.  And also while in prison, he was a model prisoner.

18  He's been in custody for approximately eight years.  Has

19  received no violations.  I would, again, comment that he's

20  conducted himself in a way which reflects well upon him while

21  in custody.  I'm not sure that, I, myself could have

22  conducted myself that way.

23        He also applied for and completed the same course

24  that Mr. Ahmad completed.  Dr. Sharkawy's course in which he

25  was described as a good student.

1            Mr. Ahsan has had some mental health issues.  I'm

2     not going to repeat them on the record.  They are described

3     in the Presentence Report, which I have adopted in Paragraphs

4     160 to 162.  He does have some conditions and has suffered

5     from some conditions in the past.  Indeed I will reference

6     material from the classified proceeding which has some

7     bearing in terms of time on the matters before the Court

8     today.

9            I will not draw a conclusion about the risk of

10     recidivism until I hear from both sides, in particular about

11     the letter to his father.  There's other things to talk

12     about, but that in particular.  But I would say other than

13     that letter, there is no sign that Mr. Ahsan's view of what

14     is Jihad in an Islamic sense should be equated with

15     terrorism.  There is no evidence that he adopted beliefs of

16     people who believe in terrorism, attacks on civilians.  In

17     fact, his own writings speak out against the attacks on the

18     civilians in the tubes in London.  He disagreed with 9-11.

19     He felt that was wrong.  He's rejected the views of Al-Qaida.

20            While the government focuses on materials in his

21     room which have what I would call violent Jihadist content,

22     it sounds like his room was packed full of material, period.

23     He had material of all kinds of views.  And I would say that

24     certainly in the months going up to the time of his arrest,

25     to the extent they are reflected in his personal, private

 1   journal, they indicate a man who is interested in his poetry

 2   and writing poetry, who is a moderate person who has peaceful

 3   views, and that -- who is appreciating the fact that he's

 4   being recognized and meeting with people who regard his

 5   talent as a poet highly.  Indeed he has won a prize for his

 6   poetry while incarcerated.  He has been encouraged in prison

 7   by noted authors for his work in poetry.  I have to say, I

 8   was a chemistry major and I wasn't a poet, by any means, Mr.

 9   Ahsan, but I found your poetry to be quite good.  I don't

10   know if you should take that as a compliment or not because I

11   really have no talent to judge it, but I particularly was

12   struck by the poem that you wrote about the prisoner and the

13   guard.

14        In all, you appear and strike me as a man who is

15   sensitive and curious, intelligent and talented.  And as I

16   say, there are many letters in support of you as well who

17   speak about you and your character as one which is not

18   violent and not aligned with the views of people who are

19   violent.

20        I think at this point, I would stop and ask if the

21   defense would like to address the Court, or would the

22   defendant like to address the Court.  Defense counsel.

23        MR. REEVE:  Thank you, your Honor.  I want to first

24   say that Mr. Ahsan will not be addressing the Court today.  I

25   think that when he wrote his letter, we had lengthy

1   discussions with him.  I think as a result of his mental

2   health issues, but even more so his personality, there's a

3   vast difference between Mr. Ahmad and his extroverted

4   personality and ability to stand up in front of a large group

5   like this.  It's just something that Talha has indicated to

6   us from the outset, he just doesn't feel like he can do.

7           So when he wrote that letter, he spent many, many

8   hours.  And I have to say that sometimes I find myself in a

9   situation where I have asked a client to write a letter, and

10  I might travel to Wyatt or Northern and the letter is not at

11  all what I had hoped that they would say.  That's not the

12  case here.

13          What Mr. Ahsan said, I think, describes and defines

14  who he is.  And looking at it last night, Pages 7 and 8 where

15  he addresses the offense, I think he talked about the nature

16  of his offense in a far more elegant -- eloquent and focused

17  way than his attorney did yesterday afternoon at the close of

18  business.

19          THE COURT:  Can you give me just one second, please?

20          Go ahead, sir.  Sorry to have interrupted you.

21          MR. REEVE:  Thank you, your Honor.

22          My goal today is going to be to speak on his behalf,

23  and to say some of the things that I know he would want to

24  say.  I should note, your Honor, you referenced his family.

25  His parents are not here.  His brother, Hanja, is here, and

1    has been here during all of the three days of the sentencing

2    proceedings.  He flew into New York about ten days ago.  So

3    he's here.

4         You heard from his parents in a very short video.

5    You did not hear from his mother, who was present on the

6    video.  She can't really talk about this case without

7    breaking down.

8         Before I address a few issues, I wanted to first

9    just address two issues that are somewhat perhaps unrelated,

10   but I think related to Mr. Ahsan in this proceeding, and I

11   think what he would want me to say.

12        Today, putting aside the last two days of hearings,

13   today is, in my judgment, an extraordinary proceeding.  I

14   have sat and I have listened.  And it's interesting that this

15   case started, in essence, with a website.  And I would ask

16   the Court to consider posting the entire transcript of

17   today's proceedings on the Court's website.

18        The Court and your Honor indicated earlier that

19   there is a plethora of information out on the internet.  What

20   happened here is an extraordinary process.  I don't think --

21   Mr. Ahmad talked about he didn't know what to expect in an

22   American courtroom.  I don't think he understands fully,

23   because he hasn't been in other American courtrooms, how

24   exceptional today is.  And so I know that Mr. Ahsan would

25   want me to thank the Court and I do.

1          The other, if you will permit me, your Honor, to

2     digress just a moment.  This is kind of a milestone in our

3     office.  This is the last case that Attorney Balakrishnan

4     will be working on.

5          THE COURT:  That's unfortunate.

6          MR. REEVE:  It's tragic.  It won't be his last case.

7     It will simply be his last case with us.  There's a reason,

8     your Honor, that Mr. Balakrishnan is sitting next to Talha.

9     And it's because there's no way that I could have done this

10    case and handled this entire situation without him.  He's a

11    silent during this proceeding, but absolutely an

12    indispensable and critical member of the defense team.

13    Government counsel knows it.  I think your Honor might be

14    aware of it, but I want to say it.  I can't thank him enough,

15    and I know that Talha cannot thank him enough.  He's spent

16    far more time with Talha than I have.  He has met with all

17    the witnesses in England.  He has met with Mr. Ahsan's

18    family.  I wanted to go back to England.  My schedule did not

19    permit me to do that after the deposition, but he stayed and

20    he talked to people there.  And his experience mirrored the

21    experiences of Attorney Ward in terms of all the people that

22    he spoke to.

23         I also think it would be remiss on my part if I did

24    not, on Talha's behalf, thank Elizabeth McLoughlin, who is

25    and has been in court every day of these hearings, who is

1    noticeable by her red suit coat today.  She has put an

2    unbelievable amount of time into this case.  She's made it

3    possible, literally possible, for Talha to not just tolerate,

4    but to thrive in Northern.  She has seen him on almost a

5    daily basis.  Your Honor knows we could not get the 6

6    terabytes or whatever the quantity of discovery into the

7    facility.  We could get none of it there.  But we did, and

8    she did it.  And we and Talha are forever in her debt.

9         And the fact of the matter is, the individual seated

10   next to her is the federal defender's computer person.  I

11   don't think any of us could have gotten here without his

12   assistance.  He has assisted both offices.  I know Talha

13   thanks him for that.

14        I want to address three issues with respect to

15   Talha.  One is, why is he here?  The second is who is he and

16   where is he going?  And the third are very specific, concrete

17   aspects of the sentencing that I am going to ask the Court to

18   impose today.

19        I think it's important, your Honor, and I think the

20   Court knows it, but I want to say this.  There are very good

21   and very legitimate reasons why Mr. Ahsan, law enforcement

22   reasons, why Mr. Ahsan is present today.  You referenced Abu

23   Jihad as a traitor.  And he was a traitor.  And the first

24   lead in this case was who is the first person in England who

25   touched the document?  And it was Mr. Ahsan.  No one, no one

1    would fault the government for focusing on him.  It was

2    appropriate at the time, and we all understand why he's here.

3    There are no villains in this case.  There's no one good side

4    and one bad side.  There are two sides who have fought hard

5    through a long, sometimes torturous process, but we have done

6    it.  And we have all made mistakes during that process, each

7    and every one of us.

8          What happened in this case is, I think, that as the

9    onion was unpeeled, as the evidence was looked at, as

10    everyone struggled through the massive amount of discovery

11    materials, as everyone struggled, as I certainly did, with

12    the applicable law.  What are the limits of 2339A.

13          THE COURT:  Not much to the limits of the statute.

14          MR. REEVE:  I think that's right.  But it's a black

15    hole, and the case law is all over the map.

16          THE COURT:  It's the law.

17          MR. REEVE:  It's impossible to figure out what it

18    is.  We would sit down in the office and say what does this

19    statute really mean?  And we'd take it apart.  I have to say,

20    I'm as ignorant today as I was at the start of this case in

21    terms on what it is.  There's scholars all over --

22          THE COURT:  I am, except that I understand that what

23    your client admitted he did is a crime under that statute.

24          MR. REEVE:  Absolutely, your Honor.

25          THE COURT:  Which I don't know that I would have

1    known that before this case.

2          MR. REEVE:  I think that's right.  I think it took

3    us awhile to reach that point, and to really grasp and

4    understand that.  And we all understand it, and that's why

5    he's entered a guilty plea here.  That's why he's come

6    forward and he said, I did what I did, and I understand why I

7    am here.

8          When the case is unraveled to its essence, I'm not

9    going to go into the facts.  Your Honor has summarized them.

10   I agree with the Court.  I think it's fair to say, Mr. Ahsan

11   had a relatively minor role in a serious offense at a time

12   when he was very young.

13         The only issue about the evidence I'm going to

14   address is the letter to his father because I think it's

15   taken us a while to get to having an understanding.  And even

16   yesterday, I think I was thrashing at times and with --

17   trying to explain it to the Court.  And I don't pretend to

18   fully explain what's inside anybody's head, let alone my own.

19         THE COURT:  On its face, it appears to be very

20   carefully written.  As I commented about the nature of his

21   printing on it, it's a deliberate writing.  It's postdated,

22   suggesting that at the time he planned to go fight, I

23   presume, in Afghanistan in the fall.  That's what it appears

24   on its face to be.

25         MR. REEVE:  I think that's right, Judge.  And I

1    think I agree.  And I think the reality in this situation is

2    that it was a very dark time, as all the evidence shows, in

3    Mr. Ahsan's life.  That he had just recently gone through a

4    divorce, and that he was quite depressed at the time.

5            The letters from his very closest friends that

6    follow our first submission to Mr. Lopez after Talha's own

7    letter, I think speaks volumes.  I should say speak volumes

8    about Mr. Ahsan's mental condition at that time.

9            THE COURT:  I would also, and this time I won't

10   forget, to reference the classified record that relates to

11   this time.

12           MR. REEVE:  I was just going to refer to that, your

13   Honor, you took the words out of my mouth.

14           THE COURT:  That's an answer, Attorney Reeve, but

15   then that poses another question for me.  I know you are not

16   done, but I have to cut you off.

17           You know, it's a dark time.  He struggled with some

18   mental health issues.  When he has his next dark time, you

19   know, is he also going to think about going -- I don't know

20   where you go today, Syria, Iraq, I don't know, and fight

21   against anybody who wants to be killing Muslims?

22           MR. REEVE:  I was going to go there, and I

23   appreciate the Court's inquiry.

24           I think what might not be clear from all the

25   paperwork is that finally during this time, Mr. Ahsan did

1    reach out for help.  He did receive counseling.  He did move

2    in a positive direction through the support of his family.

3    He did address some of those issues.  He did get better and

4    his actions around the time shows that process.

5         We have spent a great deal of time with him talking

6    about -- this is independent from whatever the Court can

7    force him to do when he's in England -- but what does he need

8    to do to make sure that if he has a dark moment, he gets the

9    help he needs?  He has the support of his family on it.  He

10   is willing and understands that he needs support on that for

11   exactly these circumstances and this situation.  And I'm

12   convinced he will do that.

13        I also think we have to be mindful of the fact that

14   sometimes writing something down in a journal shows us how

15   foolish our ideas are.  And I suggest to the Court that

16   that's part of the process of the creative writing process.

17   That's why so many people write in autobiographical ways.  I

18   am not saying this is a piece of fiction.  I am not

19   minimizing the importance.  But I think in his life, it had

20   something of a cathartic effect.

21        Now can I say, your Honor, was it kind of me

22   thinking this way, in almost a suicidal way, like this is the

23   way, you know, in the country we have suicide by bank

24   robbery.  Somebody goes in to a bank and they are hoping that

25   their life will be ended.  It happens.  Whether that was in

1     any way part of Mr. Ahsan's thinking, I can't prone the

2     depths that deeply.  What I can say is he's evaluated it.  He

3     understands exactly what he needs to do to stay out of

4     trouble.  I believe, although I agree with Attorney Miller

5     that none of us have a crystal ball.  I believe that he will.

6     And I believe that the Court can rely upon his actions

7     subsequent to that letter, but also his actions before, and

8     reach that conclusion.

9            The question of who he is and where he's going.  I

10    think the letters and especially the four letters that follow

11    Mr. Ahsan's say it better than I can.  I think he has an

12    incredible amount of talent in a creative way.  Like you, but

13    probably even worse than you, I'm not an expert in poetry.

14    But it's clear to anybody who reads his poetry, and it's been

15    clear to experts, that he has talent.  He's continued to

16    develop that talent.  I think he would make an extraordinary

17    librarian.  I think he has an opportunity to take over his

18    father's business and to relieve his elderly parents of some

19    of the burdens that his own actions have placed on them.  He

20    had and will step to the plate on that.  I think there's so

21    many ways he can go with his life.  I think when you look at

22    his beliefs and the evolution of those beliefs, there's a

23    fairly consistent thread through all of the materials and

24    everything we know about him, which is he's open-minded.  His

25    beliefs have evolved.  He has grown a great deal from the

1    time he was in his teenage years and in his very early 20s

2    when he was involved in this.

3            I have already addressed the mental health issue,

4    and I'm not going to go back to that.

5            Your Honor, I have asked the Court in this case to

6    impose a sentence of credit for time served.  I am making

7    that request now, but I want to address some specifics that

8    are of concern to me, with specific reference to Mr. Ahsan

9    all of his personal circumstances and characteristics.

10           I agree with the Court, I'm not sure I could survive

11   and grow in the manner that Talha Ahsan has.  And I have only

12   known him at Northern.  Attorney Ward talked about Northern.

13   I agree.  I don't know if your Honor has been there --

14           THE COURT:  I have not.

15           MR. REEVE:  It's worth going.  I'm going to describe

16   to you --

17           THE COURT:  I have seen videos of prisoners being

18   moved at Northern.  I have seen the cells, but I have not

19   visited.

20           MR. REEVE:  When you enter, you go up in an elevator

21   after you get through all of the security.  When you get off

22   the elevator, you are in a metal, aluminum hall.  It has a

23   regular concrete floor, but all sides are silver, and it

24   descends.  It descends down.  When you get to the end of that

25   corridor, at a very bowels of Northern, you take a right.

1        When you take a right, you get in to the death row

2   unit now.  The death row unit used to be on the left.  Now

3   it's on the right.  But it's exactly the same.  That's what I

4   think Attorney Ward was talking about.  When you walk in,

5   when you are in the visitor room, you are in a glass box.

6   You look out and the only way I can describe Northern is it's

7   like -- you know, the amusement park thing you enter, the fun

8   place, but it has all of these mirrors and reflections and

9   you don't know what's real and what's not.  That's Northern.

10  You can look out and you are seeing mirror images of things

11  but you don't know if what you are seeing is real, or if what

12  you are seeing is a mirror reflecting what's behind you.  It

13  was all constructed in that way to be as disorienting as

14  possible.  It is -- I don't know, I don't think this is

15  intentional, but because it's underground and because of the

16  nature of the heating system, it's freezing in there in the

17  wintertime, and it's hot in the summer.

18        I don't think anyone will -- who works as Northern,

19  will ever forgot the fact that in June, July and August,

20  Betty McLoughlin came in with winter gloves.  That's how she

21  came in to the prison because there's no way not to have

22  gloves on and survive three or four hours there using the

23  keyboard.  You can't do it.  We all bring sweaters in there

24  in the wintertime.  We have to wrap ourselves.  There's a

25  great deal of both, I think, intentional and unintentional

1    sensory deprivation, but he survived.

2         If your Honor imposes now credit for time served,

3    which I hope the Court is going to consider, and I hope your

4    Honor will do it, because I think it's a proper delineation

5    between the roles in the case.  If your Honor does that and

6    just says credit for time served, it's going to result in Mr.

7    Ahsan going to at least three more federal prisons after

8    Northern, and this is why.

9         He was brought here by law enforcement airplane and

10   in a secret way.  And he was dropped into the United States.

11   That's the one and only time he's ever been in the United

12   States.  When he now reaches the end of his sentence, he will

13   have to go through what I understand is a removal process by

14   ICE.  He can agree to that process, but he has to go into a

15   federal facility.  And ICE has one or two facilities in the

16   country where he'll go.  And then they will order him

17   removed, and he will be flown back to England.

18        If the Court just says credit for time served,

19   between that prison and Northern, he will go to two more

20   prisons.  He will first be moved to the MBC in Brooklyn.

21   Then he would be transported to whatever facility the Bureau

22   of Prisons says.  I know that sounds crazy because you are

23   looking at me and you are thinking, if I give him credit for

24   time served, it's done.  It's not done.  And with apologies

25   to the Court and apologies to the government, as we were

1    preparing for this, Attorney Balakrishnan contacted someone

2    we have been in touch with who is in the Federal Defender's

3    Office in New York.  I provided an affidavit.  I wish I had

4    provided it to the government many days ago.  I apologize for

5    that.  I wish I had provided it to the Court.  We just got it

6    yesterday.

7              I'm just going to summarize it, then with the

8    Court's permission, I will give it to you.  She's worked on

9    cases, she indicates, involving approximately 54 nationals.

10   What happens because the Bureau of Prisons -- and under the

11   Supreme Court case, it's their exclusive determination as

12   your Honor knows about credit for time served -- when there's

13   time spent in a foreign prison, the Bureau of Prisons

14   conducts it own due diligence investigation separate from

15   anything the U.S. Attorney's Office will say, separate from

16   anything the Court says, separate from anything that I will

17   say.  They will reach out to the English authorities.  They

18   will find out, in whatever way they can, which sometimes

19   takes months and months, was Mr. Ahsan getting credit on some

20   other pending case.  So even though this Court could impose

21   credit for time served, it's going to result in his

22   incarceration for a period of time.  But in addition, he's

23   going to have to adjust to three separate new prisons.  And

24   so what I'm asking the Court to do, and I would submit the

25   affidavit.  Again, your Honor, with apologies that it hasn't

1    gotten to the Court earlier with the thousands of pages that

2    you have received.

3         THE COURT:  I haven't read it carefully.  I had this

4    conversation with Ray this week.  But I have to tell you, I

5    struggle.  I don't understand, if the United States District

6    Court says the sentence is time served, in the past tense,

7    how the Bureau of Prisons can keep him in custody other than

8    to turn him over pursuant to a detainer that I presume they

9    have because he's not in this country legally.  I will use

10   that word loosely since he was brought here by legal

11   authorities, but he has no right to remain here.

12        I guess you will have to explain that to me other

13   than, I guess, if this affidavit explains, that it's a

14   practical matter that that's what happens.

15        MR. REEVE:  It does explain what the Bureau of

16   Prisons does.  I guess I would agree with the Court, some

17   things the Bureau of Prisons does are inexplicable, but they

18   do them.  We could all turn blue --

19        THE COURT:  We could issue a writ and have the

20   marshal here go out and serve it the Bureau of Prisons' head

21   to come and answer why he's possessing Mr. Ahsan when the

22   sentence is completed.

23        MR. REEVE:  We could do that.  Except then the civil

24   division of the U.S. Attorney's office might get involved and

25   their obligation is to defend the Department of Justice,

1  including the Bureau of Prisons, that's the work that they

2  do.  And they would come in and say that Mr. Ahsan, as

3  Attorney Ward said earlier, has not exhausted his

4  administrative remedies, and until such time as he exhausts

5  his administrative remedies, you have no jurisdiction.

6          THE COURT:  I understand the problem with credit --

7  let me finish.

8          MR. REEVE:  I have a solution.

9          THE COURT:  All right.  You go ahead.

10          MR. REEVE:  I'm sorry.  I cut you off.

11          THE COURT:  No, you are compelled to go ahead, so go

12  ahead.

13          MR. REEVE:  If your Honor -- we all know he's been

14  in prison for now eight years and one month, about, since

15  early July.  A little over eight years.  Obviously, the Court

16  is taking that time into account, but if the Court imposes a

17  sentence of, for example, 21 months.  He's been in the United

18  States more than 21 months.  We all know that he's being

19  sentenced on the basis of all of his time, but then all it

20  would take is verification from the marshals, in whose

21  custody Mr. Ahsan has been to the Bureau of Prisons,

22  indicating that there have been no other charges on which

23  he's been held.  It's the same as credit for time served.

24  Now I understand it might say in the newspaper, you know,

25  Judge Hall slapped somebody's wrist.  I understand.  And I

1       would only refer your Honor back to the comments you made at

2       the beginning of this process.  I think it's the right thing

3       to do in this case.  And what it would accomplish is that Mr.

4       Ahsan would immediately, or very shortly thereafter, go into

5       the custody of ICE.  He would still have more time in the

6       United States, but we could try to expedite that.  He'd go to

7       one facility, and he'd be on a plane as soon as we can

8       arrange it to England.

9              I think that's the only way to get around it.  Is it

10      crazy?  It's crazy, Judge, I agree.  But I think it's right,

11      it's proper and everybody in this courtroom understands what

12      would happen.  And I guess that's one of the other reasons I

13      think I would ask the Court to place this entire transcript

14      in the public record.  So that if there is questions, people

15      can read about this and understand.  Because believe me, it

16      would be an invaluable lesson.

17             It would be great if the Hartford Courant would

18      publish this entire thing, but they won't.  But that's what I

19      think.  The only solution I can come up with that gets us to

20      where I hope the Court wants to be.

21             So I appreciate the Court's time and attention

22      throughout this proceeding, as does Mr. Ahsan.  And we all

23      thank you.

24             THE COURT:  Everything you've just said about the

25      time served problem and your affidavit, it seems to me, is a

1    problem that apparently Attorney Ward and Attorney Barrett

2    are going to wrestle with in getting Mr. Ahmad full credit

3    for all of the time he has been in custody.

4         But I don't understand, if the judgment says that

5    the defendant is sentenced to term of "time served," that the

6    Bureau of Prisons has any other option but to release the

7    defendant.  He has certainly served a day at Northern in the

8    custody of the United States on a United States matter.  If

9    they want to view it as that's the same served.  Whatever it

10   is that they calculate, however they could spend years

11   deciding what time he served, at the end of the day, the

12   judgment says he served it.

13        I'm reading this affidavit, and I don't have the

14   time to read it carefully, but I'm not sure it relates to a

15   situation of a sentence of time served versus, for example,

16   the sentence I gave to Mr. Ahmad.  If I give Mr. Ahsan a

17   sentence like I gave Mr. Ahmad, which is for a certain period

18   of time and I leave it to Bureau of Prisons to calculate

19   it -- I actually had this discussion with Ray, is whether it

20   would be better and fairer if I just did the arithmetic and

21   entered a sentence which was X months with no credit for time

22   served, but I was persuaded that wasn't better.  But I don't

23   see how if the sentence is a time served sentence the Bureau

24   of Prisons ever has to think about, let alone calculate,

25   credit.  I'm missing something.

1          MR. REEVE:  I agree with the Court.  May I have a

2   moment?

3          THE COURT:  Sure.  I don't know who is in the

4   courtroom.  I don't think I see the U.S. Marshal.  The chief

5   deputy.

6          MR. REEVE:  Attorney Sheehan was trying to get my

7   attention.  We got some clarification.  I think the marshal

8   could address the Court if -- better than I can.

9          THE COURT:  He may not want to.  He might want to

10  have Brian here.

11         MR. REEVE:  I can paraphrase --

12         THE MARSHAL:  Your Honor, I have been a marshal for

13  23 years.  It's the way -- the way it's always worked in our

14  office is if a judge sentences time served, that's done.  We

15  call whoever has the detainer on him.

16         THE COURT:  So you go to immigration.

17         THE MARSHAL:  We would call immigration, we turn him

18  over to immigration.  If you were to make a date

19  determination, as in months, at that point the judgment needs

20  to be entered  --

21         THE COURT:  They do the calculation.

22         THE MARSHAL:  We have gone through this with Judge

23  Chatigny.

24         THE PROBATION OFFICER:  Just to add to the record,

25  my experience has been exactly the same for the past 24 years

1    in sentencing.

2            MR. REEVE:  And I must say, Judge, mine, too.  But I

3    haven't had a situation where there's -- most of the time is

4    the foreign time.  That's my concern.

5            I made things more complicated, as is my usual way,

6    so I accept the representation.  I stand corrected.  And I

7    think I would ask your Honor simply to impose that.

8            THE COURT:  I should say, though, in the event I was

9    not clear enough, I mean, I said it.  And I said it again at

10   Attorney Ward's request.  But my view of Mr. Ahmad's sentence

11   is that he has already served just shy of 120 months.  And he

12   has, I'm pretty sure, earned good time credits of

13   approximately 17 months.  So in my view, the sentence I

14   imposed on him today calls for him to serve an additional 13

15   months with some credit for time served.  And if served in

16   England, whatever it is they do as far as parole over there,

17   although I gather they are carrying out my sentence.

18           So if he were here in the United States, my view is

19   that he'll serve approximately one more year.  Now, it's not

20   my judgment to make that.  But if anybody thinks that that's

21   the sentence I should impose so that there's no question with

22   the Bureau of Prisons, I will do that.  Making clear that I'm

23   not sentencing him to 13 months in time.  I'm sentencing him

24   to 150, but he effectively has 13 more months to serve.

25           MR. WARD:  That -- that sounds fine to me, your

1   Honor, to do what you just said.

2           THE COURT:  Does the government have a view?  I

3   mean, obviously you are not concerned that the Bureau of

4   Prisons is going to get this right, but I have to say I am.

5   And I think that the fact that the defendant fought

6   extradition, nonetheless, he served time in prison for no

7   other crime than the one he's pled guilty to here.  And while

8   he was at a home in England, it doesn't sound like he was in

9   a camp facility, either.

10          MR. MILLER:  I think we all need to take a step

11  back.  I completely disagree with Mr. Reeve's 20 month

12  suggestion.

13          What the Court should do is sentence each defendant

14  to a term of incarceration appropriate for the crime.

15          THE COURT:  Right, that's what I'm trying to do.

16          MR. MILLER:  If you sentence -- I think you did

17  appropriately in terms of the way you placed the sentence

18  with Mr. Ahmad.  You said 150 months with credit for time

19  served in England.

20          THE COURT:  I listed the dates.

21          MR. MILLER:  If you -- and I would like a chance to

22  be heard on the sentencing advocacy issue with Mr. Ahmad.

23  But with Mr. Ahsan, he served, I think, 96ish months,

24  something like that.  Is that right, Mr. Reeve?

25          THE COURT:  He served eight years minus a few days

1    plus credit for time served.

2            MR. MILLER:  So if you were going to impose a time

3    served sentence, one way of doing it is today, I sentence you

4    to time served, which is 96 months, or whatever the right

5    time is.  I think the defense is concerned they are not going

6    to get time for credit in England, which the government -- we

7    said in the plea agreement and would stand by it, the

8    government believes they should.

9            The other caveat here is what we're forgetting, is

10   that some time, some place, in another courtroom another

11   judge is going to be looking at cases just like you did, your

12   Honor, and trying to reconcile why somebody who did what Mr.

13   Ahsan did got 20 months, and won't be able to figure it out.

14   That's not appropriate under 3553(a).

15           MR. REEVE:  Judge, I complicated this more than it

16   needs to be.  I'm confident that what the marshals have

17   represented to the Court is correct.  And I suspect --

18           THE COURT:  That works if I impose a time served

19   sentence.

20           MR. REEVE:  I suspect that Attorney Schwartz'

21   affidavit, and I haven't spoken with her directly, relates to

22   cases where the Court imposes a specific amount of time and

23   then says to be credited, as in, for example, Mr. Ahmad's

24   case.  But where the Court simply says, credit for time

25   served, I do agree that there's no exercise of discretion or

1    authority on the part of the Bureau of Prisons, that's what

2    the marshal is saying.

3            So, again, I apologize for complicating it unduly.

4            THE PROBATION OFFICER:  I would just add real quick,

5    your Honor, with respect to Mr. Ahsan.  I think the Bureau of

6    Prisons would prefer you just say time served.  That leaves

7    no question whatsoever as to what the finality.  If you said

8    time served which amounts to 96 months, they might look at

9    that as a 96-month term that needs to be computed.

10           Then with respect to the PSR, on the face sheet, has

11   in parenthesis official detention.  We talked about that.

12   And talked about the statute that commands the Bureau of

13   Prisons to apply what's termed "official detention," any

14   pretrial detention as a result of the offense that hasn't

15   been applied to any other sentence.

16           So we discussed having confidence in the statutory

17   provision, that the Bureau of Prisons couldn't do anything at

18   all with the time and detention in the U.K but to apply it to

19   his sentence.

20           THE COURT:  Okay.  Are you finished with your

21   advocacy on behalf of Mr. Ahsan?

22           MR. REEVE:  I'm more than finished, your Honor.

23           THE COURT:  For the government.

24           MR. MILLER:  Just very briefly, your Honor.

25           With respect to Mr. Ahsan, in some ways it's an

1    easier case, in some ways it's a more difficult case.  Your

2    Honor concluded, appropriately, I think what you said about

3    Mr. Ahsan is when he went to the camp twice in Afghanistan,

4    once he made it, the second time he got sick, you were not

5    very good at that.  That's exactly what the cooperating

6    witness said.  The government believes what the cooperating

7    witness said.  And you are affirming that, what the

8    cooperating witness said.  That's a fact that I think there's

9    ample evidence to find.

10           The troubling fact here is the letter.  And

11   Mr. Reeve is in a tough place.  You asked him twice, I don't

12   think he's been able to answer it either time.  Your Honor

13   picked up immediately on certain aspects of the letter, which

14   is why we introduced it as an exhibit yesterday.  You said

15   this was a deliberate writing that was postdated.  It is.

16   And it's striking when you look at it in that book.  The book

17   has been described as a creative writing journal.  The

18   letter, even juxtaposed to the very next page, is very, very

19   different.  That book is a functional document.  There's

20   diary entries in addition to creative writing in there.

21           The letter is -- I don't know what to make of it,

22   Judge, but you're appropriately troubled by it.  It's

23   factually accurate.  It's neatly written.  There's no

24   crossouts.  It's not a draft.  I guess you could conclude he

25   either did it perfectly the first time, or it was a document

1    that was a final document.  It's clearly postdated.  It's

2    expressing his sincere beliefs.  It talks accurately about

3    what he's done.  He's been to the land of Jihad.  He found --

4    someone died in his arms, I think is what he says.  And then

5    when he says at the end, after condemning the events in July

6    which are the terrorist attacks in the U.K., I add

7    practically at the mistakes of the Mujahideen and this Ummah

8    do not equal all the policy and cruelty and callousness of

9    America and those of her alliance of crusaders and their

10   actions upon the Muslim world.

11        This letter was written somewhere between July of

12   2005 and February of 2006, probably late in 2005.  And this

13   defendant is clearly less culpable, significantly than Mr.

14   Ahmad.  His sentence should clearly be less than the Court

15   imposed on Mr. Ahmad.

16        But this is a factor I think the Court needs to

17   consider in terms of imposing what is an appropriate sentence

18   in this case.

19        THE COURT:  Thank you.  What I haven't done in

20   discussing the factors, which I have principally addressed

21   them, I have not addressed the issue of the likelihood of

22   recidivism or the need of individual deterrence of Mr. Ahsan.

23        Given the nature and circumstances of what he did,

24   he was a young man, he helped in the mail room, in effect.

25   He's certainly not likely to recidivate in the sense that the

1    guidelines place him in a Category VI.  It reflects a very

2    high likelihood of recidivism.  He's not that person.

3         The letter to his father is troubling, mostly

4    because I think it does reflect struggles that he has had

5    with mental illness.  I don't mean that he's mentally ill.

6    I'm not using the right words because I'm trying to avoid

7    being more specific and revealing more of things that I'm

8    sure he wishes would remain private.

9         But his experiences during his life and struggling,

10   it's quite clear that he has, in his young life, passed

11   through many periods of what I will call darkness,

12   depression, whatever other word you want to put on it.  I

13   reference the material in the classified record, as well as

14   in the letters that I received on behalf of Mr. Ahsan, that

15   this likely was what was going on with him in the 2005, 2006

16   period.  At least early 2006.

17        It appears that he pulled himself out of that as

18   evidenced by the paperwork that supports his statements and

19   his recountings of how he was thinking of applying for

20   graduate school again, or perhaps he would become a librarian

21   and had applied for and was seeking positions to be trained

22   as a librarian.  People were encouraging him that this would

23   be a good activity for him.  That he was active in attending

24   literary events, seeking out people who had interests similar

25   to his own creative interest that way, looking for

1    encouragement of those activities.  All of that is very

2    positive.

3         What's concerning is, you know, what happens when

4    the next dark moment comes.  Will you be someone susceptible

5    to be used by a person for things which you disavow now, but

6    which might make more sense to you as perhaps they did when

7    you wrote the letter to your father.  I'm going to take --

8    and I believe that your family and friends are, as they are

9    for Mr. Ahmad, they are for you and to support you when you

10   return to England.  I will add as a condition of supervision

11   and hope that it will be respected by the U.K. authorities in

12   their supervision of you, that you receive mental health

13   treatment and counseling as is appropriate and needed for

14   you.

15        I don't think it's in your nature to, as we use a

16   legal criminal term, recidivate here, to go and do again what

17   you did when you were 19 and 20 years old, but I do worry

18   that to the extent you struggle with depressive periods, that

19   at those times things might look different to you.  But I

20   don't see that as a reason to conclude that you will

21   recidivate, particularly if you receive appropriate treatment

22   and support.

23        I think in sum, the sentence I'm about to impose

24   upon you, Mr. Ahsan, reflects the fact that you involved

25   yourself with what I view as very serious conduct.  You had a

1   minor role in it.  You were really at the edges of it, but

2   you did assist and support it.  You did it.  It was --

3   everything you did was done before 9-11, which also tends to

4   testify to the fact that your involvement was of a less

5   serious nature.

6        You were very young at the time.  And in my view,

7   your culpability is low.  While I understand why the Battle

8   Group Document was viewed so seriously, and particularly in

9   my view, from the side of the person who provided it given

10  his position.  In my opinion now, today, in -- I have lost

11  track of the date -- July something 2014, in this courtroom,

12  what it proves to me is that you never intended to, never

13  planned to, never wanted to be involved in what I call

14  invalid or terroristic Jihad because you did nothing with it.

15  Nothing was done with it.  You didn't allow anything to be

16  done with it in the sense that if someone had acted on it

17  outside of yourself, you would have been responsible for

18  having created it, but no one did.

19       You also, in effect, withdrew from what you were

20  doing, which is something I need to consider in the nature

21  and circumstances of what you have done.

22       Balanced against that, in my opinion, is the most

23  significant other factor present is your history and

24  characteristics.  You've otherwise lived a law-abiding life.

25  You have pursued your education seriously.  You have done

1     quite well.  You're intelligent.  You had a positive and

2     well-meaning life other than the struggles that you had,

3     which are mentioned in the Presentence Report.  Those aren't,

4     shall we say, your fault.  You have just struggled with them.

5             You strike the Court as a gentle person.  A person

6     who can write poetry.  It's certainly a different person than

7     I am.

8             I do hesitate because I'm concerned, and I would

9     hope that you would be sensitive to the fact that you might

10    be easily influenced by others.  And you should, I hope now

11    at the age of 30, understand that there are consequences and

12    you have to make your own choices.  And that you have to

13    think about consequences when you make those choices.  But

14    it's clear to me you have other interests now.  You are older

15    now.  And I don't see you in any way involved in anything

16    that could smack of terrorism or material support of conduct

17    which we describe as terrorism.

18            I would ask if you would please rise, sir.  Based

19    upon those considerations, the Court imposes the following

20    departed sentence, not a guideline sentence, or even departed

21    guideline sentence, but a variance.

22            The Court imposes upon you in connection with Count

23    One and Count Two, a sentence of time served to run

24    concurrently.  Just -- not to go in the judgment, but to

25    reflect my judgment, it should be understood on this public

1  record that I equate that to be together with the time you

2  have been incarcerated as well as credit for what would be

3  good time.  You have served approximately 110 months.  It's

4  my judgment that while you associated yourself with something

5  that was serious conduct, that sentence reflects it.

6  Therefore the judgment will read that you are sentenced to a

7  sentence of time served.

8         The Court imposes a period of supervised release of

9  three years on each of Counts One and Count Two to be served

10  concurrently.

11         The Court imposes no fine because it finds you

12  cannot pay one.  The Court imposes no restitution because

13  it's either not applicable or it's not been sought.

14         The Court imposes a special assessment of $100 on

15  each of Count One and Count Two for a total of $200.

16         With respect to the period of supervised release,

17  it's my understanding that you have agreed to be supervised

18  by the United Kingdom and under their protocols, but in that

19  respect, the Court would impose its own conditions of

20  supervised release as follows:  One, that you would comply

21  with the standard conditions of supervised release as well as

22  the following mandatory conditions:  You not commit another

23  crime.  You not unlawfully possess a controlled substance.

24  You pay the special assessment I have imposed, and you

25  cooperate in the collection of a DNA sample.

1        Further, the Court imposes the following special

2   conditions:  One that you be provided mental health

3   treatment, either in or outpatient as would, in this

4   instance, be determined by the probation office.  That you

5   would pay all or a portion of the cost associated with that

6   treatment based upon your ability to pay.

7        Second, you will provide the probation office with

8   access to requested financial information.  Third, that you

9   will submit your person, residence, office or vehicle to

10  search conducted by a United States Probation Office at a

11  reasonable time and in a reasonable manner based upon a

12  reasonable suspicion of contraband or evidence of a violation

13  of a condition of release.  Failure to submit to the search

14  may be grounds for revocation and the defendant shall warn

15  any other resident or occupant that the premises or vehicle

16  may be subject to search pursuant to this condition.  Next,

17  the defendant shall not possess ammunition, a firearm or

18  other dangerous weapon.  Lastly, the defendant shall, as

19  directed by the probation office, notify any third parties of

20  the risk that may be occasioned by your criminal record or

21  personal history and characteristics and permit the probation

22  office to make such notification and to confirm the

23  defendant's compliance with such notification requirement.

24       Is there anything about the sentence that's unlawful

25  or that I have overlooked?

1          THE PROBATION OFFICER:  No, your Honor.

2          MR. MILLER:  No, your Honor.

3          MR. REEVE:  No, your Honor.

4          THE COURT:  Is there a motion to dismiss the

5    remaining counts against Mr. Ahsan?

6          MR. MILLER:  Yes, your Honor.  The government moves

7    to dismiss Count Three as it pertains to this defendant.

8          THE COURT:  The government's oral motion to dismiss

9    the remaining counts as to this defendant is granted.

10          Mr. Ahsan, you had a right to appeal your sentence,

11    but I believe you waived it when you pled guilty in light of

12    the sentence I have just imposed.  So I don't think you have

13    a right, but if somehow you think you were forced to give up

14    that right or you didn't understand what you were doing, then

15    you can try to appeal.  I would urge you to speak to any one

16    of your lawyers and to consult with them about what you

17    should do about trying to appeal.

18          I would urge you to do it promptly because the time

19    to appeal is very short, only 14 days from today.  If you ask

20    them to file a Notice of Appeal, they will do so for you, but

21    it's a very short time.

22          Do you understand that you only have 14 days to file

23    such a notice?

24          THE DEFENDANT:  Yes.

25          THE COURT:  I guess apropos of the deputy's

1    comments, where do you think Mr. Ahsan would go now that he's

2    subject solely to the ICE detainer?

3              THE MARSHAL:  It is my understanding that our

4    standard procedures are to call immigration and have them

5    come and pick him up.  Where they take him from there --

6              THE COURT:  It's out of your control and my control,

7    right?

8              THE MARSHAL:  Yes.

9              THE COURT:  Is there anything further?

10             MR. REEVE:  Nothing, your Honor.

11             MR. MILLER:  No, your Honor.

12             THE COURT:  I think -- Terri, would you go and at

13   the end of the Ahsan proceeding transcript, I would like you

14   to enter the following?

15             THE COURT REPORTER:  You mean Ahmad?

16             THE COURT:  Ahmad, I'm sorry, at the end of the

17   Ahmad sentencing.

18              (The following two paragraphs were inserted on page

19   113.)

20             The Court imposed a sentence of 150 months on each

21   of Count One and on Count Two to be serve concurrent.  I

22   previously indicated that that is with credit for time

23   served, including all time spent, not only in the United

24   States, but also in the custody of the United Kingdom in

25   relation to these charges, the dates of which I understand to

```
1   be December 2 of '03 to December 9 of '03, and August of '05,
2   2004 to the present.
3        It's this Court's view and its understanding in
4   imposing sentence reflects its view that Mr. Ahmad will
5   receive credit for that time which the Court estimates,
6   including good time credit, to be approximately 137 months.
7   I'm not -- the Court does not expect to be held to the
8   precise calculus, but it wishes anyone who should decide to
9   read this transcript to understand that the sentence of 150
10  months is reflective of the approximate ten years Mr. Ahmad
11  has been in custody and recognizing that good time credit is
12  earned in connection with time served.
13       MR. WARD:  Your Honor, I think when you asked the
14  court reporter to go to the end transcript --
15       THE COURT:  I know.  She corrected me.  She knows.
16  If you didn't hear it, I'm sorry, but she fixed it.
17       MR. WARD:  Again, your Honor, just that language
18  that all time spent in custody has been in relation to these
19  charges.
20       THE COURT:  I think I said that already, if I
21  didn't, I repeat it.
22       MR. WARD:  Thank you.
23       THE COURT:  Is there anything further?
24       MR. WARD:  No, thank you, your Honor.
25       THE COURT:  I thank all of the counsel.  I thank the
```

1    court staff especially, and we'll stand adjourned.

2              (Whereupon, the above hearing adjourned at 03:31

3    p.m.)

4

5

6

7

8

9    COURT REPORTER'S TRANSCRIPT CERTIFICATE

10   I hereby certify that the within and foregoing is a true and

11   correct transcript taken from the proceedings in the

12   above-entitled matter.

13

14   /s/  Terri Fidanza

15   Terri Fidanza, RPR

16   Official Court Reporter

17

18

19

20

21

22

23

24

25